Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
Steve A. Papazian, Bar No. 288097
steve@ruttenbergiplaw.com
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorneys for Plaintiff Cadence Design Systems, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CADENCE DESIGN SYSTEMS, INC., *a Delaware Corporation*,<br><br>Plaintiff,<br><br>v.<br><br>SYNTRONIC AB, *a Publikt Aktiebolag*, SYNTRONIC RESEARCH AND DEVELOPMENT USA INC.*, a California Corporation*, SYNTRONIC (BEIJING) TECHNOLOGY R&D CENTER CO., LTD.*, a Chinese Corporation*,<br><br>Defendants. | Case No. 3:21-cv-3610-SI (JCS)<br><br>**PLAINTIFF CADENCE DESIGN SYSTEMS INC.'S OPPOSITION TO SYNTRONIC BEIJING'S MOTION FOR RECONSIDERATION**<br><br>Magistrate Judge: Hon. Joseph C. Spero |

**INTRODUCTION**

Chinese law does not prevent Defendants from complying with their discovery obligations or the Court's Order. Defendants have not met their burden to show a "true conflict" between the Court's April 15 Order and Chinese law and their Motion for Reconsideration should be denied.

Syntronic Beijing claims that China's Personal Information Protection Law ("PIPL") bars Syntronic Beijing from complying with the Court's April 15 Order. Relying on cherry-picked language in Article 39 of the PIPL, Syntronic Beijing now contends that each and every employee who used the 24 computers at issue must expressly consent to the transfer of those computers to the U.S. Not so. As explained below, other provisions in the PIPL list exceptions that are (obviously) applicable here. Indeed, the Chinese legislative office that drafted the PIPL concludes that consent is not required to transfer data abroad if it is necessary to comply with a legal obligation—*i.e.*, the Court's April 15 Order. Syntronic ignores these other provisions. Tellingly, Cadence's Chinese counsel has investigated more than 2,000 enforcement actions for personal information violations in 2021 and 2022 and not one involved the transfer of personal information outside of China, much less pursuant to a court order.

Even if Chinese law somehow precluded sending the 24 computers to the U.S. (which it does not), this Court is not beholden to that law. Weighing the traditional comity factors, there are strong reasons for the Court to order that the computers be produced here regardless—these computers are critical evidence and may be the only direct evidence that Defendants have not yet destroyed.

Beyond the merits, Syntronic's motion is deeply flawed in a number of other respects. The PIPL was not even in effect when Plaintiff requested inspection of these computers or when Syntronic Beijing responded to that request. Defendants easily could have complied then, but they instead falsely represented that they did not have the computers.

Finally, conducting an inspection in China is not practicable. Setting aside that Syntronic fails to cite any authority for the Court to order discovery within the borders of China, Covid-19 complications would effectively preclude counsel of record and any U.S. based experts from participating in the inspection. The U.S. State Department cautions against travel to China with

serious risks of lockdowns, mandatory quarantines, and other Covid-19-related complexity. Inspection should occur in the United States, as ordered by the Court.

### ARGUMENT

As set forth below, Syntronic Beijing's foreign-law objection is both procedurally and substantively flawed. The Court correctly ordered Syntronic to ship 24 computers to the United States for purposes of inspection. Syntronic's latest objection is not only waived, but substantively wrong. Further, Syntronic's proposal to have an inspection in China is obviously unworkable and solves nothing. There is no reason for the Court to reconsider these issues from the April 15 Order.

**I.     Syntronic Beijing's PIPL Objection if Procedurally Flawed.**

Syntronic's new argument rests entirely on Article 39 of the PIPL, which they contend requires the consent of every employee who used the 24 computers before they can be shipped to the U.S. Even if that legal proposition were correct—it is not, *see infra*—Defendants have failed to preserve this objection for two reasons.

First, Syntronic Beijing's objections do not mention ***anything*** regarding the provision of the PIPL that it now relies on—neither the word nor the concept of "consent" appears anywhere in these objections. (Dkt. No. 140 at Ex. A). In fact, Defendants made no mention of the PIPL in their initial interrogatory and RFP responses. Instead, a single sentence in Syntronic Beijing's "General Objections" to Cadence's Notice of Inspection is dedicated to the PIPL, but even there, it is without any explanation: "China's [PIPL] restricts cross-border transfers of certain personal information and requires approval from Chinese authorities before providing such information to foreign judicial or law enforcement authorities." (*Id.* at 2). That is not even the objection Syntronic Beijing now raises—in fact, Defendants now concede that compliance with the Court's Order does not require approval from "Chinese authorities." (Dkt. No. 138 ¶¶ 18-19). As the Court previously noted, Defendants' other discovery responses only purported to raise Chinese law objections in supplemental responses. (4/15/22 Hr'g Tr. at 15:21-22). Even at the April 15, 2022 Hearing, the Defendants could not explain what provisions of Chinese law supposedly bar the discovery sought here, much less how. (*Id.* at 16:24-17:8). And the first time Plaintiff saw the specific objections raised by Defendants was

1  in the Motion for Reconsideration itself. The Court correctly stated at the April 15 hearing that this
2  objection was waived. (4/15/22 Hr'g Tr. at 18:1-3).

3  Second, when Syntronic Beijing responded to Plaintiff's discovery requests, the PIPL was ***not***
4  ***even in effect***. Defendant's Chinese counsel confirms this point. (Dkt. No. 138 ¶ 24 ("PIPL is a new
5  law that came into effect in November 2021 . . .")). Defendants served their responses to Plaintiff's
6  Notice of Inspection on October 19, 2021. (Dkt. No. 140 at Ex. A). Defendants served their responses
7  to Plaintiff's First Set of Interrogatories on October 26, 2021. (Dkt. No. 72-4). Had Syntronic
8  truthfully responded to Plaintiff's Notice and interrogatories, this entire PIPL issue would have been
9  avoided. Instead, however, Defendants falsely claimed that they did not have the computers at all.
10 (Dkt. No. 140 at Ex. A).

11 To be clear, the PIPL had been ***passed*** on August 20, 2021, so Defendants were aware of it.
12 They simply delayed providing the computers and information until the PIPL came into effect and
13 now they want to rely on it to bar this discovery. Defendants cannot now benefit from their false
14 assertions, putting the cost and complexity of reviewing these machines in China on Cadence. *See*
15 *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992) ("[I]f the
16 hardship is self-imposed, or if Beijing could have avoided it, the fact that it finds itself in an
17 undesirable position will not work against disclosure of the requested information.").

18 **II.  Syntronic Beijing's PIPL Objection Is Substantively Wrong.**

19 Syntronic's motion should also be denied because it is wrong on the merits. To wit, in the
20 current circumstances, Article 39 of the PIPL does ***not*** require Syntronic to obtain the consent of its
21 employees before shipping the computers to the U.S. Relatedly, no comity analysis is necessary but,
22 if applied, clearly favors production of the computers in the United States.

23 In essence, the computers that are subject to inspection are all ones that appear in the "phone
24 home" reports showing that Defendants (including these particular employees) used pirated versions
25 of Cadence Software. Defendants reformatted these computers—despite having notice of Cadence's
26 claim—thereby potentially destroying key evidence. Unsurprisingly, Defendants now contend that
27 the offending employees do not "consent" to having their computers inspected. Neither the PIPL nor
28 U.S. law require such consent.

### A. Article 39 of the PIPL Does Not Require Individual Consent Under These Circumstances.

The PIPL does not require "consent" when materials are provided to comply with legal obligations, including complying with discovery obligations and orders in U.S. litigation. Defendants and their Chinese counsel completely overlook this point in their submission. The motion should be denied.

To address issues of Chinese law, Cadence submits the Declaration of Mr. Xiaodong "Vincent" Wang, a Chinese and New York attorney with substantial experience in Chinese data security, personal information, and privacy laws. (*See* Declaration of Xiaodong "Vincent" Wang ("Wang Decl."), submitted herewith). As explained by Mr. Wang, the PIPL was enacted in 2021 to protect personal information rights for individuals located in the People's Republic of China. (Wang Decl. ¶ 11). For example, as explained by Mr. Wang, the PIPL puts tighter controls on the circumstances under which a party can collect and process personal information, articulates broad principles of openness and transparency, and seeks to protect the dissemination of inaccurate and/or misleading information. (*Id.* ¶ 13).

As relevant here, Article 13 of the PIPL sets forth the basic legal framework for when parties can process personal information. (*Id.* ¶ 14). According to this Article, a party can do so if (i) they obtain the consent of the individual, *or* (ii) their processing of the data is otherwise exempted under one of the six categories set forth in that Article.[1] (*Id.*) Examples of exempted activities include "human resources management," fulfilling legal obligations, and "respond[ing] to sudden public health incidents." (*Id.*). Consent is not required if an exemption applies. (*Id.*).

Article 39 of the PIPL—upon which Syntronic Beijing relies here—states that a party transferring personal information outside of China shall inform the implicated individuals of the transfer and obtain their consent. (Wang Decl. ¶ 15). However, Article 39 is still subject to the

---

[1] The exact language from Article 13 is as follows: "If, in accordance with other relevant provisions of this Law, processing personal information is otherwise subject to the consent of the individual, no such otherwise consent shall be necessary when such processing falls into one of the circumstances provided in Item 2 through Item 7 above." (*Id.* ¶ 14).

4
OPPOSITION TO MOTION FOR RECONSIDERATION

exemptions in Article 13, including the clear statement that "no . . . consent shall be necessary" if the information is processed pursuant to one of the six exceptions to consent. (Wang Decl. ¶¶ 23-25).

The office that drafted the law has even published an interpretation explaining how Articles 13 and 39 are to be read together. Specifically, in December 2021, Mr. Heqing Yang, the Vice President of the Economic Laws Office of the Legislation Commission of the China National People's Congress, released a publication called *Interpretation of the Personal Information Protection Law of the People's Republic of China*. (Wang Decl. ¶ 24; Ex. B). In it, Mr. Yang confirms that consent is *not* required for international transfer under Article 39 if the transfer abroad is exempted under Article 13. Mr. Yang writes that "[t]he separate consent provided by this Article [39] is applicable to circumstances where processing personal information is based upon consent. In accordance with Article 13, *if providing personal information abroad is based upon another non-consent basis, no individual consent should be required*." (Wang Decl. ¶ 25).

Here, as Mr. Wang explains, Syntronic's transfer of the computers abroad also has a "non-consent basis"—*i.e.*, complying with a "legal obligation" per Article 13, paragraph 3. (*Id.* ¶ 26). As Mr. Wang also explains, the PIPL does not differentiate between legal obligations arising under Chinese law or foreign law. (*Id.*) Mr. Wang also confirms that the Court's April 15 Order gives rise to a legal obligation and makes this exception available such that consent is not required to transfer the materials abroad. (*Id.*).

Defendants do not challenge (or even address) this point. In fact, at the April 15 hearing, the Court poignantly asked Defendants whether a court order would moot any alleged conflict with foreign law. (4/15/22 Hr'g Tr. at 17:9-10 ("What happens if I just order it? Is there an exception for a court order?")). As the Court may have guessed, there is indeed an exception for a court order under these circumstances. (Wang Decl. ¶¶ 14, 26). And although the Court raised this question at the April 15 hearing, Defendants inexplicably failed to address this point at all in their moving papers.

Furthermore, there is no suggestion here that the any personal information was improperly collected in the first place. For example, Syntronic alleges that the computers at issue supposedly include not only names but also employees' dates of birth, citizen ID cards, pay stubs, performance

5
OPPOSITION TO MOTION FOR RECONSIDERATION

reviews, insurance claims, and location information related to Covid tracking protocols.[2] But Syntronic never suggests that it collected any of this information improperly. To the contrary, the type of information referenced by Syntronic would fall under the exemptions for information "necessary to conduct human resources management" and "necessary to respond to emergent public health incidents." (Wang Decl. ¶ 14). In other words, no "consent" was necessary for collecting it in the first place. (*Id.*).

Missing the forest for the trees, Syntronic and its Chinese counsel fail to acknowledge any of the foregoing. They completely ignore Article 13 and only consider Article 39 in isolation. Syntronic's Chinese counsel then does nothing more than parrot the language from a single article of the PIPL in her analysis, ignoring the other provisions. (Liu Decl. ¶¶ 9-10, 20-23). But interpreting Chinese law based solely on an isolated provision is inherently unreliable. (Wang Decl. ¶ 17-20). Syntronic cannot ignore the other provisions, not to mention other sources. As Mr. Wang explains, Chinese law (like the PIPL) is written in high-level principles. (Wang Decl. ¶ 18). Even U.S. courts have cautioned against plain language interpretations of Chinese law. *See Wultz v. Bank of China Ltd.*, No. 11 CIV. 1266 SAS, 2012 WL 5431013, at *4 (S.D.N.Y. Nov. 5, 2012) ("The discrepancy between language and legal reality in Chinese law calls into question the attempt to deduce Chinese law simply from the language of Chinese legal sources . . .").

Confirming its incorrect interpretation, Syntronic Beijing has not shown ***any*** instance in which any Chinese authorities have enforced Article 39 under their interpretation. For example, Ms. Liu cites five exemplary "enforcement actions" in Exhibit B to her Declaration. But none of those actions have anything to do with the issues involved here. (Wang Decl. ¶¶ 30-34). Indeed, none of them are based on failing to get the consent of individuals before transferring data out of China, much less pursuant to a court order. (*Id.* ¶¶ 30, 32). Instead, all of the examples provided by Ms. Liu involved instances where a party improperly collected personal data, and all of them depend on another Chinese law (Cybersecurity Law of the PRC), which is not relevant here. (*Id.* ¶¶ 32-33). And even for those examples cited by Ms. Liu, the offending party only received a warning. (*Id.* ¶ 31).

---

[2] This argument by Syntronic is somewhat of a red herring. It is not clear that the computers actually have this specific information, nor is that the purpose of the inspection here.

To further investigate this issue, Mr. Wang examined notices of more than 2,000 enforcement actions addressing mishandling of personal information from 2021 and 2022. (*Id.* ¶ 33). Critically, not one of those actions involved the transfer of data outside of China. (*Id.*). *Cf. Belparts Grp., N.V. v. Belimo Automation AG*, No. 3:21-CV-00334 (SALM), 2022 WL 1223018, at *4 (D. Conn. Apr. 26, 2022) (ordering discovery over alleged conflict where, among other things, "defendants have not supplied the Court with evidence of any [foreign] decisions . . . that might be relevant to the present circumstances, such as prosecutions against persons or entities who voluntarily produced documents in their possession in a civil litigation to which they were a party"). Presumably, Chinese companies are still participating in U.S. discovery, yet Syntronic has not cited any hint of an "enforcement action" involving any of them.

In short, the PIPL does not require individual consents before transferring out the 24 computers and the motion for reconsideration should be denied.

**B. The Court Need Not Perform a Comity Analysis, But Such an Analysis Would Not Favor Syntronic's Position.**

"A party relying on foreign law has the burden of showing that such law bars compliance with a court order." *In re Grand Jury Proc.*, 873 F.2d 238, 239–40 (9th Cir. 1989). Absent a showing of a "true conflict between domestic and foreign law," the Court need not perform a comity analysis. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993); *Belparts Grp.*, 2022 WL 1223018 at *5 (D. Conn. Apr. 26, 2022) ("Because defendants have failed to meet the threshold requirement of demonstrating a true conflict of law, no further comity analysis is warranted, and their general objection to complying with Federal Rules discovery is overruled."). Here, Defendants have not shown a true conflict and considerations of comity are irrelevant.

Even if Defendants did show such a conflict, though, it is "well settled that [conflicting foreign laws] do not deprive an American court of the power to order a party to its jurisdiction to produce evidence even though the act of production may violate [those laws]." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 (1987). Defendants acknowledge this and suggest a comity analysis is necessary. Yet they fail to meaningfully analyze the comity factors, which weigh heavily in favor of production of the computers in the U.S. These 24 computers

contained unauthorized versions of Cadence Software and are very important evidence in this case—indeed, they may be the only direct evidence that Syntronic has not yet destroyed. The Court's order is also very specific, precisely identifying 24 machines. As explained below, Syntronic has also not identified a practical "alternative means" of inspecting these computers—they cite no authority for the Court to order an inspection to occur in China, much less in the midst of Covid-19 lockdowns, mandatory quarantines, and other complications. Further, Syntronic largely concedes that the specific employees who have supposedly withheld their "consent" are also employees who used pirated software. The balance of sovereign interests also strongly favors inspection in the U.S. because the U.S. has a strong interest in protecting its companies' intellectual property rights whereas China's interest in protecting the personal information of the Syntronic employees involved in software piracy is negligible. *See Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 339 (S.D.N.Y. 2018) (ordering Chinese bank to produce discovery that allegedly violated Chinese law and noting that requested information pertained to counterfeiters).[3]

Further, the purpose of the inspection is to identify evidence of pirated software. Defendants do not dispute that the Cadence Software originated in the United States, and that the pirated software circumvents protections in the United States. And Syntronic's assertions that "[t]here is no dispute that the data in the computers originated outside of the United States . . . and all conduct at issue occurred in China" is disingenuous. (Mot. at 4:25-5:1). Those assertions are ***hotly disputed***. At least one of the 24 computers used pirated Cadence software at a U.S. IP address and many others were configured in English for use in the U.S.

Finally, as Syntronic notes, courts in the Ninth Circuit consider the potential hardship of compliance on the party ordered to comply—*i.e.*, whether they are likely to face prosecution in their home country. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1477 (9th Cir. 1992). But there is no hardship here—shipping the computers would not violate the PIPL and Syntronic has not shown that any prosecutions, fines, or other action against a Chinese company has ever occurred

---

[3] Judge Illston has also entered a two-tier Attorneys' Eyes Only Protective Order in this case. (*See* Dkt. Nos. 68, 64-1). Other courts have found similar protective orders diminish the importance of foreign privacy interests. *See In re Mercedes-Benz Emissions Litig.*, No. 16-CV-881 (KM) (ESK), 2020 WL 487288, at *8 (D.N.J. Jan. 30, 2020).

under similar circumstances. (Wang Decl. ¶¶ 22-26, 33). As noted above, even in the (irrelevant) examples cited by Syntronic, the offending parties only received a warning. (*Id.* ¶ 31). This factor, too, weighs in favor of denying Syntronic's motion.

**III.    Inspection in China Would Not Resolve Any Issues and Is Not Practicable.**

The Court should also reject Syntronic's request to produce the computers in China because doing so (i) would not resolve any of the Chinese law issues they raise (if true), and (ii) is not practicable.

As to the first point, assume Cadence inspects the computers in China and recovers relevant data. What then? Cadence will need to use that data, which would then require ***Cadence to transfer the data out of China***. Syntronic Beijing would then argue the same lack of consent that precluded it from sending these machines to the U.S. would also preclude Cadence from sending the data. Syntronic fails to explain how its proposal would solve any of the problems that Syntronic claims to exist.

Moreover, as a practical matter, Cadence cannot actually perform any inspections in China in the foreseeable future. Syntronic's invitation to China comes on the heels of fresh threats to report Cadence to Chinese authorities for prosecuting this case. For example, in a March 14, 2022 email, Syntronic's Chinese counsel threatened that if the parties did not reach a settlement, "Syntronic Beijing has to report the situation to the relevant Chinese authorities," which "shall inevitably make things very complicated and the government could address inquiries to both parties, including Cadence China, which could be influential to business of both parties." (Declaration of Steve Papazian ("Papazian Decl."), Ex. C). Cadence has serious concerns about conducting discovery in China and facing baseless, retaliatory actions in that country.

Further complicating matters, municipalities in China—including Beijing—are under ever-changing lockdowns due to the Covid-19 pandemic and China's Zero Covid policy. The U.S. State Department advises travelers to "[r]econsider travel to the People's Republic of China (PRC) due to arbitrary enforcement of local laws and COVID-19-related restrictions" and warns "[a]ll travelers [to China] should prepare to quarantine at a government designated location for a minimum of 14 days upon arrival." (Papazian Decl., Ex. D). Cadence's counsel of record (based in Los Angeles, CA)

cannot realistically participate in the inspection of these computers in China. Nor do Cadence's affiliate locations in China somehow render production of the computers in China appropriate—Cadence's experts and counsel need to be involved in the process.[4]

## CONCLUSION

From the outset of this case (and even during pre-suit discussions), Cadence has been seeking basic information concerning the offending Syntronic computers that used pirated versions of Cadence Software. Syntronic's excuses keep changing, but it still has not provided the information. Its latest excuse—the new PIPL—is no better than its other ones. Syntronic Beijing's Motion for Reconsideration should be denied.

DATED: May 27, 2022      By:   */s/ Steve Papazian*

Guy Ruttenberg
Steve Papazian
RUTTENBERG IP LAW, A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260
guy@ruttenbergiplaw.com
steve@ruttenbergiplaw.com

*Attorneys for Plaintiff*

---

[4] Syntronic claims "Plaintiff's Chinese affiliate has previously been in contact with Syntronic Beijing." (Dkt. No. 137 at 1:28). That contention is blatantly misleading. The referenced communications were initiated by Syntronic Beijing in an effort to circumvent counsel of record in settlement discussions. Cadence's Chinese affiliate informed Syntronic that it is not involved in this litigation, and directed the conversation back to U.S. company. (Ex. C at 1).