Guy Ruttenberg, Bar No. 207937
guy@ruttenbergiplaw.com
Steve A. Papazian, Bar No. 288097
steve@ruttenbergiplaw.com
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260

*Attorneys for Plaintiff Cadence Design Systems, Inc.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CADENCE DESIGN SYSTEMS, INC., *a Delaware Corporation*,<br><br>Plaintiff,<br><br>v.<br><br>SYNTRONIC AB, *a Publikt Aktiebolag*, SYNTRONIC RESEARCH AND DEVELOPMENT USA INC*., a California Corporation*, SYNTRONIC (BEIJING) TECHNOLOGY R&D CENTER CO., LTD*., a Chinese Corporation*,<br><br>Defendants. | Case No. 3:21-cv-3610-SI<br><br>**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR:**<br><br>1. **COPYRIGHT INFRINGEMENT;**<br>2. **CIRCUMVENTION OF COPYRIGHT PROTECTION SYSTEMS;**<br>3. **BREACH OF CONTRACT;**<br>4. **LANHAM ACT VIOLATIONS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

For its Second Amended Complaint, Plaintiff Cadence Design Systems, Inc. ("Cadence") alleges against Defendants Syntronic AB ("Syntronic Sweden"), Syntronic Research and Development USA Inc. ("Syntronic USA"), and Syntronic (Beijing) Technology R&D Center Co., Ltd. ("Syntronic Beijing") (collectively, "Syntronic"[1]) as follows:

1.      This is an action for copyright infringement, circumvention of copyright protection systems, breach of contract, and violation of the Lanham Act.

## **PARTIES**

2.      Plaintiff Cadence is a Delaware corporation with its principal place of business at 2655 Seely Avenue, San Jose, California 95134.

3.      Defendant Syntronic AB ("Syntronic Sweden") is a Swedish *Publikt Aktiebolag* with its principal place of business at Utmarksvägen 33C, 802 91 Gävle, Sweden.

4.      Defendant Syntronic Research and Development USA Inc. ("Syntronic USA") is a California Corporation with its principal place of business at 5201 Great America Pkwy, Suite 320 Santa Clara, California 95054.  Syntronic USA filed its Articles of Incorporation on September 28, 2018, listing Utmarksvägen 33C, 802 91 Gävle, Sweden as its street address.

5.      Defendant Syntronic (Beijing) Technology R&D Center Co., Ltd. ("Syntronic Beijing") is a Chinese corporation with its principal place of business at Wangjing Reward Building C1301, Chaoyang District, Beijing, China 100102.

6.      On information and belief, Syntronic AB, Syntronic USA, and Syntronic Beijing are a single enterprise and/or alter egos of one another.

7.      Syntronic AB, Syntronic USA, and Syntronic Beijing share a unity of interest.

8.      Syntronic AB, Syntronic USA, and Syntronic Beijing collectively hold themselves out to the public as a single entity named "Syntronic" and "Syntronic Group."

9.      Syntronic AB, Syntronic USA, and Syntronic Beijing also collectively hold themselves out as a "Syntronic - Global Design House."

---

[1] All three Defendants conduct business under the name and mark "Syntronic" and not their individual legal names.

1

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

10.     Syntronic AB, Syntronic USA, and Syntronic Beijing also collectively hold themselves out as "**one** Syntronic" (emphasis in original).

11.     Björn Jansson publicly identifies himself as the "Group CEO" of "Syntronic."

12.     Bjorn Jansson publicly states that one of the key factors for "Syntronic's" success is that Syntronic works as "**one** Syntronic globally" (emphasis in original).

13.     For example, in an article entitled "Syntronic milestone: 15 years in China" dated October 29, 2020 on www.syntronic.com, Björn Jansson is quoted as follows: "I am very proud of what we have done in China. One of the key factors of our success is that we work as **one** Syntronic globally."

14.     Zinser Zhao, the "General Manager of Syntronic Asia" and other executives at Syntronic refer to the unity of Syntronic legal entities as "One Syntronic."

15.     Lily Chen, the "HR manager in China," made the following statement in an article entitled "Interview Lily Chen" on Syntronic's website: "In large organizations, clear communication is crucial. Communication can be a straightforward process in smaller teams, but to communicate smoothly and efficiently within a larger group of people, it becomes necessary to implement proper procedures . . . It is important that the same procedures and routines are put in place and followed at all the branches where the company is present. It is a strategy that works well for us. We emphasize that we are One Syntronic."

16.     On information and belief, each of Syntronic AB, Syntronic USA, and Syntronic Beijing are under the same legal and equitable control, *i.e.*, the management of Syntronic AB.

17.     Syntronic USA represented to the Secretary of State of Michigan that its "main business or headquarters office" is Utmarksvägen 33C, 802 91 Gävle, Sweden, the address of Syntronic AB.

18.     Syntronic AB, Syntronic USA, and Syntronic Beijing have overlapping officers and employees.

19.     For example, Björn Jansson is on the board of directors of all three Defendants.

20.     Monica Jansson is on the board of directors of Syntronic Beijing and Syntronic AB.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

21.     Björn Ostlund is and/or was an officer at Syntronic Beijing, Syntronic USA, and Syntronic AB.

22.     Syntronic AB, Syntronic USA, and Syntronic Beijing view their employees as interchangeable and common between the three companies.

23.     For example, Syntronic represents on its website that it comprises 1276 employees without differentiating between Syntronic AB, Syntronic USA, Syntronic Beijing, or any other Syntronic-owned or affiliated entities.

24.     Syntronic employees likewise treat Syntronic AB and its affiliates as one and the same.

25.     On information and belief, Syntronic AB, Syntronic USA, and Syntronic Beijing commingle their assets.

26.     For example, Björn Jansson has testified that Syntronic AB and Syntronic Beijing maintain inter-company accounts.

27.     All three Defendants purport to operate under the same human resource policies and procedures.

28.     For example, at least one Syntronic employee based in Canada represented that his employer is "based in Sweden."

29.     Through job postings for positions in Beijing, Syntronic likewise holds itself out as a single company that comprises all three Defendants. For example, on March 30, 2021, Syntronic posted a position for "Digital HW Design Engineer" in Beijing through the Swedish Chamber of Commerce in Beijing. The posting refers to Syntronic Beijing as the "Beijing Technology R&D Centre" for a company known as "Syntronic" that was "[e]stablished in 1983" with "Headquarter[s] in Sweden." As part of the "Benefits," Syntronic describes itself has having "offices in 8 countries worldwide," and explains that "Our APAC Design Center is located in Beijing, China," which offers a "Relaxed Nordic working environment."

30.     An explicit "Qualification & Requirement" of the Syntronic job posting in Beijing requires "Experience with Cadence Concept and Allegro tools."

31.     Syntronic also advertises and solicits employees, including in California and in this District, to work for its global Swedish-headquartered company.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

32.     In its job postings in this District, Syntronic touts the Santa Clara, CA office as one of the "Syntronic sites," and emphasizes that prospective employees will likely work with a "team" located in other "sites," including in Sweden and China, and that prospective employee would be among more than 1300 employees of "Syntronic."

33.     For example, on or about July 7, 2021, Syntronic posted a position for "Security Engineer/Developer" to be housed in Santa Clara, CA. The job posting emphasizes that, "since Syntronic is a global Design House, you will probably work within a team with engineers from other Syntronic sites (Canada, Sweden, China, Malaysia, Japan)." The posting also notes, "Syntronic has today over 1400 employees in 8 countries."

34.     Syntronic AB, Syntronic USA, and Syntronic Beijing are part of a single enterprise, having a headquarters (which Syntronic calls its "Company Head Office") in Gävle, Sweden, which organizes its business activities by region and business units rather than as separately operating legal entities.

35.     Syntronic holds itself out as having three regions, namely (1) "Americas," which on information and belief represents Syntronic's business in North and South America; (2) "APAC," which on information and belief represents Syntronic's business in Asia and the Pacific, and (3) "EMEA," which on information and belief represents Syntronic's business in Europe, the Middle East and Africa.

36.     Syntronic holds itself out as having "operations in Sweden, USA, Canada, China, Japan, Malaysia and Indonesia."

37.     For example, the three Defendants participated under the guise of "Syntronic" at the 2019 World Mobile Congress, where the three Defendants appeared together in the Swedish Pavilion. In the Swedish Pavilion of the 2019 World Mobile Congress, Syntronic (including the three Defendants) described itself as follows:

> Syntronic is a leading engineering design house with more than 30 years of experience from working with development, production and aftermarket services and all related support during a product life cycle of embedded systems.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

> Telecom infrastructure equipment for wireless communication is one area of our expertise. We can also be your partner for development and life cycle support of equipment using 5G and IoT technology.
>
> We are a global company with local presence and you find us in Canada, China, Indonesia, Japan, Sweden and Malaysia.

38.    Syntronic also holds itself out as having a partnership with STMicroelectronics. The STMicroelectronics website (st.com) includes a "partnerpage" for Syntronic, where Syntronic (including the three Defendants) is described as follows:

> Syntronic is a product solution and design services company offering end-to-end product development capability. We are global, and has over 1300 employees.
>
> Our main focus is developing products for customers based on specifications or ideas. We have over 30 years of experience in this field. We are working in competence areas such as hardware, RF, antenna, embedded/application software, FPGA, mechanics, integration and verification, NPI and manufacturing (have two own sites).
>
> One of Syntronic's strongest areas is wireless communication. Except our huge competence in this area, we also have several well-equipped labs for measuring RF, digital, analog, antenna performance etc.
>
> Syntronic is working in following market and technology areas: Telecom, industrial, automotive, consumer, medtech, robotics and connected devices.
>
> Syntronic has operations in Sweden, USA, Canada, China, Japan, Malaysia and Indonesia.

39.    On information and belief, Syntronic approved its "partnerpage" on the st.com website, including the text and description quoted above.

40.    On its own website, Syntronic explains, "Several of our assignments, delivered all over the world, are parts of a planned globalization that is, and always has been, very important for our development."

41.    The Syntronic website includes a timeline for Syntronic, explaining (among other things) that Syntronic in 1983 "Started in Stockholm, Sweden," in 1986 "Head Office opens in Gävle, Sweden," in 2005 "Opens in Beijing, China," in 2008 "We celebrated 25 years as a company," in 2015 "We celebrates [sic] 10 years in China," in 2016 "Opens in Chengdu, China," in 2018 "Exceeds

1000 employees globally," in 2018 "Opens in Tianjin, China," in 2019 "Opens in Nanjing, China," in 2019 "Opens in Santa Clara, United States," and in 2021 "Opens in Shanghai, China."

42.     Syntronic officer and employee Zinser Zhao publicly represents that he is "General Manager, Syntronic Asia" and "Responsible for Syntronic China business and operation."

43.     On information and belief, Syntronic Beijing provides services for global customers of Syntronic.

44.     Syntronic AB, Syntronic USA, and Syntronic Beijing share offices and/or other business locations.

45.     For example, for at least part of the time during which Syntronic committed the wrongful acts described herein, Syntronic USA and Syntronic AB shared an address at Utmarksvägen 33C, 802 91 Gävle, Sweden.

46.     Syntronic AB, Syntronic USA, and Syntronic Beijing share a website, namely www.syntronic.com, which is registered to Syntronic AB.

47.     Syntronic AB, Syntronic USA, and Syntronic Beijing share a trade name, namely "Syntronic."

48.     On information and belief, Syntronic AB, Syntronic USA, and Syntronic Beijing submit financial statements and pay taxes on a consolidated basis.

49.     On information and belief, Syntronic USA and Syntronic Beijing are undercapitalized.

50.     For example, on information and belief, Syntronic AB transfers and/or has transferred funds to Syntronic USA for Syntronic USA to pay the wages of its employees.

51.     Similarly, on information and belief, Syntronic AB has made various transfers of funds and capital when needed to pay debts and obligations of Syntronic Beijing, as opposed to properly capitalizing Syntronic AB.

52.     It would be inequitable for Syntronic AB, Syntronic USA, and Syntronic Beijing to hide behind their corporate veils.

53.     For example, given that the Defendants hold themselves out to prospective and actual customers, employees and business partners as "**one** Syntronic"—including through its unpermitted use of Cadence's software as alleged herein—it would be inequitable for Syntronic AB, Syntronic

USA, and Syntronic Beijing to rely on their purported "corporate separateness" for purposes of evading liability.

54. Recognizing corporate separateness in this litigation among the Defendants who publicly tout the unitary nature of their collective enterprise (*e.g.*, referring to themselves as "One Syntronic") would also perpetuate a fraud.

55. Syntronic AB, Syntronic USA, and Syntronic Beijing have also acted in bad faith.

56. For example, before bringing suit, Plaintiff contacted Syntronic AB and Syntronic USA to attempt to resolve the claims set forth herein.  Counsel for Syntronic AB and Syntronic USA initially engaged with Plaintiff but then referred Plaintiff to Syntronic Beijing.  Plaintiff then reached out to Syntronic Beijing, but that entity refused to engage with Cadence. In essence, Syntronic AB, Syntronic USA, and Syntronic Beijing are engaging in a shell game, attempting to use their legal separateness (which is not recognized by Defendants in the regular course of their business) to evade liability and frustrate Plaintiff's efforts to curb pirated use of its software. As set forth below, the Defendants also continued their unauthorized infringement and other wrongful conduct well after receiving explicit notice from Cadence.

## **JURISDICTION**

57. This Court has subject matter jurisdiction pursuant to 17 U.S.C. § 501, *et seq.* (copyright infringement), 17 U.S.C. §1201, *et seq.* (circumvention of copyright protection systems under the Digital Millennium Copyright Act), 15 U.S.C. § 1121, *et seq.* (Lanham Act violation), and 28 U.S.C. §§ 1331 (federal questions jurisdiction) and 1338(a).  The Court also has supplemental jurisdiction over Count III below, pursuant to 28 U.S.C. §1367(a).

58. This Court has personal jurisdiction over Syntronic, including each of the three Defendants.

59. Syntronic, including each of the three Defendants, contractually agreed to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute pursuant to the Software License and Maintenance Agreements, respectively, attached hereto as Exhibits 1 through 11.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

60.     On information and belief, representatives of Syntronic with authority to bind Syntronic, including for each of the three Defendants, approved and/or ratified the use of Cadence Software, including the agreement to submit to jurisdiction in California.

61.     Defendants expressly solicit and recruit employees with skills in Cadence's software, including Allegro.

62.     Further, even after Plaintiff provided notice (and even after Plaintiff provided a draft Complaint) to management for Syntronic—including those having authority to bind each Defendant—Syntronic (including each of the three Defendants) continued their infringement.

63.     Syntronic USA is a California corporation based in Santa Clara, California and subject to general jurisdiction in this State.  Syntronic USA has appeared in this action without challenging, and does not challenge, personal jurisdiction.

64.     Defendant Syntronic AB was served with Plaintiff's Complaint and Summons in California, and Defendant Syntronic AB has appeared in this action without challenging such service.

65.     Defendants Syntronic Beijing was also served with Plaintiff's Complaint and Summons in California.

66.     Syntronic, including Defendants Syntronic AB and Syntronic Beijing, are subject to general jurisdiction as the alter egos of Syntronic USA.

67.     Defendants Syntronic AB and Syntronic Beijing are also subject to specific jurisdiction in California.

68.     Defendants Syntronic AB and Syntronic Beijing committed an intentional act directed to this forum.

69.     For example, Defendants downloaded, copied, and/or used "cracked" versions of Cadence Software.

70.     Defendants Syntronic AB and Syntronic Beijing's misconduct and/or infringement was expressly aimed at this forum.

71.     For example, Syntronic AB and Syntronic Beijing are and were aware that Cadence is located in California, including because Cadence specifically informed Defendants of this fact in February 2020 in correspondence to Defendants.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

72.    Defendants continued willfully using Cadence's software without authorization after receiving Cadence's February 2020 correspondence and after even Cadence filed this lawsuit.

73.    Syntronic AB and Syntronic Beijing knew using Cadence's software without authorization (and continuing to use Cadence's software after receiving notice and a draft Complaint from Cadence) would foreseeably harm Cadence in California where Cadence is located.

74.    Defendants Syntronic AB and Syntronic Beijing also regularly conduct business in California and purposefully avail themselves of the privilege of conducting activities in this forum.

75.    For example, Syntronic claims to "work closely" with existing clients in the Bay Area.

76.    Syntronic's Facebook page also claims that it "assists customers in Silicon Valley and beyond."

77.    Syntronic USA purports to have "long experience and great skills in schematic and PCB layout design as well as thermal-, signal- and power integrity simulations," allegedly using Cadence's OrCAD and Allegro PCB software programs.

78.    Syntronic AB's contacts with California are stronger than Syntronic AB's contacts with any other state or jurisdiction in the United States.

79.    Exercising personal jurisdiction over Syntronic Beijing in connection with the claims asserted here is consistent with the United States Constitution and laws.

80.    Syntronic Beijing's contacts with California are stronger than Syntronic AB's contacts with any other state or jurisdiction in the United States.

81.    Exercising personal jurisdiction over Syntronic Beijing in connection with the claims asserted here is consistent with the United States Constitution and laws.

**VENUE**

82.    Venue is proper in this District pursuant to the terms of the Software License and Maintenance Agreements, attached hereto as Exhibits 1 through 11.  Venue is also proper in this District pursuant to 28 U.S.C. § 1400(a) because Syntronic may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Syntronic is subject to personal jurisdiction in this District.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

**INTRADISTRICT ASSIGNMENT**

83.     This is an intellectual property action subject to district-wide assignment pursuant to Civil L.R. 3-2(c).

**GENERAL ALLEGATIONS**

84.     Cadence is a worldwide leader in Electronic Design Automation (EDA) software and engineering services, as well as semiconductor intellectual property.  Cadence's custom and analog tools help engineers design the transistors, standard cells, and IP blocks that make up systems on chips.  Cadence's offerings allow engineers to design integrated circuits and printed circuit boards, and test and simulate their designs to verify the builds of their circuits.

85.     Cadence's design platforms include Allegro, OrCAD, PSpice, Sigrity, AWR Microwave Office and other related software and tools (collectively, the "Cadence Software").  The Cadence Software provides engineers with the ability to design, test, and simulate printed circuit boards customized for their specific needs.  Since its founding, Cadence has expended considerable resources further developing and refining this technology to remain at the forefront of the EDA industry.

86.     Cadence licenses these products throughout the United States, Europe, Asia and other parts of the world.

87.     Cadence owns a valid Copyrighted Work, entitled Cadence PCB Systems Division Version 15.0, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 7-264-496 (the "'496 Registration").  A true and correct copy of the '496 Registration is attached hereto as Exhibit 13

88.     Cadence owns a valid Copyrighted Work, entitled Allegro 16.5, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 7-751-386 (the "'386 Registration").  A true and correct copy of the '386 Registration is attached hereto as Exhibit 14.

89.     Cadence owns a valid Copyrighted Work, entitled Allegro PCB 16.6, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-323-840 (the "'840 Registration").  A true and correct copy of the '840 Registration is attached hereto as Exhibit 15.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

90.    Cadence owns a valid Copyrighted Work, entitled Allegro PCB 17.2, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-322-031 (the "'031 Registration"). A true and correct copy of the '031 Registration is attached hereto as Exhibit 16.

91.    Cadence owns a valid Copyrighted Work, entitled Sigrity 2015, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-322-028 (the "'028 Registration"). A true and correct copy of the '236 Registration is attached hereto as Exhibit 17.

92.    Cadence owns a valid Copyrighted Work, entitled Sigrity 2016, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-264-236 (the "'236 Registration"). A true and correct copy of the '236 Registration is attached hereto as Exhibit 18.

93.    Cadence owns a valid Copyrighted Work, entitled Sigrity 2017, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-320-010 (the "'010 Registration"). A true and correct copy of the '010 Registration is attached hereto as Exhibit 19.

94.    Cadence owns a valid Copyrighted Work, entitled OrCAD 16.5, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-320-016 (the "'016 Registration"). A true and correct copy of the '016 Registration is attached hereto as Exhibit 20.

95.    Cadence owns a valid Copyrighted Work, entitled OrCAD 16.6, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-320-041 (the "'041 Registration"). A true and correct copy of the '041 Registration is attached hereto as Exhibit 21.

96.    Cadence owns a valid Copyrighted Work, entitled OrCAD 17.2, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-320-040 (the "'040 Registration"). A true and correct copy of the '040 Registration is attached hereto as Exhibit 22.

97.    Cadence owns a valid Copyrighted Work, entitled Allegro PCB 17.4, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-905-154 (the "'154 Registration"). A true and correct copy of the '154 Registration is attached hereto as Exhibit 23.

98.    Cadence owns a valid Copyrighted Work, entitled Clarity 3D Solver 2019, which was duly registered with the United States Copyright Office as Copyright Registration No. TX 8-905-132 (the "'132 Registration"). A true and correct copy of the '132 Registration is attached hereto as Exhibit 24.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

99.     Cadence owns a valid Copyrighted Work, entitled Microwave Office 2017 Release 13.00, which was duly registered with the United States Copyright Office as Copyright Registration TX 8-377-602, as supplemented by TX 8-510-281 (the "'602 Registration").  A true and correct copy of the '602 Registration is attached hereto as Exhibit 25.

### CADENCE'S LICENSE AGREEMENTS AND LICENSE FILES

100.     To protect its software and intellectual property against any unauthorized use, Cadence has made significant investments in technology designed to prevent unauthorized access or use.

101.     Cadence typically licenses its proprietary software. The license is issued as a Floating/Concurrent license, whereby the customer purchases a set number of floating seats, which may be occupied by any licensed users as long as the number of concurrent users does not exceed the set number.  When a customer purchases a license to the Cadence Software, the customer receives an invoice indicating the type of license that was purchased, as well as a license file.

102.     Upon the purchase of software, Cadence (as part of its copyright protection system) generates a license file in this District that is provisioned to the customer based on the HOSTID and/or MAC address corresponding to the machine on which the license file will reside.

103.     As part of Cadence's copyright protection system, the Cadence Software will not operate unless a user first installs the Cadence License Manager.  When using the Cadence Software on a single computer, the user must install the License Manager directly on that computer.  If the user intends to use a network license, the user must install the License Manager on a server accessible over the network.

104.     The Cadence License Manager cannot be installed unless a user first executes an agreement with Cadence.  Specifically, when installing the License Manager, a user is prompted to accept the terms of a Cadence Design Systems, Inc. Software License and Maintenance Agreement ("SLMA").

105.     Cadence has incorporated multiple versions of its SLMA into the License Manager installation process.

106.     Exhibit 1 is a true and correct copy of an SLMA for Cadence's Allegro PCB 16.5, which was used without authorization by Syntronic.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

107.    Exhibit 2 is a true and correct copy of an SLMA for Cadence's Allegro PCB 16.6 and OrCAD 16.6, which were used without authorization by Syntronic.

108.    Exhibit 3 is a true and correct copy of an SLMA for Cadence's Allegro PCB 17.2 and OrCAD 17.2, which were used without authorization by Syntronic.

109.    Exhibit 4 and 5 are true and correct copies of SLMAs for Cadence's Allegro PCB 17.4, which was used without authorization by Syntronic.

110.    Exhibit 6 is a true and correct copy of an SLMA for Cadence's Clarity 2019, which was used without authorization by Syntronic.

111.    Exhibit 7 is a true and correct copy of an SLMA for Cadence's Sigrity 2016, which was used without authorization by Syntronic.

112.    Exhibit 8 is a true and correct copy of an SLMA for Cadence's Sigrity 2017, which was used without authorization by Syntronic.

113.    Exhibit 9 is a true and correct copy of an SLMA for Cadence's Sigrity 2019, which was used without authorization by Syntronic.

114.    Exhibits 10 and 11 are true and correct copies of SLMAs used with Cadence's AWR Microwave Office, which was used without authorization by Syntronic.

115.    Exhibits 1 through 11 set forth the terms that govern use of the software programs associated with those SLMAs.

116.    For example, Exhibit 1 states, in part:

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT.  IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING

1   MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED

2   MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION

3   AND BY USING THE SOFTWARE . . . YOU ACKNOWLEDGE THAT YOU HAVE

4   READ THE AGREEMENT AND ACCEPT ITS TERMS.

5   117.    With respect to the software programs governed by Exhibits 1 through 9, when

6   attempting to install the License Manager, a user must select "I accept the terms of the license

7   agreement" in order to proceed with installation.  If the user does not select the "I accept" option, or

8   if the user selects "I do not accept the terms of the license agreement," the user cannot proceed with

9   installation of the License Manager.

10   118.    After the License Manager has been installed, the program prompts the user to specify

11   the location of a Cadence license file.  Alternatively, the user may later configure the appropriate

12   licensing for the Cadence Software by using a License Server Configuration Utility packaged with

13   the Cadence Software.

14   119.    After the user installs the License Manager, the user may then install the Cadence

15   Software on the client desktops or laptops connected to the License Server.  The Cadence Software

16   will not operate on those client machines unless the user provides a valid license file issued by

17   Cadence.  The license file indicates to the License Manager and the Cadence servers how many

18   licenses are available for use at the client machines, and which Cadence Software and additional

19   functionality the user is permitted to use.

20   120.    When the user installs the Cadence Software, the user must again accept the terms of

21   the SLMAs by selecting the "I accept" option.  As before, if the user does not select the "I accept"

22   option, or if the user selects "I do not accept the terms of the license agreement," the user cannot

23   proceed with installation of the Cadence Software.

24   121.    A similar process is implemented for the AWR Microwave Office software governed

25   by Exhibits 10 and 11.

26   122.    To protect its software and intellectual property against any unauthorized use, Cadence

27   also has made significant investments in technological measures designed to track unauthorized use.

28

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

123.   These measures transmit data to Cadence whenever they detect unauthorized alterations or uses of the product, such as when a user bypasses a technological measure by using counterfeit license files or when a user alters the Cadence Software by circumventing the license mechanism.

124.   The Cadence Software also includes other technological measures to verify that the Cadence Software is used according to an appropriate license.

**SYNTRONIC'S INFRINGEMENT AND UNAUTHORIZED ACCESS**

125.   Syntronic purports to be a global design services firm engaged in, *inter alia*, system design (HW/SW/mechanics), hardware design (digital, analogue, radio / microwave, PCB layout), ASIC design, verification, and other related activities.

126.   Syntronic has repeatedly obtained, copied and used the Cadence Software without authorization from Cadence.

127.   Computers associated with the domain "@syntronic.com" have used, accessed, and/or copied "cracked" Cadence Software at multiple IP addresses in California, including after Cadence first provided notice to Defendants of their unauthorized use of Cadence Software.

128.   Computers associated with the domain "@syntronic.com" have used, accessed, and/or copied "cracked" Cadence Software at IP addresses in California on multiple occasions, including in February 2020.

129.   The "@syntronic.com" domain is used by Syntronic AB, Syntronic Beijing, and Syntronic USA.

130.   For example, Syntronic Beijing's "General Manager" uses an email address with the @syntronic.com domain.

131.   For example, Jesper Gullberg (Strategic Projects) of Syntronic AB uses an email address with the @syntronic.com domain.

132.   For example, Björn Ostlund (who purports to be Syntronic USA's President and alleged sole officer) uses an email address with the @syntronic.com domain.

133.   Syntronic has unlawfully copied, reproduced, and used the Cadence Software without a valid license file and without authorization from Cadence.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

134.    For example, Björn Jansson, the CEO of Syntronic AB and "Group CEO" of Syntronic, stated in a June 4, 2020 letter to Cadence that "[i]n Syntronic (Beijing) Technology R&D Center Co, Ltd (Syntronic China) we work with Cadence software in projects performed on behalf of a main customer."

135.    Although Mr. Jansson has suggested that Syntronic receives licenses from its customer(s) to use Cadence's software, Syntronic has never provided Cadence with any evidence of such licenses. Further, the usage traced to Syntronic is associated with "cracked" licenses.

136.    By installing and using the Cadence License and the Cadence Software, Syntronic accepted the terms of the SLMAs and agreed to be bound by the terms of the SLMAs.

137.    On information and belief, after installing the Cadence Software, Syntronic uses "cracked" license files to access and use the Cadence Software.

138.    Under the SLMAs attached hereto as Exhibits 1 through 9, Syntronic agreed "to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution." Syntronic further agreed that it would "have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons."

139.    Under the SLMAs attached hereto as Exhibits 10 and 11, Syntronic agreed to "not distribute, make accessible, transmit or provide any key code to any third party or make it available to the public, use or attempt to use the key code other than for the Software for which it is provided by AWR to Customer, or take any action to circumvent any key code system or alternative licensing protection mechanism."

140.    On information and belief, Syntronic has altered and/or "cracked," and/or used altered and/or "cracked" versions of the Cadence License Manager and/or Cadence Software that circumvent technological measures.

141.    On information and belief, Syntronic has also tampered with files during installation of the Cadence License Manager and/or Cadence Software and otherwise used altered data files for installing the Cadence License Manager and/or Cadence Software, including using "cracked" versions of the license and/or using counterfeit license files.

142. By obtaining, copying, installing, and/or using "cracked" versions of the Cadence License Manager and/or Cadence Software and/or "cracked" licenses, Syntronic circumvents technological measures that control access to a copyrighted work protected under the Copyright Act.

143. On information and belief, Syntronic also conspires with others to use and obtain unauthorized software license files from a source other than Cadence and/or to circumvent Cadence's technological measures.

144. On information and belief, Syntronic knowingly obtains, downloads, copies, installs and/or otherwise uses unauthorized versions of the Cadence License Manager and/or Cadence Software, including using websites and internet service providers known to traffic in illegal content.

145. By installing the Cadence Software using the counterfeit license files and subsequently using the Cadence software without authorization, Syntronic breached the terms of the agreed upon SLMAs by allowing the Cadence Software to be used or copied by unlicensed persons, and by failing to take reasonable steps and exercise due diligence to protect the Cadence Software from unauthorized reproduction, publication, or distribution.

146. Further, Cadence Software includes additional Product Options, which are available at additional cost for higher levels of design functionality. These options are locked unless they are purchased by the customer, in which case Cadence provisions a license file that enables the user to access the corresponding portions of the Cadence Software.

147. However, when the Cadence License Manager and/or Cadence Software is "cracked," or when "cracked" license files are used, the license protections for the Product Options are bypassed and all Options are unlocked, thus allowing a user to obtain any Product Options it desires without having to pay for those Options.

148. By using "cracked" versions of the Cadence License Manager and/or Cadence Software and/or "cracked" license files, Syntronic circumvents additional technological measures that prevent users from accessing additional copyrighted Product Options that would otherwise require an independent purchase to use.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

149.    By using the Cadence Software without authorization and by circumventing Cadence's technological measures, Syntronic has also violated Cadence's registered copyright and avoided paying Cadence at least $8.3 million dollars in license fees.

150.    Through the use of its technological measures, Cadence compiled a list of over 64 machines that were using Cadence Software without having a valid License issued by Cadence.  These technological measures identified multiple instances where these machines installed, uninstalled, or used Cadence Software.

151.    The information these machines transmitted to Cadence indicate that Syntronic devices and accounts were responsible for a significant number of unauthorized uses of the Cadence Software.

152.    For example, the domain "syntronic.net," among others, are linked to the machines bypassing technological measures in the Cadence Software.

153.    Further, email addresses ending with the extension "@syntronic.com" and "@china.syntronic.net," among others, are also linked to the machines bypassing technological measures in the Cadence Software.

154.    The domains "syntronic.net" and "syntronic.com" belong to and/or are otherwise associated with Syntronic, including with each of the three Defendants.

155.    Similarly, email addresses ending with the extension "@syntronic.com" are associated with Syntronic, including with each of the three Defendants.

156.    Email addresses ending with the extension "@china.syntronic.net" are also associated with Syntronic, including at least Syntronic Beijing.

157.    Various Syntronic computers with machine names such as "SYNTRONIC0748," among others, are also linked to the machines bypassing technological measures in the Cadence Software.

158.    Syntronic's unlawful conduct not only harms Cadence, but it also harms Cadence's customers.  Namely, Cadence's customers who pay for Cadence Software are forced to compete with Syntronic, which unlawfully uses the software without payment.  By eliminating this cost item, Syntronic is able to compete unfairly with law-abiding competitors who pay for software.

159.    Thus, Syntronic irreparably harmed Cadence's long-term market share and reputation.

**CADENCE INFORMS SYNTRONIC OF ITS UNAUTHORIZED ACTIVITES**

160.    On February 5, 2020, Cadence informed Syntronic that Cadence has evidence showing Syntronic has used unlicensed or "cracked" versions of Cadence Software.

161.    On February 12, 2020, Mikael Åhlén, Senior Vice President Operational Development for Syntronic, emailed Cadence, stating Syntronic was investigating "if the listed Mac-addresses are link to computers owned by Syntronic."

162.    Cadence responded to Mr. Åhlén the same day (February 12, 2020), proposing to schedule a conference call and offering to, *inter alia*, "address your questions regarding more information related to those [offending] machines during the call."

163.    Mr. Åhlén never responded to Cadence's February 12, 2020 communication.

164.    On March 10, 2020, Cadence sent a further communication addressed to Messrs. Björn Jansson (CEO of Syntonic) and Mikael Åhlén (Senior Vice President Operational Development for Syntronic). Cadence received no response at the time.

165.    Cadence sent a further communication to Syntronic on April 20, 2020 through outside counsel.

166.    Cadence's April 20, 2020 correspondence included an attachment detailing MAC addresses, computer names, and associated domains for 64 different offending computers.

167.    This time, on May 21, 2020, Jesper Gullberg, Strategic Projects at Syntronic, responded, claiming Syntronic was "looking into this and will get back to [Cadence] within short [sic]."

168.    Mr. Gullberg, Syntronic's outside counsel at Carr & Ferrell, and Plaintiff's counsel conferred on June 1, 2020 to discuss Syntronic's unauthorized use.  During that conference, Syntronic's counsel represented that Syntronic was further investigating Plaintiff's claims and agreed to have a further conference with Cadence one week later.

169.    However, both Mr. Gullberg and Syntronic's counsel at Carr & Ferrell later declined to participate in a second conference.

170.     Instead, on around June 4, 2020, Cadence received a letter from Björn Jansson, the CEO of Syntronic, who insisted that Cadence communicate directly with Syntronic Beijing.  In his letter, Mr. Jansson explained (among other things), "In Syntronic (Beijing) Technology R&D Center Co, Ltd (Syntronic China) we work with Cadence software in projects performed on behalf of a main customer. Our customer provides us with third party licenses for this work." Mr. Jansson provided contact details for Zinzer Zhao, whom Mr. Jansson described as "Syntronic China General Manager."

171.     Mr. Jansson did not furnish Cadence with any evidence or further information concerning the so-called "third party licenses" described in his January 4, 2020 letter.  Nor has anyone else from Syntronic furnished any such information to date.

172.     As requested by Mr. Jansson, on July 6, 2020, Cadence contacted Zinser Zhao at Syntronic Beijing, forwarding the prior correspondence (including Cadence's February 5, 2020, March 10, 2020 and April 20, 2020 communications, as well as Mr. Jansson's June 4, 2020 letter), and asking to set up a call. Cadence received no response.

173.     On July 24, 2020, Cadence again contacted Syntronic's counsel at Carr & Ferrell.

174.     Syntronic's counsel also failed to respond to the July 24, 2020 communication.

175.     On September 24, 2020, Cadence again wrote to Syntronic, enclosing a draft Complaint.

176.     Then, on September 29, 2020, Zinser Zhao of Syntronic Beijing sent Cadence an email, stating that the July 6, 2020 email "went to blocked folder, which did not attract my attention," insisting, "About the case you refer, it shall be resolved in P.R. China under Chinese law since Syntronic Beijing is a legal entity registered in China and run business in China only.  Apparently you talked with wrong company and wrong person, especially initiate the communication at wrong place. If you or your company representative can come to Beijing and communicate, you are welcomed." Mr. Zhao also added, "At the same time, we are talking with Cadence China on more business cooperation for your information."

177.     In his September 29, 2020 email, Mr. Zhao also added Jesper Gulberg (who is apparently responsible for Strategic Projects at Syntronic AB) as a recipient on the email.

20

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

178.    Cadence responded to Mr. Zhao's email on October 14, 2020, again proposing that the parties speak over the phone (traveling to China during the COVID-19 pandemic is not practicable).

179.    Neither Mr. Zhao nor anyone else from Syntronic responded to Cadence's October 14, 2020 message.

180.    Neither Mr. Zhao nor anyone else from Syntronic responded to the substance of Cadence's allegations, including with respect to the 64 machines identified in the July 24, 2020 communication.

181.    Syntronic did not cease its unauthorized use of Cadence Software after Cadence provided notice on February 5, 2020.

182.    To the contrary, Syntronic has continued using Cadence Software without authorization, including on machines Cadence previously identified in its correspondence to Syntronic.

183.    Syntronic has continued using Cadence Software without authorization, including as late as April 2022.

184.    For example, the computer with MAC address 48ba4ef8a7ac is a computer belonging to Defendants.

185.    An employee of Defendants used unauthorized versions of Cadence Software on the computer with MAC address 48ba4ef8a7ac as late as April 2022.

**SYNTRONIC'S DESTRUCTION OF EVIDENCE**

186.    As of April 20, 2020, more than forty of the computers identified in Cadence's April 20, 2022 correspondence were in the possession, custody, or control of Defendants.

187.    After receiving Cadence's April 20, 2022 correspondence, Defendants disposed of eighteen computers that were identified in Cadence's April 20, 2022 correspondence.

188.    Defendants disposed of at least seven computers that were identified in Cadence's April 20, 2022 correspondence after this litigation was filed.

189.    After receiving Cadence's April 20, 2022 correspondence, Defendants reformatted twenty-four computers that were identified in Cadence's April 20, 2022 correspondence.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

## COUNT I

(Copyright Infringement under 17 U.S.C. § 501 Against All Defendants)

190.   Cadence incorporates and realleges by reference the foregoing paragraphs as if set forth in full herein.

191.   Cadence is the owner of various valid Copyrighted Works, including those registered under the '386 Registration, the '840 Registration, '031 Registration, '236 Registration, '010 Registration, '016 Registration, '041 Registration, '040 Registration, '154 Registration, '496 Registration, '028 Registration, '602 Registration, and '132 Registration.

192.   Cadence has complied with all statutory formalities required by the Copyright Act to maintain the validity of its copyrights in its Copyright Works, including as reflected in its copyright registrations attached as Exhibits 3 through 12.

193.   On multiple occasions Syntronic has downloaded, modified, used, and/or otherwise copied and installed Cadence Software without permission or authorization from Cadence, including copies of Cadence's Copyrighted Works registered under the '386 Registration, the '840 Registration, '031 Registration, '236 Registration, '010 Registration, '016 Registration, '041 Registration, '040 Registration, '154 Registration, '496 Registration, '028 Registration, '602 Registration, and '132 Registration.

194.   Syntronic's unauthorized use and/or duplication of Cadence's copyrighted software constitutes direct and contributory copyright infringement under 17 U.S.C. § 501.

195.   Syntronic is also liable for vicarious infringement.

196.   The individuals who downloaded, modified, used, and/or otherwise copied and installed Cadence Software without permission or authorization from Cadence are subject to the control of Syntronic, and Syntronic directly benefits from their direct infringement.

197.   Individuals who downloaded, modified, used and/or otherwise copied and installed Cadence Software without permission or authorization from Cadence have "@syntronic.com" email addresses and certain infringing machines have the name "Syntronic" in their name.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

198.    On information and belief, Syntronic directly benefits from its infringing activity by, *inter alia*, using Cadence Software to offer services to its clients without paying license fees to Cadence.

199.    Syntronic's actions in violation of the Copyright Act have been knowing and willful.

200.    For example, Syntronic has continued its unauthorized use of Cadence Software after Cadence first provided notice of Syntronic's infringement and after Cadence filed this litigation, including as late as April 2022.

201.    Syntronic's conduct is causing, and is likely to continue to cause, irreparable harm to Cadence and its customers, and Syntronic's unlawful conduct will continue to cause such irreparable injury unless Syntronic is enjoined by this Court.  Cadence has no adequate remedy at law.   Cadence is entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502.

202.    As a result of Syntronic's wrongful actions, Cadence has suffered damages in an amount to be proven at trial, including at least $8.3 million dollars in unpaid licenses.  Cadence is entitled to its actual damages and Syntronic's profits or, alternatively, statutory damages, as well as its costs, attorneys' fees and interest.

## COUNT II

(Circumvention of Copyright Protection Systems under 17 U.S.C. § 1201 Against All Defendants)

203.    Cadence incorporates and realleges by reference the foregoing paragraphs as if set forth in full herein.

204.    The Cadence License Manager and Cadence Software employ technological mechanisms that effectively provide security controlled access to the work and copyright protections.

205.    On information and belief, Syntronic has modified the Cadence License Manager and/or Cadence Software and/or knowingly used copies of Cadence Software that had been tampered and or "cracked" to circumvent Cadence's License Manager and other access control mechanisms at IP addresses located in California. Syntronic made these modifications to the Cadence License Manager and/or Cadence Software, and/or knowingly used copies of Cadence Software or Cadence's License Manager that had been tampered or "cracked," in order to bypass the required entry and/or use of a valid license file and to circumvent the technological measures controlling access to Cadence

23

Software, enabling Syntronic to bypass Cadence's security access mechanisms and copyright protections in the Cadence Software in violation of 17 U.S.C. § 1201(a)(1).

206.    Cadence's license file provision system operates in this District.

207.    On information and belief, Syntronic's actions have been and continue to be willful.

208.    On information and belief, Syntronic also materially contributes to the circumvention of the technological measures by obtaining, downloading, and copying unauthorized versions of the Cadence License Manager and/or Cadence Software from websites and internet service providers known to traffic in illegal content, and is therefore also contributorily liable for the circumvention of Cadence's technological measures.

209.    Syntronic is also vicariously liable for circumvention of Cadence's technological measures.

210.    The individuals who circumvented Cadence's copyright protection mechanisms are subject to the control of Syntronic and Syntronic directly benefits from their direct infringement.

211.    Individuals who circumvented Cadence's copyright protection mechanisms have "@syntronic.com" email addresses and certain infringing machines have the name "Syntronic" in their name.

212.    On information and belief, Syntronic directly benefits from this circumvention by, *inter alia*, using Cadence Software to offer services to its clients without paying license fees to Cadence.

213.    Syntronic's conduct is causing, and is likely to continue to cause, irreparable harm to Cadence and its customers, and Syntronic's unlawful conduct will continue to cause such irreparable injury unless Syntronic is enjoined by this Court.  Cadence has no adequate remedy at law.   Cadence is entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 1203.

214.    As a result of Syntronic's wrongful actions, Cadence has suffered damages in an amount to be proven at trial.  Cadence is entitled to its actual damages and Syntronic's profits or, alternatively, statutory damages in an amount up to $2500 per act of circumvention, device, product, component, offer, or performance of service, as well as its costs, attorneys' fees and interest.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

**COUNT III**

(Breach of Contract Against All Defendants)

215.    Cadence incorporates and realleges by reference the foregoing paragraphs as if set forth in full herein.

216.    Syntronic agreed to the terms of the SLMAs attached hereto as Exhibits 1 through 11 expressly accepting those terms and proceeding with installation of the License Manager and/or the Cadence Software.

217.    On information and belief, the individuals who consented to the terms of the SLMAs attached as Exhibits 1 through 11 are agents with authority to bind Syntronic, including with authority to bind each Defendant.

218.    Several machines on which unauthorized versions of Cadence Software were used are associated with the Username "Administrator."

219.    The use of "cracked" Cadence Software by Syntronic is widespread. On April 20, 2020, Cadence provided Syntronic with a list detailing MAC addresses, computer names, and associated domains for 64 different offending computers. On information and belief, such widespread software piracy is unlikely to occur without the approval of management.

220.    Syntronic specifically recruits and hires engineers who are experienced in the use of Cadence Software.

221.    Syntronic CEO Mr. Jansson expressly acknowledged that Syntronic uses Cadence Software. Although Mr. Jansson contended that Syntronic has "third party licenses," no evidence of such licenses has ever been supplied to Cadence. On the contrary, Cadence provided Syntronic with 64 Syntronic machines using "cracked" versions of Cadence Software.

222.    The individuals who consented to the terms of the SLMAs attached as Exhibits 1 through 11 are also ostensible agents of Syntronic.

223.    For example, Syntronic intentionally and/or carelessly created the impression that the individuals who consented to the terms of the SLMAs attached as Exhibits 1 through 11 are agents of Syntronic by, on information and belief, permitting that they download Cadence Software on

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

machines associated with the @syntronic.com domain and contain further data tying the individuals to Syntronic.

224.    It was reasonable to believe that the individuals who consented to the terms of the SLMAs attached as Exhibits 1 through 11 were agents of Syntronic, including because these individuals downloaded software on machines associated with the @syntronic.com domain and contain further data tying the individuals to Syntronic.

225.    Syntronic, including each of the Defendants, also ratified the above-referenced conduct.

226.    For example, the individuals who copied, shared, and/or used "cracked" Cadence Software purported to act on behalf of Syntronic by downloading this software on machines associated with the @syntronic.com domain and further data tying the individuals to Syntronic.

227.    In February 2020 and on several other occasions, Cadence informed Syntronic of the unauthorized use of its software by Syntronic, including by sending Syntronic a draft of Cadence's original Complaint that set forth in detail the contracts entered and breached by Defendants.

228.    Defendants approved of the conduct of the individuals who copied, shared, and/or used "cracked" Cadence Software, including by failing to curb their software piracy and continued use of Cadence Software even though Defendants do not have a valid license to use Cadence Software.

229.    Defendants also approved of the conduct of the individuals who copied, shared, and/or used "cracked" Cadence Software by voluntarily keeping the benefits of the conduct of the individuals who copied, shared, and/or used "cracked" Cadence Software, including by continuing to use Cadence Software after Syntronic had notice of its unauthorized use and continued use of the software to gain fees and compensation from Syntronic clients.

230.    Cadence substantially performed its obligations that are conditions precedent (if any) under the SLMAs and any nonperformance was excused.

231.    Syntronic breached at least Section 3 of Exhibits 1 through 3 and Exhibits 5 through 9 by copying, sharing, and using the Cadence Software without authorization from Cadence, by bypassing the license file entry and not using valid license files, by taking actions to circumvent the entry of license file information, by continuing to use the Cadence software for commercial purposes

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

without any valid license, by installing the Cadence software on its computers without authorization, and by not paying a licensing fee.

232.    Syntronic breached the terms of at least Section 3.2 of Exhibit 4 by using Cadence Software in a manner not permitted by the terms of this SLMA, including by copying, sharing, and using the Cadence Software without authorization from Cadence, by bypassing the license file entry and not using valid license files, by taking actions to circumvent the entry of license file information, by continuing to use the Cadence software for commercial purposes without any valid license, by installing the Cadence software on its computers without authorization, and by not paying a licensing fee.

233.    Syntronic breached the terms of at least Section 2.f of Exhibits 10 and 11 by using a key code not directly provided to customer by AWR or Cadence and taking action to circumvent the key code system and/or alternative licensing protection mechanisms.

234.    Cadence was damaged as a result of Syntronic's breaches.  For example, Syntronic's breach deprived Cadence of substantial license fees.

235.    Cadence is entitled to injunctive relief and recovery of its attorneys' fees, costs and interest.

## COUNT IV

### (Violation of Lanham Act, 15 U.S.C. § 1125(a) Against All Defendants)

236.    Cadence incorporates and realleges by reference the foregoing paragraphs as if set forth in full herein.

237.    Defendants collectively operate a website at the URL http://syntronic.com.

238.    The domain syntronic.com is registered to Syntronic AB.

239.    Exhibit 12 is a true and correct copy of a website printout from the URL http://syntronic.com/research-and-development/, created on August 10, 2022.

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

1    240.    The following is a screenshot from Exhibit 12:



14    241.    As seen in Exhibit 12, Defendants collectively represent, including through the

15 statements on their public website, http://syntronic.com/research-and-development, that Cadence is

16 their "design partner."

17    242.    Cadence is not, and has never been, a "design partner" of Defendants.

18    243.    Defendants collectively represent, including through the statements on their website,

19 that they "collaborate with global players who are world-leading in their areas of expertise," including

20 Cadence.

21    244.    Cadence does not "collaborate" and has never "collaborated" with Defendants in their

22 design process.

23    245.    Defendants' website contains protected marks and logos belonging to Cadence.

24    246.    Cadence has not authorized Defendants to use Cadence's marks and logos, including

25 on their public-facing website, htttp://syntronic.com.

26    247.    Cadence has not authorized Defendants to hold themselves out as partners of Cadence.

27    248.    Cadence has not authorized Defendants to hold themselves out as collaborating with

28 Cadence on Defendants' design process.

249.   On information and belief, Defendants have used the goodwill in Cadence's marks and goods to trade in their products and services, including by representing to the public that Cadence has "partnered" and "collaborated" with Syntronic.

250.   Defendants' public statements utilizing Cadence's marks and logos set forth above, as well as their display of Cadence's marks and logos are made in connection with the goods and services offered by Defendants.

251.   Defendants' reference to Cadence as a "design partner," along with its use of Cadence's marks and logos, is likely to cause confusion, mistake, or deceive as to the affiliation, connection, or association of Defendants with Syntronic.

252.   Defendants' reference to Cadence as a "design partner" and/or "collaborator," along with its use of Cadence's marks and logos, is likely to cause confusion, mistake, or deceive as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by Cadence.

253.   Defendants have continued to publicly represent that Cadence and Defendants are "design" partners, even more than a year after Cadence filed suit to address Defendants' pirated use of Cadence Software.

254.   Defendants' deceptive and misleading conduct has likely harmed Cadence, including by diminishing the value of Cadence's goodwill in its marks, logos, and other intellectual property.

255.   Defendants have also unfairly and unjustly profited from falsely associating their services and  business with Cadence.

## PRAYER FOR RELIEF

WHEREFOR, Plaintiff Cadence prays that this Court provide relief by:

a.   Preliminarily and permanently enjoining and restraining each of Syntronic AB, Syntronic USA, and Syntronic Beijing, as well as their officers, directors, agents, employees, and all other individuals, firms, corporations, associations, and partnerships affiliated, associated, or acting in concert with them from using the Cadence Software or any other Cadence software to which they hold no valid license;

b.   Awarding Cadence compensatory and actual damages;

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

c.      Ordering each of Syntronic AB, Syntronic USA, and Syntronic Beijing to provide an accounting of its profits;

d.      Awarding Cadence its actual damages plus Syntronic's profits under the Copyright Act, or, at the election of Cadence, statutory damages for Syntronic's copyright infringement;

e.      Awarding Cadence its actual damages plus Syntronic's profits, or, at the election of Cadence, statutory damages for Syntronic's copyright infringement pursuant to 17 U.S.C. § 1203(c)(1);

f.      Increasing the award damages because of Syntronic's willful infringement and/or circumvention;

g.      Requiring each of Syntronic AB, Syntronic USA, and Syntronic Beijing to deliver upon oath, to be impounded during the pendency of this action, all infringing copies of Cadence's copyrighted works, any unauthorized software used to circumvent the licensing restrictions on the Cadence Software, and any products produced, designed, or manufactured, in part or in whole, with or in conjunction with the Cadence software; and that an order of impoundment and/or seizure in respect of the foregoing be issued out of this Court in the manner provided by the Copyright Act and by the United States Supreme Court Copyright Practice Rules (1909); and that at the conclusion of this action, the Court shall order all such materials so held to be surrendered to Cadence or to be destroyed under a Writ of Destruction issued under 17 U.S.C. § 503, whichever shall seem to this Court to be most just and proper;

h.      Awarding Cadence its actual damages, defendant's profits, costs and any other available remedies for Defendants violation of the Lanham Act under 15 U.S.C. § 1125(a).

i.      Awarding Cadence restitution;

j.      Awarding Cadence its attorneys' fees and costs;

k.      Awarding Cadence prejudgment and post-judgment interest;

l.      Awarding Cadence such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Cadence demands a jury trial on all issues triable by a jury.

DATED:  October 7, 2022          By:    */s/ Guy Ruttenberg*

Guy Ruttenberg
Steve Papazian
RUTTENBERG IP LAW, A PROFESSIONAL
CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
Facsimile: (310) 627-2260
guy@ruttenbergiplaw.com
steve@ruttenbergiplaw.com

*Attorneys for Plaintiff*

SECOND AMENDED AND SUPP. COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Exhibit 1

CADENCE DESIGN SYSTEMS, INC. SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED DISTRIBUTORS FOR THIS SOFTWARE.

SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE. So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

   A. SINGLE USER LICENSE. If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.

   B. MULTI-USER AND NETWORK LICENSES. If you have multi-user and network license(s) ("Licenses") for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will

be determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES. If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT. This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes, or (3) disclose the Product to any third party.  You must label any copies with all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that You are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product.  You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.  Customer shall keep full, clear and accurate records to confirm its authorized Use of the Product hereunder, including but not limited to ensuring that Customer has not exceeded the number of authorized copies of Product and other obligations hereunder. Cadence shall have the right to audit such records during regular business hours to confirm Customer's compliance with its obligations hereunder. Customer shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in Fees uncovered by such audit plus interest at the rate set forth in Section 4(a) below. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then Customer shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS. The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other

entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY. THE PRODUCT IS SOLD "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS. The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and 227.7202-3 (JUNE 1995).  The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS. You acknowledge and agree that the SOFTWARE is subject to restrictions and controls imposed by the United States Export Administration Act (the "Act") and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES. Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has not obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.

(a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.   Such assistance will be at Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.  If it determines that the reported problem is not due to the Product, if you request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence provides to correct such problem.

(b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.

(c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.

(d) Cadence shall not be obligated to provide Maintenance Services pursuant to this Agreement that are required by any of the following:

(1) abuse, misuse, accident or neglect; or

(2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or

(3) use of materials not meeting Cadence's requirements; or

(4) use of the Product for other than the intended purpose for which licensed and designated; or

(5) malfunction, modification or relocation of the Designated Equipment (as defined below); or

(6) where inadequate backups are supplied.

(e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.

(f) Products are licensed for use on a specific hardware unit ("Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.


12. INITIAL TERM; COMMENCEMENT; RENEWAL. This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).  Unless otherwise specified in a Product Quotation from Cadence, this Agreement shall have an initial term of one (1) year.  Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per section 20 below.  If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.  You shall pay Cadence's software update charges where applicable. Maintenance Services renewal is contingent on current payment of maintenance fees, your not being in default hereunder, and a valid order from you.


13. NO WARRANTY.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER

THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the Product Quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B point of shipment.  Shipping charges, including insurance, shall be paid by you.  Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of 6 months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.  Maintenance Services outside the contiguous United States that would otherwise be covered by this Agreement are excluded.

18. YOUR RESPONSIBILITIES.  You shall:

   (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing.  Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;

   (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;

   (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during Service;

(d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;

(e) Provide the same standard of care for Product that it applies to its own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;

(f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.  You shall notify Cadence in writing not more than thirty (30) days prior to moving the Designated Equipment as to its intended new location.  Cadence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.  YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION. Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of Your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all the assets of Customer, a merger, a re-organization, or change in control of fifty percent (50%) or more of the equity of Customer (a "Change in Control").  No transfer, delegation or assignment (including, without limitation, an assignment by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence?s sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the Product Quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS? FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys? fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.  Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2011 by Cadence Design Systems, Inc. All rights reserved.

Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134 U.S.A.

v2011-01

Exhibit 2

CADENCE DESIGN SYSTEMS, INC. SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED DISTRIBUTORS FOR THIS SOFTWARE.

SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE.  So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

  A. SINGLE USER LICENSE.  If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.

  B. MULTI-USER AND NETWORK LICENSES.  If you have multi-user and network Licenses for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will be

determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES.  If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT.  This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes.  You must label any copies with all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that you are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product.  You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.  You shall keep full, clear and accurate records to confirm your authorized Use of the Product hereunder, including but not limited to ensuring that you have not exceeded the number of authorized copies of Product and other obligations hereunder.  Cadence shall have the right to audit such records during regular business hours to confirm your compliance with your obligations hereunder. You shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in Fees uncovered by such audit plus interest at the rate of one and one-half percent (1½%) per month. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then you shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS.  The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY.  THE PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS.  The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and 227.7202-3 (JUNE 1995).  The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS.  You acknowledge and agree that the SOFTWARE is subject to restrictions and controls imposed by the United States Export Administration Act and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES.  Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has no obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.

   (a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.  Such assistance will be at Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.  If it determines that the reported problem is not due to the Product, if you

request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence provides to correct such problem.

(b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.

(c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.

(d) Cadence shall not be obligated to provide Maintenance Services pursuant to this Agreement that are required by any of the following:

(1) abuse, misuse, accident or neglect; or

(2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or

(3) use of materials not meeting Cadence's requirements; or

(4) use of the Product for other than the intended purpose for which licensed and designated; or

(5) malfunction, modification or relocation of the Designated Equipment (as defined below); or

(6) where inadequate backups are supplied.

(e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.

(f) Products are licensed for use on a specific hardware unit ("Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.


12. INITIAL TERM; COMMENCEMENT; RENEWAL.  This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).  Unless otherwise specified in a product quotation from Cadence or an authorized Cadence reseller, this Agreement shall have an initial term of one (1) year.  Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per section 21 below.  If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.  You shall pay Cadence's software update charges where applicable.  Maintenance Services renewal is contingent on current payment of maintenance fees, your not being in default hereunder, and a valid order from you.


13. NO WARRANTY.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the product quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B. point of shipment.  Shipping charges, including insurance, shall be paid by you.  Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of six (6) months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.

18. YOUR RESPONSIBILITIES.  You shall:

   (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing.  Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;

   (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;

   (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during a service visit;

   (d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;

   (e) Provide the same standard of care for Product that you apply to your own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as

directed by Cadence;

   (f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.  You shall notify Cadence in writing not less than thirty (30) days prior to moving the Designated Equipment as to its intended new location.  Cadence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.  YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION.  Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all your assets, a merger, a re-organization, or change in control of fifty percent (50%) or more of your equity (a "Change in Control").  No transfer, delegation or assignment (including, without limitation, an assignment by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the product quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, U.S.A., Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  Any terms and conditions contained or incorporated by reference in purchase orders, acknowledgments, invoices, confirmations or other business forms of either party which add to or differ from the terms and conditions of this Agreement shall be of no force or effect whatsoever concerning the subject matter of this Agreement, and either party's failure to object thereto shall not be deemed a waiver of such party's rights hereunder.  This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.  Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2012 by Cadence Design Systems, Inc. All rights reserved.

Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134, U.S.A.

v2012-10 (146406_2)

Exhibit 3

CADENCE DESIGN SYSTEMS, INC.  SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED RESELLERS FOR THIS SOFTWARE.

SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE.  So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive, non-transferrable, right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

   A. SINGLE USER LICENSE.  If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.

B. MULTI-USER AND NETWORK LICENSES.  If you have multi-user and network Licenses for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will be determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2.      VIRTUAL MACHINES.  You may not use the Software in connection with any virtual machines unless a virtual machine license is provided to you, in which case in the applicable Cadence documentation, the following shall apply:.  :
a)      You shall ensure that any use of virtual machines shall not result in the use of Software in excess of the number of License Keys (as used herein, "License Key(s)" shall be defined as a physical or electronic activation key provided to a you that authorizes: (i) the Software, including the version number and quantity that is licensed to you; and (ii) the Designated Equipment (as defined in Section 11 below); and (iii) the codes that you must input to access the Software on the Designated Equipment) issued to you;

b)        Prior to moving the License Key from one virtual machine to another virtual machine with a different Ethernet address, IP address, host name and/or domain name (which shall be a "Relocation" as defined in Section 19 below), you shall (i) complete and return Cadence's Request for Relocation and Certificate of Discontinued Use and (ii) obtain a new License Key;

c)        In the event of a Relocation without first obtaining a new License Key, you acknowledge and consent to the following:  (i) certain information will be automatically transmitted back to Cadence for the purpose of tracking each virtual machine involved in such Relocation and (ii) the automatic shutdown of the Software on virtual machines after seven days of non-compliance (or such other period of time stated in the applicable License Key(s)).  Information currently transmitted back to Cadence is Ethernet address, IP address, host name, and domain name.  Cadence will not change the information transmitted back without first informing you at least ninety (90) days in advance.

d)        You shall not host Cadence license servers using virtual machine desktop or laptop products, including but not limited to VMware Fusion, VMware Workstation, VirtualBox and Parallels.  Any such hosting of Cadence license servers using desktop or laptop products is expressly prohibited and will not be supported by Cadence.


3. UPGRADES AND UPDATES.  If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT AND TRADEMARK.  This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes.  You may not disclose the Product to any third party.  You must label any copies with all information included on the original media label and all legends, trademarks, trade names, copyright legends and other identifications must be copied when copying the Product. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that you are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product.  You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF SOFTWARE [OR PRODUCT]  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.  You shall not remove or alter any of Cadence's or its licensors' restrictive or ownership legends appearing on or in the Software and shall reproduce such legends on all copies permitted to be made.  You grant Cadence the right and license to make, use, sell, reproduce, modify, sublicense, disclose, distribute and otherwise exploit error reports, corrections or suggestions provided by you concerning the Software and any modifications based thereon.


5. COMPLIANCE WITH AGREEMENT PROVISIONS.  You shall keep full, clear and accurate records to confirm your authorized Use of the Product hereunder, including but not limited to ensuring that you have not exceeded the number of authorized copies of Product and other obligations hereunder.  Cadence shall have the right to audit such records during regular business hours to confirm your compliance with your obligations hereunder. You shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in fees uncovered by such audit plus interest at the rate of one and one-half percent (1½%) per month. If the audit uncovers any shortfall in payment of

more than five percent (5%) for any quarter, then you shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS.  The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. WARRANTY DISCLAIMER.  CADENCE DOES NOT WARRANT THAT THE SOFTWARE WILL MEET YOUR REQUIREMENTS AND THAT USE OF THE SOFTWARE WILL BE UNINTERRUPTED OR ERROR FREE. CADENCE, ITS LICENSORS AND ITS AUTHORIZED RESELLERS MAKE NO WARRANTIES TO YOU WITH RESPECT TO THE LICENSED MATERIALS OR ANY SERVICE, ADVICE, OR ASSISTANCE FURNISHED HEREUNDER, AND NO WARRANTIES OF ANY KIND, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OR ARISING FROM COURSE OF DEALING OR USAGE IN TRADE SHALL APPLY.

8. LIMITATION OF LIABILITY.  IN NO EVENT SHALL CADENCE OR ITS AUTHORIZED RESELLERS BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE ACTUALLY RECEIVED BY CADENCE FROM YOU FOR THE SOFTWARE WHICH IS THE SUBJECT OF THE CLAIM UNDER THE APPLICABLE ORDER OR CONFIRMATION FOR YOUR TRIAL SOFTWARE SIGNUP.

9. U.S.A. GOVERNMENT CONTRACTING.  The Product shall not be provided to any third party, including the U.S. Government, without prior written authorization by Cadence.  The Products are "commercial computer software" as defined in Federal Acquisition Regulation ("FAR") 2.101.  If the Products are licensed by (or if Customer is authorized by Cadence to license on behalf of) (i) a civilian agency, the U.S. Government licenses the Products subject to this Cadence commercial license agreement as specified in 48 C.F.R. 12.212 (Computer Software) and 12.211 (Technical Data) of the FAR and its successors; or (ii) an agency within the Department of Defense ("DOD"), the U.S. Government licenses Cadence Products subject to this Cadence commercial license agreement as specified in 48 C.F.R. 227.7202-3 of the DOD FAR Supplement ("DFARS") and its successors.  The terms of this Agreement supersede and are in lieu of any FAR, DFARS, or supplemental regulations to the FAR.

10. EXPORT LAWS AND REGULATIONS.  You acknowledge and agree that the Software is subject to restrictions and controls imposed by the United States Export Administration Act and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary.  You also agree that your obligations under this Section will survive and continue after any termination or revocation of rights under this Agreement. You shall be strictly responsible for ensuring that you, you employees and any third parties who access the Product on your behalf fully comply with the requirements of this Section 10 and provisions of ITAR and EAR, and you shall indemnify Cadence against any loss related to any failure to conform to these requirements.

MAINTENANCE SERVICES

This portion of this Agreement applies to any Maintenance Services (as defined below) purchased by you from Cadence or its authorized distributors for this Software, as indicated in the applicable order, product quotation, or confirmation for your Software trial signup.

11. MAINTENANCE SERVICES.  As applicable, Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has no obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.

   (a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.  Such assistance will be at Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.  If it determines that the reported problem is not due to the Product, if you request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence provides to correct such problem.

   (b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.

   (c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.

   (d) Cadence shall not be obligated to provide Maintenance Services pursuant to this Agreement that are required by any of the following:

   (1) abuse, misuse, accident or neglect; or

   (2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or

   (3) use of materials not meeting Cadence's requirements; or

   (4) use of the Product for other than the intended purpose for which licensed and designated; or

   (5) malfunction, modification or relocation of the Designated Equipment (as defined below); or

   (6) where inadequate backups are supplied.

   (e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.

   (f) Products are licensed for use on a specific hardware unit ("Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.

12. INITIAL TERM; COMMENCEMENT; RENEWAL.  This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).

(a) Unless otherwise specified in a product quotation from Cadence or an authorized Cadence reseller, this Agreement shall have an initial term of one (1) year.  Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per Section 21 below.  If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.  You shall pay Cadence's software update charges where applicable.  Maintenance Services renewal is contingent on current payment of maintenance fees, you not being in default hereunder, and a valid order from you.

(b) In the case of a Software trial, unless otherwise specified in the signup confirmation from Cadence or an authorized Cadence reseller, this Agreement shall have a term of thirty (30) days. After the term has expired, this Agreement shall terminate immediately.  If you desire to use the Software beyond the thirty (30) day term, you will need to contact Cadence or a Cadence reseller for a new license.

13. WARRANTY DISCLAIMER.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the product quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made Ex Works point of shipment. Shipping charges, including insurance, shall be paid by you.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of six (6) months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.

18. YOUR RESPONSIBILITIES.  You shall:
   (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing.  Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;
   (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;
   (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during a service visit;
   (d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;
   (e) Provide the same standard of care for Product that you apply to your own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;
   (f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION.  The Software may only be moved from the Designated Equipment with Cadence's prior written consent ("Relocation").  You will immediately return Cadence's Request for Relocation and Certificate for Discontinued Use when the Software is moved. You shall completely remove the Software from the previous Designated Equipment.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE ACTUALLY RECEIVED BY CADENCE FROM YOU FOR THE SOFTWARE WHICH IS THE SUBJECT OF THE CLAIM UNDER THE APPLICABLE ORDER

REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE. YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

GENERAL TERMS
This portion of the Agreement applies to both Software and Maintenance Services.

21. TERMINATION.  Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all your assets, a merger, a re-organization, or change in control of fifty percent (50%) or more of your equity (a "Change in Control").  No assignment, delegation or transfer (including, without limitation, by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the product quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, U.S.A., Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  Any terms and conditions contained or incorporated by reference in purchase orders, acknowledgments, invoices, confirmations or other business forms of either party which add to or differ from the terms and conditions of this Agreement shall be of no force or effect whatsoever concerning the subject matter of this Agreement, and either party's failure to object thereto shall not be deemed a waiver of such party's rights hereunder.  This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

30. INJUNCTIVE RELIEF.  You acknowledge that breach may cause irreparable harm to Cadence for which money damages would be inadequate, and Cadence shall be entitled to obtain timely injunctive relief without the necessity of posting bonds, in addition to any and all remedies available at law.

Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2017 by Cadence Design Systems, Inc.  All rights reserved.
Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134, U.S.A.

v2017-2 (279273_2)

Exhibit 4



## ORCAD SOFTWARE LICENSE AND MAINTENANCE
## TERMS AND CONDITIONS

These OrCAD Software License and Maintenance Terms and Conditions ("**Terms**") apply to Orders for Licensed Materials from Cadence Design Systems, Inc., a Delaware company, having a principal place of business at 2655 Seely Avenue, San Jose, California 95134-1937, U.S.A. or any other Cadence Affiliate as indicated in the Order ("**Cadence**"), including Orders from an authorized Cadence reseller.  For an Order entered into by a Cadence Affiliate, references to Cadence under these Terms shall be deemed references to the Cadence Affiliate who entered into the Order.  "**Customer**" refers to the entity listed in the Order.

**1.**      **DEFINITIONS.**  The following definitions apply herein:

**1.1.**      "**Acquired Cadence Software**" means Software acquired by Cadence (or its Affiliates) as the result of an acquisition by Cadence (or its Affiliates) of either a third party, or the technology of a third party.

**1.2.**      "**Affiliate**" means an entity that now or hereafter controls, is controlled by, or is under common control with, a specified entity, where "control" means beneficial ownership, directly or indirectly, of more than fifty percent (50%) of the outstanding shares or other ownership interest (representing the right to vote for the election of directors or other managing authority or the right to make the decisions for such entity, as applicable) of an entity.  Such entity shall be deemed to be an Affiliate only so long as such control exists.

**1.3.**      "**Design Elements**" means library elements, libraries, symbols, simulation or behavioral models, circuit and logic elements, and any Updates thereto included with, and Used in conjunction with Software.

**1.4.**      "**Designated Equipment**" means either: (i) a server identified by serial number, or host I.D. on which the Licensed Materials are stored; or (ii) a computer or workstation, as identified by its serial number, host I.D. number (of such machine or a dongle) or Ethernet address; to which the Licensed Materials are downloaded and Used only upon the issuance of a License Key.  The Designated Equipment shall be of a manufacture, make and model, and have the configuration, capacity (i.e., memory/disk), operating software version level, and pre-requisite and co-requisite applications, described in the Documentation or otherwise necessary or desirable for the operation of the Software.

**1.5.**      "**Documentation**" means the user manuals and other written materials that describe the Software, its operation and matters related to its Use, which Cadence generally makes available to its commercial licensees for use with the Software and any Updated, improved or modified version(s) of such materials, whether provided in published written material, on magnetic media or communicated by electronic means.

**1.6.**      "**Effective Date**" means the date specified in the applicable Order representing the commencement of the Term of Use for the Licensed Materials.

**1.7.**      "**License Key**" means a physical or electronic activation key provided to Customer that authorizes:  (i) the Licensed Materials, including the version number and quantity that is licensed to Customer; (ii) the Designated Equipment; and (iii) the codes that Customer must input to access the Licensed Materials on the Designated Equipment.

**1.8.**      "**Licensed Materials**" means the specific group of OrCAD Software, Design Elements, and the associated Documentation (if any) licensed to Customer as described in the Order.  Unless otherwise specified in the Order, Licensed Materials exclude New Technology, Upgrades, and Acquired Cadence Software.

**1.9.**      "**Maintenance Service(s)**" means the services which Cadence makes available to Customer related to the Licensed Materials as more particularly described in Section 9 (Technical Support) herein.

**1.10.**      "**New Technology**" or "**Upgrade**" means any enhancement(s) or addition(s) to Software (other than an Update) which Cadence does not make available to its commercial customers as a part of the standard Maintenance Services offering, but rather is only provided subject to payment of a separate fee.  Acquired Cadence Software, New Technology and Upgrades are not covered by, and will not be provided in consideration of the Fees already paid by Customer unless otherwise specified in an Order.

**1.11.**      "**Open Source Software**" means any software or derivative work thereof that is subject to terms imposing on Customer:  (i) a requirement that it is to be distributed or made available in source code; (ii) a requirement that any patents related to the software are either licensed to or may not be asserted against, recipients of the software; or (iii) any license meeting the Open Source Definition (as promulgated by the Open Source Initiative) or the Free Software Definition (as promulgated by the Free Software Foundation, or any substantially similar license, including the GNU General Public License (GPL), Lesser/Library GPL (LGPL), the Mozilla Public License (MPL), the Apache License, the BSD License or the MIT license).

**1.12.**      "**Order**" means a quotation entered into and signed by authorized representatives of Cadence or its authorized reseller and Customer.  Orders may state additional terms and conditions which apply to particular Licensed Materials.  These Terms shall apply

separately to each Order that includes OrCAD Software.  Customer's order forms may be used for invoicing or administrative purposes, but are subject to Section 6 (Ordering) herein, and are not considered part of the Order under these Terms.

1.13.    "**Software**" means any applications programming code or executable computer program(s), including any Updates thereto.

1.14.    "**Subscription**" means the license of Software and Documentation for a fixed period of time that is less than ninety-nine (99) years in which the Fee for Maintenance Services is included within the Fees quoted for the entire Term of Use.

1.15.    "**Term of Use**" means that period of time Customer has Use of the Software as specified in the applicable Order.

1.16.    "**Update**" means a Software modification released by Cadence on a general, regularly scheduled basis as a standard Maintenance Services offering to its other commercial customers.  Updates may include revisions to the Documentation.  Updates do not include any Acquired Cadence Software, Upgrades, or New Technology.

1.17.    "**Use**" means copying all or any portion of Software, Design Elements, and/or License Key into the Designated Equipment or transmitting it to the Designated Equipment for: (i) executing or processing instructions contained in the Software; (ii) using, executing or modifying any of the Design Elements; or (iii) loading data into or displaying, viewing or extracting output results from or otherwise operating any portion of the Software or Design Elements, each solely for the purpose of Customer's internal design and manufacture of electronic circuits and systems.

1.18.    "**99-year License**" means the license of Software and Documentation for a period of ninety-nine (99) years in which the License Fees are quoted separately from Maintenance Services Fees and in which Maintenance Services are not automatically included during the Term of Use, except for the first year.

2.    **SCOPE AND BACKGROUND**

2.1.    **Generally.**  These Terms provide the terms and conditions for Customer to:  (i) license a specific quantity of Licensed Materials on either a Subscription or 99-year License basis; and (ii) obtain Maintenance Services for the Licensed Materials pursuant to the provisions set forth herein.  Licensed Materials shall only be Used at the site where the Designated Equipment is located and shall not be Used on a wide area network.

2.2.    **Authorized Cadence Resellers.**  For any Software licenses acquired by Customer through an authorized Cadence reseller, in the event of a conflict between (1) the terms of Section 4.1 (Fees and Payment) and/or Section 4.2 (Taxes), and (2) the terms entered into by Customer and an authorized Cadence reseller which govern the transaction, the terms of the authorized Cadence reseller shall prevail.  While Cadence shall remain the "licensor" for purposes of the grant of the licenses and other rights hereunder, and Customer shall remain the "licensee" for purposes of the obligations contained herein, Customer shall contract directly with the authorized Cadence reseller for the purchase of License Keys and any Maintenance Services on Software provided by such authorized Cadence reseller.

3.    **LICENSE GRANT**

3.1.    **Grant.**  Subject to Customer's timely payment of the Fees as set forth in Section 4 (Fees; Taxes) and compliance with these Terms, Cadence, either directly or by and through one of its Affiliates, grants Customer, for the Term of Use as specified in the Order, a non-transferable, non-exclusive, license to:  (i) Use the quantity of Licensed Materials identified in the applicable Order on the Designated Equipment as implemented by the number of License Keys issued for the Licensed Materials; and (ii) Use the Documentation as is reasonably necessary for Customer's licensed Use of the Licensed Materials.  All rights not expressly granted to Customer pursuant to these Terms are reserved by Cadence.

3.2.    **Limitations.**  All rights, title, and interest in the Licensed Materials shall remain the exclusive property of Cadence and/or its licensors.  The Licensed Materials are the Confidential Information (as defined below) of Cadence or third parties from whom Cadence has obtained the appropriate rights and Customer shall not disclose the Licensed Materials to any third party except as expressly provided hereunder.  Customer shall not Use or copy the Licensed Materials except as expressly permitted herein.  Customer may only Use those Licensed Materials specified in the applicable Order.  Customer shall not modify, disassemble, decompile or reverse translate, or create derivative works from the Licensed Materials or otherwise attempt to derive the source code, or let any third party do so, except to the extent the foregoing are not permitted to be restricted under applicable law.  No right or license is granted or implied under any of Cadence, or its licensors', patents, copyrights, trademarks, trade names, service marks, or other intellectual property rights to Use the Licensed Materials or to authorize others to Use the Licensed Materials beyond the rights and restrictions set forth in these Terms.  By way of example and not limitation, Customer shall not disclose to any third party any benchmarking of:  (i) the Licensed Materials; or (ii) the output of any Licensed Materials (which means any form of competitive analysis of the Licensed Materials versus competitive tool products), nor permit any third party to do so.  Customer shall not remove or alter any of Cadence's or its licensors' restrictive or ownership legends appearing on or in the Licensed Materials and shall reproduce such legends on all copies permitted to be made.  Customer grants Cadence the right and license to make, use, sell, reproduce, modify, sublicense, disclose, distribute, and otherwise exploit error reports, corrections or suggestions provided by Customer concerning the Licensed Materials and any modifications based thereon.

3.3.    **Restrictions.**  Customer shall not let the Licensed Materials be accessed or Used by third parties or anyone other than Customer's employees whose duties require such access or Use.  Notwithstanding the foregoing, Customer's authorized consultants and

contractors (excluding any competitors of Cadence) ("**Authorized Contractors**") may Use the Licensed Materials on the Designated Equipment only at a Customer's facility, solely where such Use is incidental to their performing services on Customer's behalf. Customer must ensure that such access and Use by Authorized Contractors is limited solely to the Use permitted by the license granted to Customer hereunder and is limited solely to Customer's facility. Prior to allowing any access or Use by Authorized Contractors under this Section 3.3 (Restrictions), Customer shall first have a written agreement in place between Customer and such Authorized Contractors obligating Customer and its Authorized Contractors to observe the same restrictions concerning the Licensed Materials as are contained in these Terms together with each applicable Order. Customer shall be responsible to Cadence for all acts and omissions of each Authorized Contractor as if they were the acts and omissions of Customer, which responsibility shall survive termination of these Terms together with each applicable Order.

**3.4.**   **Open Source.** The Licensed Materials may be provided with Open Source Software subject to separate terms identified in a text file or about box or in a file or files referenced thereby (and shall include any associated license agreement, notices and other related information therein), or may be accompanied by its own license agreement. Customer's Use of the Open Source Software will be subject to the terms and conditions of such other license agreement and are not considered part of the Licensed Materials subject to the terms and conditions of these Terms. By using such Open Source Software, Customer shall be bound by all such license agreements, notices, and information.

**3.5.**   **Evaluation Licenses.** Cadence may also agree to provide Customer with an evaluation license for Licensed Materials under these Terms. Such evaluation licenses shall be evidenced by an Order designating such Licensed Materials as provided for evaluation purposes only. The Term of Use for such evaluation licenses shall be thirty (30) days unless otherwise stated in the Order. In such event, Section 9 (Technical Support) and Section 10 (Warranty Disclaimer) shall not apply.

**3.6.**   **Virtual Machines.** Customer may only Use Licensed Materials through virtual machines subject to the Terms including the following:

    **(a)**   Customer shall ensure that any Use of virtual machines shall not result in the Use of Licensed Materials in excess of the number of License Keys issued to Customer;

    **(b)**   Prior to moving the License Key from one virtual machine to another virtual machine with a different Ethernet address, IP address, host name and/or domain name (which shall be a "Relocation" as defined in Section 8.2 (Relocation) below), Customer shall (i) complete and return Cadence's Request for Relocation and Certificate of Discontinued Use, and (ii) obtain a new License Key;

    **(c)**   In the event of a Relocation without first obtaining a new License Key, Customer acknowledges and consents to the following: (i) certain information will be automatically transmitted back to Cadence for the purpose of tracking each virtual machine involved in such Relocation; and (ii) the automatic shutdown of the Licensed Materials on virtual machines after seven (7) days of non-compliance by Customer (or such other period of time stated in the applicable License Key(s)). Information currently transmitted back to Cadence is Ethernet address, IP address, host name, and domain name.

    **(d)**   Customer shall not host Cadence license servers using virtual machine desktop or laptop products, including, but not limited to, VMware Fusion, VMware Workstation, VirtualBox and Parallels. Any such hosting of Cadence license servers using desktop or laptop products is expressly prohibited and will not be supported by Cadence.

**4.**   **FEES; TAXES**

**4.1.**   **Fees and Payment.** Customer shall pay Cadence the license fees ("**License Fees**") and maintenance services fees ("**Maintenance Services Fees**") (collectively, the "**Fees**"). All payments shall be in U.S. Dollars, unless otherwise specified in the Order. Such Fees shall be remitted so that they are received by Cadence by the dates and in the amounts set forth in the Order. Except as expressly provided to the contrary herein, all Fees are non-cancellable, non-refundable, and shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Without limiting any other rights or remedies of Cadence (including termination rights), past due amounts shall be subject to a charge of one and one-half percent (1½%) per month of the unpaid balance or the maximum rate allowable by law. In addition, Customer shall pay all reasonable out-of-pocket expenses incurred by Cadence, including, but not limited to, counsel fees and costs, in connection with collection thereof.

**4.2.**   **Taxes.** All Fees are net. Customer shall pay or reimburse all taxes, duties and assessments, if any due, based on or measured by amounts payable to Cadence in any transaction between Customer and Cadence under these Terms (excluding taxes based on Cadence's net income) together with any interest or penalties assessed thereon, or furnish Cadence with evidence acceptable to the taxing authority to sustain an exemption therefrom (collectively, "**Taxes**"). If any Fees are subject to withholding, then Customer shall pay such additional amounts to ensure that Cadence receives the full amount it would have received had payment not been subject to such withholding. The parties shall cooperate to qualify for the benefits available under any applicable treaty for the avoidance of double taxation and to promptly provide to each other relevant documentation for same.

**4.3.**   **Records; Audit.** Customer shall keep full, clear and accurate records to confirm its authorized Use of the Licensed Materials hereunder, including, but not limited to, ensuring that Customer has not exceeded the number of authorized copies of Licensed Materials and other obligations hereunder. Cadence shall have the right to audit such records during regular business hours to confirm Customer's

compliance with its obligations hereunder.  Customer shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in Fees uncovered by such audit plus interest at the rate set forth in Section 4.1 (Fees and Payment) above.  If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then Customer shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

## 5.    TERM AND TERMINATION

**5.1.    Term.**  These Terms shall remain in effect for the applicable Order, unless such Order is terminated as set forth below.  The Term of Use for the Licensed Materials provided thereunder shall commence on the Effective Date for the Order and continue as set forth in the Order, unless the applicable Order is terminated as provided in Section 5.2 (Termination) below.  For Software licensed on a 99-year basis, Maintenance Services are only provided for the initial year.  Maintenance Services are thereafter renewable by Customer for additional periods upon issuance by Cadence or its authorized reseller of a renewal confirmation or Licensed Materials and payment by Customer of the Maintenance Services Fees.

**5.2.    Termination.**  These Terms and any Order may be terminated by Cadence:  (i) if Customer fails to pay when due, all or any portion of any amounts payable under such Order, and such failure is not cured within ten (10) days after receipt of written notice; (ii) immediately if Customer becomes insolvent or makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for Customer or for a substantial part of its assets, or bankruptcy, reorganization, or insolvency proceedings shall be instituted by or against Customer; or (iii) if Customer breaches any other material provision of these Terms together with each applicable Order and such failure is not cured within thirty (30) days after receipt of written notice if such breach is curable or immediately upon notice if such breach is not curable.  In addition, without limiting any other rights or remedies available to Cadence (including termination rights), in the event Customer fails to pay any Fees due under an Order, Cadence may accelerate all remaining Fees under such Order, together with any applicable Taxes, to become immediately due and payable by Customer to Cadence and withhold delivery of any License Key, Licensed Materials and Maintenance Services until Customer pays such past due amounts in full.

**5.3.    Effect of Termination.**  Expiration or termination of these Terms shall simultaneously terminate all rights granted pursuant to Section 3 (License Grant) and Cadence's obligations with respect thereto.  Within thirty (30) days after such expiration or termination, and without limiting any other rights or remedies of Cadence, Customer shall:  (i) furnish Cadence written notice certifying that the original and all copies, including partial copies, of the Licensed Materials furnished by Cadence under these Terms or made by Customer as permitted by these Terms, have either been returned to Cadence or destroyed and no copies or portions thereof remain in the possession of Customer, its employees or agents including Authorized Contractors; and (ii) make prompt payment in full to Cadence for all amounts then due plus the unpaid balance of the remaining License Fees set forth in the Order, together with any applicable Taxes, which shall accelerate and become immediately due and payable by Customer to Cadence.  In addition, each party's rights and remedies with respect to any breach by the other party shall survive.  Sections 3.2 (Limitations), 3.3 (Restrictions), 3.4 (Open Source), 4 (Fees; Taxes), 5.3 (Effect of Termination), 10 (Warranty Disclaimer), 11 (Limitation of Liability), and 12 (General Provisions) shall survive expiration or termination of these Terms.

## 6.    ORDERING

These Terms shall govern all Orders for OrCAD Software and any such Customer purchase orders, regardless of whether the Customer's purchase order was received by Cadence directly or through an authorized Cadence reseller.  Any terms and conditions contained or incorporated by reference in purchase orders, acknowledgments, invoices, confirmations or other business forms of either party which add to or differ from the terms and conditions of these Terms together with each applicable Order are rejected and shall be of no force or effect whatsoever, and either party's failure to object thereto shall not be deemed a waiver of such party's rights hereunder.  Cadence has the right to discontinue the sale of licenses of the Licensed Materials (and associated Maintenance Services) at any time.

## 7.    SHIPMENT

Upon acceptance of an Order by Cadence or an authorized Cadence reseller, all Cadence Software is available for download by Customer from Cadence; provided, however, Customer shall only Use Cadence Software for which a License Key has been purchased from either Cadence or an authorized Cadence reseller.  Unless otherwise requested in writing by Customer as set forth herein, all Licensed Materials and License Keys shall be provided to Customer in electronic format only.  Cadence agrees not to deliver to Customer and Customer agrees not to accept any Licensed Materials on tangible media, (including, but not limited to, CD ROM, tape or paper), excluding written or printed Documentation provided under these Terms.  In the event Customer requests the delivery of any tangible media, such request must be in writing and received at least ninety (90) days prior to the delivery of the Licensed Materials.  Delivery of any tangible media requested by Customer hereunder shall be made Ex Works (per Incoterms in effect on the Effective Date for the Order) point of shipment.  Customer shall pay all shipping charges, including, but not limited to, insurance.  Risk of loss shall pass to Customer upon delivery to carrier.

## 8.    COPIES AND TRANSFER

**8.1.    Copies.**  Customer may make a reasonable number of copies of Software for either of the following purposes only:  (i) archival purposes; or (ii) for Use as a back-up when the Software is not operational.  Customer may make a reasonable number of copies of

Design Elements, provided that such copies are made only in connection with its authorized Use of such Design Elements.  All legends, trademarks, trade names, copyright legends, and other identifications must be copied when copying the Licensed Materials. Documentation may not be copied except for a reasonable number of printed copies from the Documentation provided by Cadence.

**8.2.** **Relocation.**  The Licensed Materials may only be moved from the Designated Equipment with Cadence's prior written consent ("**Relocation**").  Customer will immediately return Cadence's Request for Relocation and Certificate of Discontinued Use when the Licensed Materials are moved.  Customer shall completely remove the Licensed Materials from the previous Designated Equipment.

## 9.    TECHNICAL SUPPORT

**9.1.** **Generally.**  Subject to these Terms together with each applicable Order, and Customer's timely payment of applicable Fees, Cadence agrees to use commercially reasonable efforts to perform, or have provided through its authorized reseller, during the Term of Use specified in an Order for Subscription licenses and for the initial year of the Term of Use for a 99-year License (and any agreed renewal periods for which applicable Fees are paid), the following technical assistance with respect to the Licensed Materials.

**9.2.** **Maintenance Services.**

**9.2.1.** **Technical Support.**  Cadence will make technical assistance available to Customer through Cadence Customer Support between 9:00 a.m. and 5:00 p.m., local time ("**Prime Shift**"), Monday through Friday, excluding Cadence's holidays.

**9.2.2.** **Issue Resolution Assistance.**  Cadence or its authorized Reseller will acknowledge receipt of Customer's service request ("**SR**") within four (4) Prime Shift hours.  Customer's SR shall include a detailed description of the nature of the issue, the conditions under which it occurs, and other relevant data sufficient to enable Cadence to reproduce the reported error in order to verify its existence and diagnose its cause.  Upon completion of diagnosis, Cadence will provide Customer appropriate assistance in accordance with Cadence's standard commercial practices, including furnishing Customer with an avoidance procedure, bypass, work-around, patch or hot-fix (i.e., a Customer specific release for a production stopping problem with no work-around) to correct or alleviate the condition reported.

**9.2.3.** **Update(s).**  Cadence will provide Update(s) to Customer for the Licensed Materials.  Cadence will also provide instructions and/or Documentation to Customer that Cadence considers reasonably necessary to assist in a smooth transition for Use of an Update.

**9.2.4.** **Communication.**  Cadence will provide Customer:  (i) access to Cadence's online Customer support service; and (ii) such newsletters and other publications, as Cadence routinely provides or makes accessible to all Maintenance Services' customers to furnish information on topics such as Software advisories, known problem and solution summaries, product release notes, application notes, product descriptions, removal of an item from a product line, training class descriptions and schedules, bulletins about user group activity and the like.

**9.2.5.** **Versions Supported.**  Customer acknowledges that, subject to Cadence's End Sale/End Support Process, Cadence will maintain only the most current version of the Licensed Materials.  Cadence shall also maintain the last prior version of the Licensed Materials until the earlier of:  (i) six (6) months from the release of each new version release; or (ii) termination of the applicable Order.

**9.3.** **Customer's Responsibilities.**  Customer shall:

**9.3.1.** **Notification.**  Notify Cadence promptly through Cadence's electronic problem reporting software which is available online.  If Customer does not receive Cadence's acknowledgment of its receipt of such report within four (4) Prime Shift hours after making such report, Customer shall promptly re-transmit such report.

**9.3.2.** **Access.**  If requested by Cadence, allow Cadence access to the Designated Equipment and communication facilities during the Prime Shift and subject to Customer's security and safety procedures, and provide Cadence reasonable work space and other normal and customary facilities.

**9.3.3.** **Assistance.**  Provide Cadence with reasonable assistance as requested if Maintenance Services are performed on site at Customer's facility and ensure that a Customer's employee is present.

**9.3.4.** **Test Time.**  Provide sufficient support and test time on Customer's Designated Equipment to allow Cadence to duplicate an error and verify if it is due to Licensed Materials, and when corrections are complete, acknowledge that the error has been resolved.

**9.3.5.** **Standard of Care.**  Provide the same standard of care (but no less than reasonable care) for the Licensed Materials that Customer applies to its own products or data of like value to its business and return any defective Licensed Materials or attest in writing to the destruction of same as directed by Cadence.

**9.3.6.** **Support.**  Promptly inform Cadence in writing if Customer develops interfaces to the Licensed Materials, and provide such information as Cadence determines necessary to properly maintain the Licensed Materials.

**9.3.7.** **Data Necessary.**  Provide sufficient data to enable Cadence to replicate a reported error on Cadence's computers at the Cadence Customer Response Center.

**9.3.8.  Excluded Services.**  Maintenance Services required in connection with or resulting from the following are excluded from these Terms together with each applicable Order:

**(1)**  abuse, misuse, accident or neglect; or repairs, alterations, and/or modifications which are not permitted under these Terms together with each applicable Order and which are performed by a party other than Cadence or its agents; or

**(2)**  the relocation of Licensed Materials from one unit of Designated Equipment to another or from the Customer's location; or

**(3)**  making changes due to Customer's decision to reconfigure the Licensed Materials or the system or network upon which it is installed; or

**(4)**  maintenance, malfunction, or modification of the Designated Equipment or its operating system; or

**(5)**  Use of the Licensed Materials on a hardware platform other than the Designated Equipment; or use of other than the most current or last prior release of the Licensed Materials as specified in, Section 9.2.5 (Versions Supported) above; or

**6)**  Customer's failure to properly maintain configuration environment (i.e., memory/disk capacity, operating system revision level, prerequisite or co-requisite items, etc.) specified in the Documentation or to supply adequate backups.

**9.4.  Additional Services.**  If Cadence agrees to perform services requested by Customer which are not included as part of these Terms together with each applicable Order, such services shall be billed to Customer at prices and terms to be mutually agreed by the parties.

## 10.  WARRANTY DISCLAIMER

Cadence does not warrant that Licensed Materials will meet Customer's requirements or that Use of the Licensed Materials will be uninterrupted or error free.  **CADENCE, ITS LICENSORS, AND ITS AUTHORIZED RESELLERS MAKE NO WARRANTIES TO CUSTOMER WITH RESPECT TO THE LICENSED MATERIALS OR ANY SERVICE, ADVICE, OR ASSISTANCE FURNISHED HEREUNDER, AND NO WARRANTIES OF ANY KIND, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR ARISING FROM COURSE OF DEALING OR USAGE IN TRADE SHALL APPLY.**

## 11.  LIMITATION OF LIABILITY

**11.1.**  CADENCE AND ITS AUTHORIZED RESELLERS SHALL NOT BE LIABLE FOR COSTS OF SUBSTITUTES OR LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR ANY SPECIAL, EXEMPLARY, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, OF ANY KIND OR NATURE WHATSOEVER ARISING OUT OF OR RELATING TO THESE TERMS TOGETHER WITH EACH APPLICABLE ORDER, HOWEVER CAUSED, WHETHER BASED ON BREACH OF WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE.

**11.2.**  CADENCE'S CUMULATIVE AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THESE TERMS TOGETHER WITH EACH APPLICABLE ORDER (OR PERFORMANCE OR BREACH THEREOF) OR THE LICENSED MATERIALS SHALL BE LIMITED TO AND NOT EXCEED THE AMOUNT OF FEES ACTUALLY RECEIVED BY CADENCE FROM CUSTOMER FOR THE LICENSED MATERIALS WHICH ARE THE SUBJECT OF THE CLAIM UNDER THE APPLICABLE ORDER.

**11.3.**  The above limitations shall apply (i) notwithstanding failure of essential purpose of any exclusive or limited remedy, and (ii) whether or not Cadence has been advised of the possibility of such damages.  This Section 11 (Limitation of Liability) allocates the risks under these Terms together with each applicable Order and Cadence's pricing reflects this allocation of risk and the above limitations.

## 12.  GENERAL PROVISIONS

**12.1.  Governing Law and Dispute Resolution.**  These Terms together with each applicable Order shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of law rules and principles.  The United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded and shall not apply.  These Terms together with each applicable Order are prepared and executed and shall be interpreted in the English language only.

**12.1.1.  For Customers in the United States Only.**  Any dispute regarding these Terms together with each applicable Order shall be subject to the exclusive jurisdiction of the state courts in and for Santa Clara County, California (or, if there is federal jurisdiction, the United States District Court for the Northern District of California), and the parties hereby irrevocably agree to submit to the personal and exclusive jurisdiction and venue of such courts.

**12.1.2.  For Customers Located Outside of the United States.**  Any controversy or claim arising out of or relating to these Terms, or the breach thereof, shall be determined by arbitration in accordance with applicable law and as administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules.  The number of arbitrators shall be three (3).  The place of arbitration shall be San Francisco, California, and the language of the arbitration shall be English.  In addition to the authority

conferred on the arbitrators by the above-designated rules, and without prejudice to any provisional measures that may be available from a court of competent jurisdiction, the arbitrators shall have the power to grant any provisional measure deemed appropriate, including, but not limited to, provisional injunctive relief.  Any provisional measures ordered by the arbitrators may, to the extent permitted by applicable law, be deemed to be a final award on the subject matter of the measures and shall be enforceable as such.  The arbitrators shall be guided by the IBA Rules on the Taking of Evidence in International Arbitration when deciding issues addressed by those rules. No information concerning an arbitration, beyond the names of the parties and the relief requested, may be unilaterally disclosed to a third party by any party unless required by law.  Any documentary or other evidence given by a party or witness in an arbitration shall be treated as confidential by any party whose access to such evidence arises exclusively as a result of its participation in the arbitration, and shall not be disclosed to any third party (other than a witness or expert), except as may be required by law.  The arbitrators may award to the prevailing party, if any, its costs and expenses, including attorneys' fees, as such costs and expenses are determined by the arbitrators.  Judgment upon any award rendered by the arbitrators may be entered in any court of competent jurisdiction.

**12.2.**   **Notices.**   All notices, demands or consents required or permitted hereunder shall be delivered in writing to the addresses set forth in the applicable Order, and, in the case of Cadence, to the attention of the General Counsel, or at such other address provided in writing for such purposes.

**12.3.**   **Severability.**   If any provision is determined to be invalid or unenforceable, it shall be adjusted rather than voided, if possible, to achieve the intent of the parties.  All other provisions shall be deemed valid and enforceable to the maximum extent possible.

**12.4.**   **Force Majeure.**   Except for Customer's payment obligations, neither party shall be liable for any failure or delay in performing any obligation, if failure or delay is due to circumstances beyond its reasonable control.

**12.5.**   **Relationship.**   The relationship between the parties is that of independent contractors.

**12.6.**   **Assignment.**   Customer may not delegate, assign or transfer the applicable Order or these Terms, or any of its rights and obligations under these Terms, and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of all or substantially all the assets of Customer, a merger, a re-organization, share exchange, consolidation or change in control of fifty percent (50%) or more of the beneficial ownership of equity interest or voting power of Customer or any entity that directly or indirectly controls Customer (a "**Change in Control**").  No transfer, delegation or assignment (including, without limitation, an assignment by operation of law) of these Terms together with each applicable Order may be made without the prior written consent of Cadence, which may be withheld in Cadence's sole discretion.  As used in these Terms together with each applicable Order, assignment shall not include, and no consent shall be required if :  (1) Customer raises additional capital through sale of equity (either privately or through a public offering) or debt instruments, provided that the additional equity issued does not result in a Change in Control; (2) Customer changes its state of incorporation; or (3) Customer reorganizes its corporate structure without a change in its equity structure; provided, however, that any reorganization that would result in the rights hereunder being transferred or the Licensed Materials being Used by an entity that is not controlled by Customer shall require Cadence's prior written consent.  Cadence may delegate its obligations to its Affiliates or contractors, provided that Cadence remains liable for its obligations hereunder.

**12.7.**   **Export Laws and Regulations.**   Neither party shall export, directly or indirectly, any technical data acquired from the other pursuant to these Terms or any product utilizing any such data to any country for which an export license or other governmental approval is required at the time of export from the country in which the data originates, without first obtaining such license or approval.  The disclosing party shall not disclose any information that is subject to export control under any of the following regimes without the prior written consent of the receiving party in each instance:  The ITAR, the Wassenaar Arrangement Lists of Dual Use Goods and Technologies and Munitions Lists, or the U.S. Export Administration Regulations ("**EAR**") for control reasons other than anti-terrorism (AT).  Customer agrees and certifies that:  (i) Customer is not subject to E.U. or U.S. sanctions or prohibitions; (ii) Customer is not an Affiliate of any person or organization who are subject to U.S. or E.U. sanctions; (iii) Customer shall not use the Licensed Materials for any purpose prohibited by EAR or for the benefit of any person or organization subject to E.U. or U.S. sanctions or prohibitions; (iv) as prohibited in EAR §744, Customer shall not use the Licensed Materials and any Cadence technical data in the design, production, or use of nuclear, missile, or chemical and biological weapons activities or systems; (v) Customer shall not use the Licensed Materials and any Cadence technical data for the design or development of microprocessors and microprocessor microcircuits where the end-user or end use is prohibited as described in EAR §744; and (vi) Customer shall not transport, export, or re-export, directly or indirectly, any Licensed Materials to Cuba, Iran, North Korea, Sudan, or Syria, or any nationals thereof wherever located.  To certify compliance with the foregoing, Customer shall execute and deliver to Cadence such "Letters of Assurance" as may be reasonably requested by Cadence. Customer shall be strictly responsible for ensuring that Customer, its employees and any third parties who access the Licensed Materials on its behalf fully comply with the requirements of this Section 12.7 (Export Laws and Regulations) and provisions of ITAR and EAR, and Customer shall indemnify Cadence against any loss related to any failure to conform to these requirements.

**12.8.**   **Confidentiality.**   Customer shall not disclose to any third party or use for any purpose (except as expressly authorized hereunder): (i) Licensed Materials; (ii) the terms and conditions of these Terms together with each applicable Order; or (iii) any other information disclosed by Cadence or its Affiliates marked or otherwise designated as "confidential" or "proprietary" or is clearly by its nature confidential ("**Confidential Information**").  Customer may only disclose Confidential Information to recipients explicitly permitted to access the Licensed Materials hereunder on a strict need-to-know basis and only to the minimum extent necessary.  Customer shall use

at least the same degree of care that it uses to protect its own confidential information of like kind, but not less than reasonable care, to protect Cadence's Confidential Information.  However, Confidential Information shall not include information that : (a) is or becomes part of the public domain through no fault of Customer; (b) was in Customer's lawful possession without obligation of confidentiality prior to receipt from Cadence; (c) is provided to Customer without confidentiality obligations from a source independent of Cadence in lawful possession and authorized to disclose it without confidentiality obligations; or (d) is independently developed by Customer without use of or access to Confidential Information.

**12.8.1.   Exception.**   The foregoing prohibitions on disclosure of Confidential Information shall not apply to the extent certain Confidential Information is required to be disclosed as a matter of law or by court order or other legal process, provided that Customer uses reasonable efforts to provide Cadence with prior notice of such obligation to disclose and reasonably assists Cadence in obtaining a protective order or in otherwise limiting such disclosure.

**12.9.    Entire Agreement.**   These Terms are the complete and exclusive agreement between the parties relating to the subject matter hereof and supersede all other communications between the parties relating thereto.  These Terms supersedes all pre-printed terms and conditions contained in any purchase order or other business form submitted hereafter by either party and any inconsistent non-pre-printed terms.  Only a written instrument duly executed by both parties may modify these Terms.

**12.10.    Waiver.**   Failure by either party to enforce at any time any provision of these Terms, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of these Terms or any part thereof, or the right of the waiving party to thereafter enforce each and every such provision.

**12.11.    Construction.**   Each party has had the opportunity to review these Terms with legal counsel, and there shall be no presumption that ambiguities shall be construed or interpreted against the drafter.  The words "include" and "including" and variations shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

**12.12.    Counterparts.**   The parties may execute these Terms in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement.  These Terms are effective upon delivery of one executed counterpart from each party to other parties, including by facsimile or other electronic form.

**12.13.    Injunctive Relief.**   Customer acknowledges that breach may cause irreparable harm to Cadence for which money damages would be inadequate, and Cadence shall be entitled to obtain timely injunctive relief without the necessity of posting bonds, in addition to any and all remedies available at law.

**12.14.    U.S. Government Contracting.**   Except as expressly permitted hereunder, the Licensed Materials shall not be provided to any third party, including the U.S. Government, without prior written authorization by Cadence.  The Licensed Materials are "commercial computer software" and "commercial computer software documentation" as defined in Federal Acquisition Regulation ("**FAR**") 2.101.  If the Licensed Materials are licensed by (or if Customer is authorized by Cadence to license on behalf of):  (i) a civilian agency, the U.S. Government licenses the Licensed Materials subject to this Cadence commercial license agreement as specified in FAR 12.212 (Computer Software), 12.211 (Technical Data), and 52.227-19 (Commercial Computer Software License) and any successor regulations; or (ii) an agency within the Department of Defense ("**DOD**"), the U.S. Government licenses Cadence Licensed Materials subject to this Cadence commercial license agreement as specified in the DOD FAR Supplement ("**DFARS**") 227.7202 (Commercial Computer Software and Commercial Computer Software Documentation) and any successor regulations.  Any use, modification, reproduction release, performance, display, or disclosure of the Licensed Materials shall be solely in accordance with these terms, and the terms of these Terms supersede and are in lieu of any FAR, DFARS, or supplemental regulations to the FAR.

**12.15.    Personal Data.**   Any personal data provided to Cadence by Customer, shall be used by Cadence in accordance with Cadence's Privacy Policy available at www.cadence.com.  Customer shall ensure that its employees and representatives are aware of the personal data processing terms described in such policy.

# Appendix 1

## Country Specific Terms and Conditions

If the country specified in Customer's address in the applicable Order is one of the countries specified below, then the following terms set forth below for that country replace or modify the referenced terms in the applicable Order as indicated below.  All terms set forth in the OrCAD Software License Terms and Conditions that are not changed by these amendments remain unchanged and in effect.

## PEOPLE'S REPUBLIC OF CHINA

If Customer's address in the applicable Order is the People's Republic of China (which for purposes of these Terms does not include Taiwan), then the following shall replace (in their entirety) or add as new the Sections referenced:

**Section 3.2.**  **Limitations.**  All rights, title and interest in the Licensed Materials shall remain the exclusive property of Cadence and/or its licensors.  The Licensed Materials are the Confidential Information (as defined below) of Cadence or third parties from whom Cadence has obtained the appropriate rights and Customer shall not disclose the Licensed Materials to any third party except as expressly provided hereunder.  Customer shall not Use or copy the Licensed Materials except as expressly permitted herein.  Customer may only Use those Licensed Materials which are specified in the applicable Order.  Customer shall not delete, modify, or alter (or permit any third party to delete, modify or alter) any technical measures incorporated in the Licensed Materials or otherwise adopted by Cadence to protect its copyright in the Licensed Materials ("**Technical Measures**") and shall not take any action (or permit any third party to take any action) intended to avoid or breach such Technical Measures, including, but not limited to, modifying, disassembling, decompiling, reverse translating or otherwise attempting to derive source code, related to such Technical Measures.  No right or license is granted or implied under any of Cadence, or its licensors', patents, copyrights, trademarks, trade names, service marks, or other intellectual property rights to Use the Licensed Materials or to authorize others to Use the Licensed Materials beyond the rights and restrictions set forth in these Terms.  By way of example and not limitation, Customer shall not disclose to any third party any benchmarking of:  (i) the Software or Design Elements or (ii) the output of any Software or Design Elements (which means any form of competitive analysis of the Licensed Materials versus competitive tool products), nor permit any third party to do so.  Customer shall not remove or alter any of Cadence's or its licensors' restrictive or ownership legends appearing on or in the Licensed Materials and shall reproduce such legends on all copies permitted to be made.  Customer grants Cadence the right and license to make, use, sell, reproduce, modify, sublicense, disclose, distribute and otherwise exploit error reports, corrections or suggestions provided by Customer concerning the Licensed Materials and any modifications based thereon.  The aforementioned license shall be royalty-free except as to activities in the People's Republic of China ("**PRC**"), in respect of which activities the license shall be deemed fully paid up in consideration of Cadence's provision of certain discounts off of the list price for the Licensed Materials, which Customer hereby acknowledges and agrees constitutes fair and reasonable consideration.

**Section 12.1.2.**  **For Customers Located Outside of the United States.**  Any dispute, controversy, difference or claim arising out of or relating to these Terms , including the existence, validity, interpretation, performance, breach or termination thereof, or any dispute regarding non-contractual obligations arising out of or relating to it, shall be referred to and finally resolved by arbitration in Hong Kong administered by the Hong Kong International Arbitration Centre ("**HKIAC**") under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted.  The number of arbitrators shall be three (3) unless otherwise subsequently agreed in writing by the parties.  The arbitration proceedings shall be conducted in English only.  Nothing in this Section 12.1.2 (For Customers Located Outside of the United States) shall restrict the right of a party to apply to a court of competent jurisdiction for injunctive relief at any time.  The arbitrators may award to the prevailing party, if any, its costs and expenses, including attorneys' fees, as such costs and expenses are determined by the arbitrators.  Judgment upon any award rendered by the arbitrators may be entered in any court of competent jurisdiction.

**Section 12.15.**  **Import Laws and Regulations.**  Customer covenants to Cadence that, as importer of the Licensed Materials, Customer shall diligently prosecute any and all filings and registrations of these Terms and each Order with such governmental authorities as may be required under applicable law (including, but not limited to, registration under the Technology Import and Export Regulations with the Ministry of Commerce of the PRC).  Customer shall promptly notify Cadence in writing of any documentation, information or assistance reasonably required by Customer from Cadence to complete such filings and registrations.  Customer further covenants to Cadence that such filings and registrations shall be made as soon as practicable after (and in any event within ninety (90) days following) the relevant Effective Date (or such shorter period as may be required by law).

## FRANCE

If Customer's address in the applicable Order is France, then the following shall replace (in their entirety) the Section referenced:

**Section 13.1.**     **Governing Law and Dispute Resolution.**  These Terms shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of law rules and principles.  The United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded and shall not apply.  These Terms is prepared and executed and shall be interpreted in the English language only.  LE CLIENT RECONNAIT AVOIR COMPRIS LE CONTENU DE CE CONTRAT QUI EST REDIGE EN LANGUE ANGLAISE.

## INDIA

If Customer's address in the applicable Order is India, then the following shall replace (in their entirety) the Section referenced:

**Section 7.**     **SHIPMENT.**  Upon acceptance of an Order by Cadence or an authorized Cadence reseller, all Cadence Software is available for download by Customer from Cadence, provided however Customer shall only Use Cadence Software for which a License Key has been purchased from either Cadence or an authorized Cadence reseller.  Unless otherwise requested in writing by Customer as set forth herein, all Licensed Materials and License Keys shall be provided to Customer in electronic format only.  Cadence agrees not to deliver to Customer and Customer agrees not to accept any Licensed Materials on tangible media, (including, but not limited to, CD ROM, tape or paper), excluding written or printed Documentation provided under these Terms.  In the event Customer requests the delivery of any tangible media, such request must be in writing and received at least ninety (90) days prior to the delivery of the Licensed Materials.  Delivery of any tangible media requested by Customer hereunder shall be made D.A.P. point of shipment (per Incoterms in effect on the Order Date).  Customer shall pay all shipping charges, including insurance.

## JAPAN

If Customer's address in the applicable Order is Japan, then the following shall replace (in their entirety) the Sections referenced:

**Section 3.1.**     **Grant.**  Subject to Customer's timely payment of the Fees as set forth in Section 4 (Fees; Taxes) and compliance with these Terms, Cadence, either directly or by and through one of its Affiliates, grants Customer, for the Term of Use as specified in the Order, a non-transferable, non-exclusive, license to:  (i) Use the quantity of Licensed Materials identified in the applicable Order on the Designated Equipment as implemented by the number of License Keys issued for the Licensed Materials; and (ii) Use the Documentation as is reasonably necessary for Customer's licensed Use of the Licensed Materials.  All rights not expressly granted to Customer pursuant to these Terms are reserved by Cadence.  Customer understands and agrees that, by operation of License Key, the Licensed Material will automatically become inoperable upon expiration of the Term of Use for the Licensed Materials.

**Section 4.2.**     **Taxes.**  All Fees are net.  Customer shall pay or reimburse all taxes, duties and assessments, if any due, based on or measured by amounts payable to Cadence in any transaction between Customer and Cadence under these Terms (excluding taxes based on Cadence's net income) together with any interest or penalties assessed thereon, or furnish Cadence with evidence acceptable to the taxing authority to sustain an exemption therefrom (collectively, "**Taxes**").  The parties shall cooperate to qualify for the benefits under any applicable treaty for the avoidance of double taxation and to promptly provide to each other relevant documentation for same.

**Section 9.2.**     **Maintenance Services.**  Maintenance Services for the Licensed Materials are provided by Cadence during the Term of Use at no additional charge.  Customer may not terminate or otherwise cancel the Maintenance Services during the Term of Use

**Section 12.7.**     **Export Laws and Regulations.**  The Licensed Materials and all related technical information or materials are subject to export controls and (are or may be) restricted under the U.S. Government export regulations.  Customer shall not export, directly or indirectly, any technical data acquired from Cadence pursuant to these Terms or any product utilizing any such data to any country for which the U.S., or Japanese government or any agency thereof at the time of export requires an export license or other governmental approval is required at the time of export from the country in which the data originates, without first obtaining such license or approval.  Customer shall not disclose any information that is subject to export control under any of the following regimes without the prior written consent of Cadence in each instance:  The ITAR, the Wassenaar Arrangement Lists of Dual Use Goods and Technologies and Munitions Lists, the U.S. Export Administration Regulations ("**EAR**") for control reasons other than anti-terrorism (AT), or Items 1 through 15 in the Appended Table of the Japanese Foreign Exchange Order.  Customer agrees and certifies that: (i) Customer is not subject to E.U. or U.S. sanctions or prohibitions; (ii) Customer is not an Affiliate of any person or organization who are subject to U.S. or  E.U. sanctions; (iii) Customer shall not use the Licensed Materials for any purpose prohibited by EAR  or for the benefit of any person or organization subject to E.U. or U.S. sanctions or prohibitions; (iv)  as prohibited in EAR §744, Customer shall not use the Licensed Materials and any Cadence technical data in the design, production, or use of nuclear, missile, or chemical and biological weapons

activities or systems; (v) Customer shall not use the Licensed Materials and any Cadence technical data for the design or development of microprocessors and microprocessor microcircuits where the end-user or end use is prohibited as described in EAR §744; and (vi) Customer shall not transport, export, or re-export, directly or indirectly, any Licensed Materials to Cuba, Iran, North Korea, Sudan, or Syria, or any nationals thereof wherever located.  To certify compliance with the foregoing, Customer shall execute and deliver to Cadence such "Letters of Assurance" as may be reasonably requested by Cadence.  Customer shall be strictly responsible for ensuring that Customer, its employees and any third parties who access the Licensed Materials on its behalf fully comply with the requirements of Section 12.7 (Export Laws and Regulations) and provisions of ITAR and EAR, and Customer shall indemnify Cadence against any loss related to any failure to conform to these requirements.

Exhibit 5

# cadence®

CADENCE DESIGN SYSTEMS, INC.   SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING ACCEPT DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED RESELLERS FOR THIS SOFTWARE.


SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE.   So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

   A. SINGLE USER LICENSE.   If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.
   B. MULTI-USER AND NETWORK LICENSES.   If you have multi-user and network Licenses for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.   The geographic scope of the permitted use will be determined by the License you acquire. Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES.   If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT.   This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes.   You may not disclose the Product to any third party.   You must label any copies with all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.   To help ensure that you are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.   No such data is collected or transmitted unless unauthorized modifications are made to the Product.

You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.   You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.   You shall keep full, clear and accurate records to confirm your authorized Use of the Product hereunder, including but not limited to ensuring that you have not exceeded the number of authorized copies of Product and other obligations hereunder.   Cadence shall have the right to audit such records during regular business hours to confirm your compliance with your obligations hereunder. You shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in fees uncovered by such audit plus interest at the rate of one and one-half percent (1½%) per month. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then you shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in con nection with such audit.

6. OTHER RESTRICTIONS.   The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY.   THE PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY.   TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT.   SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS.   The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and 227.7202-3 (JUNE 1995).   The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS.   You acknowledge and agree that the Software is subject to restrictions and controls imposed by the United States Export Administration Act and the regulations thereunder.   You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this Section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES.   Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.   Please note that certain features within the Software are pr ovided for the convenience of customers but are not supported by Cadence.   Cadence has no obligation to provide Maintenance Services for such features.   These unsupported features are designated within the Software.

(a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.   Such assistance will be at

Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.   If it determines that the reported problem is not due to the Product, if you request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence prov ides to correct such problem.

(b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.

(c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.

(d) Cadence shall not be obligated to provide  Maintenance Services pursuant to this Agreement that are required by any of the following:

(1) abuse, misuse, accident or neglect; or

(2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or

(3) use of materials not meeting Cadence's requirements; or

(4) use of the Product for other than the intended purpose for which licensed and designated; or

(5) malfunction, modification or relocation of the Designated Equipment (as defined below); or

(6) where inadequate backups are supplied.

(e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.

(f) Products are licensed for use on a specific hardware unit (   "Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.

12. INITIAL TERM; COMMENCEMENT; RENEWAL.   This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).   Unless otherwise specified in a product quotation from Cadence or an authorized Cadence reseller, this Agreement shall have an initial term of one (1) year.   Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per Section 21 below.   If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.   You shall pay Cadence's software update charges where applicable.   Maintenance Services renewal is contingent on current payment of maintenance fees, you not being in default hereunder, and a valid order from you.

13. NO WARRANTY.   IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.   The price for Maintenance Services set forth on the product quotation applies to the initial term.   Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.   Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B. point of shipment.   Shipping charges, including insurance, shall be paid by you.   Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.   If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.   Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.   You acknowledge that Cadence will maintain only the most current version of the Software.   Cadence shall maintain prior versions until the earlier of six (6) months from the release of each new version release, or termination of this Agreement.   Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other co pies of the previous version of the Product.   New products are determined

and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.   Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.   In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.   The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.

18. YOUR RESPONSIBILITIES.   You shall:

(a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems an d provide follow-up reports in writing.   Cadence will confirm receipt of any electronic problem report within twenty -four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;

(b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;

(c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during  a service visit;

(d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;

(e) Provide the same standard of care for Product that you apply to your own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;

(f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.   Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.   You shall notify Cadence in writing not less than thirty (30) days prior to moving the Designated Equipment as to its intended new location.   C  adence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.   CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.   CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.   YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION.   Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.   Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.   You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.   Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.   You shall not assign, delegate, or subcontract any portion of your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.   Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all your assets, a merger, a re-organization, or change in control of fifty percent (50%) or more of your equity (a "Change in Control").   No assignment, delegation or transfer (including, without limitation, by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.   Notices to you shall be sent to the address specified by you on the product quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, U.S.A., Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.   You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.   The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT.   This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.   Any terms and conditions contained or incorporated by reference in purchase orders, acknowledgments, invoices, confirmations or other business forms of either party which add to or differ from the terms and conditions of this Agreement shall be of no force or effect whatsoever concerning the subject matter of this Agreement, and either party's failure to object thereto shall not be deemed a waiver of such party's rights hereunder.   This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.   Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2016 by Cadence Design Systems, Inc.    All rights reserved.
Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134, U.S.A.

v2016-1 (146406_3)

Exhibit 6

CADENCE DESIGN SYSTEMS, INC. SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED DISTRIBUTORS FOR THIS SOFTWARE.


SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE. So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

     A. SINGLE USER LICENSE. If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.
     B. MULTI-USER AND NETWORK LICENSES. If you have multi-user and network license(s) ("Licenses") for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will be determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES. If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT. This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes, or (3) disclose the Product to any third party.  You must label any copies with all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that You are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product. You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.  Customer shall keep full, clear and accurate records to confirm its authorized Use of the Product hereunder, including but not limited to ensuring that Customer has not exceeded the number of authorized copies of Product and other obligations hereunder.  Cadence shall have the right to audit such records during regular business hours to confirm Customer's compliance with its obligations hereunder. Customer shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in Fees uncovered by such audit plus interest at the rate set forth in Section 4(a) below. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then Customer shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS. The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than

those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY. THE PRODUCT IS SOLD "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS. The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and 227.7202-3 (JUNE 1995).  The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS. You acknowledge and agree that the SOFTWARE is subject to restrictions and controls imposed by the United States Export Administration Act (the "Act") and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES. Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has not obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.
   (a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support

Organization.  Such assistance will be at Cadence's expense where it determines
that the reported problem is due to defects in an unaltered most current version of
the Product.  If it determines that the reported problem is not due to the Product,
if you request and Cadence agrees to provide the requested service, you agree to pay
Cadence's then current prices for services Cadence provides to correct such problem.

(b) If you make modifications, interfaces, and/or other changes to the Product,
if permitted by Cadence in writing, you shall promptly inform Cadence in writing and
provide such information as Cadence determines necessary to properly maintain the
Product.

(c) Cadence's obligation to provide Maintenance Services pursuant to this
Agreement is dependent upon your compliance at all times with the terms of the this
Agreement.

(d) Cadence shall not be obligated to provide Maintenance Services pursuant to
this Agreement that are required by any of the following:

(1) abuse, misuse, accident or neglect; or

(2) repairs, alterations, and/or modifications which are not permitted under
this Agreement and which are performed by other than Cadence or its agents; or

(3) use of materials not meeting Cadence's requirements; or

(4) use of the Product for other than the intended purpose for which licensed
and designated; or

(5) malfunction, modification or relocation of the Designated Equipment (as
defined below); or

(6) where inadequate backups are supplied.

(e) Cadence may refuse to provide Maintenance Services where, in Cadence's
opinion, a condition exists that represents a hazard to the safety of its employees
or agents.

(f) Products are licensed for use on a specific hardware unit ("Designated
Equipment"), and as indicated in this Agreement, a Product may only be transferred
to another hardware unit upon prior approval of Cadence and after payment of the
appropriate transfer fees.


12. INITIAL TERM; COMMENCEMENT; RENEWAL. This Agreement is intended to commence at
the time of shipment or download, as applicable, of the Product(s). Maintenance
Services shall commence on the business day following software installation subject
to the approval of Cadence and payment in advance of the applicable fee(s).  Unless
otherwise specified in a Product Quotation from Cadence, this Agreement shall have
an initial term of one (1) year.  Upon issuance of your purchase order prior to the
expiration of the initial term or any renewal term, acceptance by Cadence of such
purchase order and payment by you of the applicable fees, this Agreement shall renew
for successive periods (for the term specified in a product quotation) unless
terminated by Cadence per section 20 below.  If there has been any lapse of
Maintenance Services, such Maintenance Services will commence only after an
evaluation by Cadence of your current status, payment of applicable fees, and, if
necessary, updating of the Software to a serviceable revision.  You shall pay
Cadence's software update charges where applicable.  Maintenance Services renewal is
contingent on current payment of maintenance fees, your not being in default
hereunder, and a valid order from you.

Page 4

13. NO WARRANTY.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the Product Quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B point of shipment. Shipping charges, including insurance, shall be paid by you.  Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of 6 months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.  Maintenance Services outside the contiguous United States that would otherwise be covered by this Agreement are excluded.

18. YOUR RESPONSIBILITIES.  You shall:
    (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing. Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;
    (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;
    (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during Service;

(d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;

(e) Provide the same standard of care for Product that it applies to its own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;

(f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.  You shall notify Cadence in writing not more than thirty (30) days prior to moving the Designated Equipment as to its intended new location.  Cadence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE. YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION. Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of Your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all the assets of Customer, a merger, a re-organization, or change in control of fifty percent (50%) or more of the equity of Customer (a "Change in Control").  No transfer, delegation or assignment (including, without limitation, an assignment by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the Product Quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.  Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2019 by Cadence Design Systems, Inc. All rights reserved.
Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134 U.S.A.

v2012-01

Exhibit 7

CADENCE DESIGN SYSTEMS, INC. SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED DISTRIBUTORS FOR THIS SOFTWARE.

SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE. So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

   A. SINGLE USER LICENSE. If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.
   B. MULTI-USER AND NETWORK LICENSES. If you have multi-user and network license(s) ("Licenses") for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will be determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES. If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT. This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or

archival purposes, or (3) disclose the Product to any third party.  You must label any copies with all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that You are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product.  You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.  Customer shall keep full, clear and accurate records to confirm its authorized Use of the Product hereunder, including but not limited to ensuring that Customer has not exceeded the number of authorized copies of Product and other obligations hereunder. Cadence shall have the right to audit such records during regular business hours to confirm Customer's compliance with its obligations hereunder. Customer shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in Fees uncovered by such audit plus interest at the rate set forth in Section 4(a) below. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then Customer shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS. The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY. THE PRODUCT IS SOLD "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS. The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and

227.7202-3 (JUNE 1995).  The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS. You acknowledge and agree that the SOFTWARE is subject to restrictions and controls imposed by the United States Export Administration Act (the "Act") and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES. Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has not obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.
   (a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.   Such assistance will be at Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.  If it determines that the reported problem is not due to the Product, if you request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence provides to correct such problem.
   (b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.
   (c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.
   (d) Cadence shall not be obligated to provide Maintenance Services pursuant to this Agreement that are required by any of the following:
   (1) abuse, misuse, accident or neglect; or
   (2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or
   (3) use of materials not meeting Cadence's requirements; or
   (4) use of the Product for other than the intended purpose for which licensed and designated; or
   (5) malfunction, modification or relocation of the Designated Equipment (as defined below); or
   (6) where inadequate backups are supplied.
   (e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.
   (f) Products are licensed for use on a specific hardware unit ("Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.

12. INITIAL TERM; COMMENCEMENT; RENEWAL. This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).  Unless otherwise specified in a Product Quotation from Cadence, this Agreement shall have an initial term of one (1) year.  Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per section 20 below.  If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.  You shall pay Cadence's software update charges where applicable. Maintenance Services renewal is contingent on current payment of maintenance fees, your not being in

default hereunder, and a valid order from you.

13. NO WARRANTY.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the Product Quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B point of shipment.  Shipping charges, including insurance, shall be paid by you.  Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of 6 months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.  Maintenance Services outside the contiguous United States that would otherwise be covered by this Agreement are excluded.

18. YOUR RESPONSIBILITIES.  You shall:
   (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing.  Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;
   (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;
   (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during Service;
   (d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;
   (e) Provide the same standard of care for Product that it applies to its own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;
   (f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.  You shall notify Cadence in writing not more than

thirty (30) days prior to moving the Designated Equipment as to its intended new location.  Cadence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.  YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION. Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of Your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all the assets of Customer, a merger, a re-organization, or change in control of fifty percent (50%) or more of the equity of Customer (a "Change in Control").  No transfer, delegation or assignment (including, without limitation, an assignment by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the Product Quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.  Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2012 by Cadence Design Systems, Inc. All rights reserved.
Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134 U.S.A.

v2012-01

Exhibit 8

CADENCE DESIGN SYSTEMS, INC.  SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED RESELLERS FOR THIS SOFTWARE.


SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE.  So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

    A. SINGLE USER LICENSE.  If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.
    B. MULTI-USER AND NETWORK LICENSES.  If you have multi-user and network Licenses for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will be determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES.  If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT.  This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes.  You may not disclose the Product to any third party.  You must label any copies with

all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that you are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product.  You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.  You shall keep full, clear and accurate records to confirm your authorized Use of the Product hereunder, including but not limited to ensuring that you have not exceeded the number of authorized copies of Product and other obligations hereunder.  Cadence shall have the right to audit such records during regular business hours to confirm your compliance with your obligations hereunder. You shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in fees uncovered by such audit plus interest at the rate of one and one-half percent (1½%) per month. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then you shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS.  The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY.  THE PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS.  The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and 227.7202-3 (JUNE 1995).  The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS.  You acknowledge and agree that the Software is subject to restrictions and controls imposed by the United States Export Administration Act and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this Section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES.  Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has no obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.

    (a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.  Such assistance will be at Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.  If it determines that the reported problem is not due to the Product, if you request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence provides to correct such problem.

    (b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.

    (c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.

    (d) Cadence shall not be obligated to provide Maintenance Services pursuant to this Agreement that are required by any of the following:

    (1) abuse, misuse, accident or neglect; or

    (2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or

    (3) use of materials not meeting Cadence's requirements; or

    (4) use of the Product for other than the intended purpose for which licensed and designated; or

    (5) malfunction, modification or relocation of the Designated Equipment (as defined below); or

    (6) where inadequate backups are supplied.

    (e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.

    (f) Products are licensed for use on a specific hardware unit ("Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.

12. INITIAL TERM; COMMENCEMENT; RENEWAL.  This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).  Unless otherwise specified in a product quotation from Cadence or an authorized Cadence reseller, this Agreement shall have an initial term of one (1) year.  Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per Section 21 below.  If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.  You shall pay Cadence's software update charges where applicable.  Maintenance Services renewal is contingent on current payment of maintenance fees, you not being in default hereunder, and a valid order from you.

13. NO WARRANTY.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER

THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the product quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B. point of shipment.  Shipping charges, including insurance, shall be paid by you.  Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of six (6) months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.

18. YOUR RESPONSIBILITIES.  You shall:
    (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing.  Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;
    (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;
    (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during a service visit;
    (d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;
    (e) Provide the same standard of care for Product that you apply to your own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;
    (f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.  You shall notify Cadence in writing not less than thirty (30) days prior to moving the Designated Equipment as to its intended new location.  Cadence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF

THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.  YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION.  Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all your assets, a merger, a re-organization, or change in control of fifty percent (50%) or more of your equity (a "Change in Control").  No assignment, delegation or transfer (including, without limitation, by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the product quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, U.S.A., Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  Any terms and conditions contained or incorporated by reference in purchase orders, acknowledgments, invoices, confirmations or other business forms of either party which add to or differ from the terms and conditions of this Agreement shall be of no force or effect whatsoever concerning the subject matter of this Agreement, and either party's failure to object thereto shall not be deemed a waiver of such party's rights hereunder.  This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.  Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2016 by Cadence Design Systems, Inc.  All rights reserved.
Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134, U.S.A.

v2016-1 (146406_3)

Exhibit 9

CADENCE DESIGN SYSTEMS, INC.  SOFTWARE LICENSE AND MAINTENANCE AGREEMENT

THIS SOFTWARE LICENSE AND MAINTENANCE AGREEMENT ("AGREEMENT") IS A LEGAL DOCUMENT BETWEEN YOU AND CADENCE DESIGN SYSTEMS, INC. ("CADENCE"). PLEASE READ THIS AGREEMENT CAREFULLY BEFORE INSTALLING YOUR CADENCE SOFTWARE ("SOFTWARE"). BY USING THE SOFTWARE, YOU (EITHER AN INDIVIDUAL OR A BUSINESS ENTITY) AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT. IF YOU DO NOT WANT TO BE BOUND BY THE TERMS OF THIS AGREEMENT, CADENCE IS UNWILLING TO LICENSE THE SOFTWARE TO YOU, IN WHICH EVENT YOU MUST PROMPTLY RETURN THE SOFTWARE AND ALL ACCOMPANYING ITEMS (INCLUDING MANUALS, BINDERS OR OTHER CONTAINERS, AND ANY OTHER PRINTED MATERIALS) WITHIN 30 DAYS. BY CLICKING YES DURING THE INSTALLATION AND BY USING THE SOFTWARE, OR PURCHASING MAINTENANCE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ THE AGREEMENT AND ACCEPT ITS TERMS. YOUR REGISTRATION INFORMATION IS PROOF THAT YOU ARE A LICENSED USER. PLEASE TREAT IT AS VALUABLE PROPERTY.

THE MAINTENANCE PORTION OF THE AGREEMENT APPLIES TO ANY MAINTENANCE SERVICES PURCHASED BY YOU FROM CADENCE OR ITS AUTHORIZED RESELLERS FOR THIS SOFTWARE.


SOFTWARE

1. GRANT OF LICENSE FOR CADENCE SOFTWARE.  So long as you comply with the terms of this Agreement, Cadence grants to you the nonexclusive right to use the Software and its documentation ("Product"). The Software, which may include user documentation provided in the Software or in electronic form, is licensed as a single Product. The computer or server on which the Software is loaded shall be located within the country in which the licenses to use the Software ("Licenses") are first acquired unless otherwise permitted in writing by Cadence.

   A. SINGLE USER LICENSE.  If you have a single user License for the Software, as indicated on the invoice, then Cadence grants to you the nonexclusive right to use, or in the event of a business entity licensee, to allow your employees to use, one copy of the Product on any single computer at a single location.
   B. MULTI-USER AND NETWORK LICENSES.  If you have multi-user and network Licenses for the Software, as indicated on the invoice(s), then Cadence grants to you the nonexclusive right to have, at any time, as many copies of the Software "in use" as you have Licenses. The number of copies of Software "in use" includes copies loaded into the CPU memory (i.e., RAM) but does not include copies loaded on a network server for the sole purpose of distribution to other computers. Should you load the Software on a network server, you agree to have a reasonable mechanism or process in place to ensure that the number and location of persons using the Software concurrently does not exceed the number or geographic scope of Licenses granted to you.  The geographic scope of the permitted use will be determined by the License you acquire.  Other geographic locations that may be indicated include, but are not limited to: within the same country as where the server is located; within the same continent where the server is located; within the same Cadence "region" where the server is located; or worldwide.

2. UPGRADES AND UPDATES.  If the Software is an upgrade from or update to another version of Cadence Software, you agree to use the upgraded or updated Software only in accordance with this Agreement.

3. COPYRIGHT.  This Product and any copies thereof are the confidential and proprietary property of Cadence or third parties from whom Cadence has obtained rights and are protected by United States copyright laws and international treaty provisions. You may: (a) make no more than one (1) copy of the Software solely for backup or archival purposes; or (b) copy the Software to a single hard disk or other permanent memory, provided you keep the original and no more than one other copy solely for backup or archival purposes.  You may not disclose the Product to any third party.  You must label any copies with

all information included on the original media label. You agree not to distribute copies of the Product to others. You further agree to take all reasonable steps and to exercise due diligence to protect the Product from unauthorized reproduction, publication, or distribution. If the Software is copied to or used on a computer attached to a network, you must have a reasonable mechanism in place to ensure that the Software may not be used or copied by unlicensed persons.  To help ensure that you are only using authorized copies of the Product Cadence utilizes monitoring technologies to obtain and transmit non-proprietary data on unauthorized modifications to the Product.  No such data is collected or transmitted unless unauthorized modifications are made to the Product.  You hereby agree to the use of such technology and transmission of such non-proprietary data by Cadence.

4. PROTECTION OF LICENSED MATERIALS.  You receive no rights to and shall not create nor attempt to create by reverse engineering, reverse assembly, reverse compiling any part of the source code from any such Product or permit any third party to do so.

5. COMPLIANCE WITH AGREEMENT PROVISIONS.  You shall keep full, clear and accurate records to confirm your authorized Use of the Product hereunder, including but not limited to ensuring that you have not exceeded the number of authorized copies of Product and other obligations hereunder.  Cadence shall have the right to audit such records during regular business hours to confirm your compliance with your obligations hereunder. You shall promptly correct any deficiencies discovered by such audit including payment to Cadence of the amount of any shortfall in fees uncovered by such audit plus interest at the rate of one and one-half percent (1½%) per month. If the audit uncovers any shortfall in payment of more than five percent (5%) for any quarter, then you shall also promptly pay to Cadence the costs and expenses of such audit, including fees of auditors and other professionals incurred by Cadence in connection with such audit.

6. OTHER RESTRICTIONS.  The Product is the sole and exclusive property of Cadence. You receive no rights to and will not sell, assign, lease, market, transfer, encumber, or otherwise suffer to exist any lien or security interest (other than those of Cadence), nor allow any third person, firm, corporation, or other entity to modify, copy, reproduce or disclose in whole or in part in any manner the Product, except as expressly provided for in this Agreement or with Cadence's advance written consent.

7. LIMITED WARRANTY.  THE PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY, EXPRESS OR IMPLIED, AS TO PERFORMANCE, MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL CADENCE OR ANYONE ELSE INVOLVED IN THE CREATION, PRODUCTION, DELIVERY, OR LICENSING OF THE PRODUCT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR ANY OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE PRODUCT, WHETHER OR NOT THE POSSIBILITY OR CAUSE OF SUCH DAMAGES WAS KNOWN TO CADENCE. IN NO EVENT SHALL CADENCE'S LIABILITY IN CONNECTION WITH THE PRODUCT EXCEED THE LICENSE FEE PAID FOR THE PRODUCT. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

9. U.S.A. GOVERNMENT RESTRICTED RIGHTS.  The Product includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 (SEPT 1995) and is provided to the Government (i) for acquisition by or on behalf of civilian agencies, consistent with the policy set forth in 48 C.F.R. 12.212; or (ii) for acquisition by or on behalf of units of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 (JUNE 1995) and 227.7202-3 (JUNE 1995).  The Product constitutes trade secrets of Cadence for all purposes of the Freedom of Information Act.

10. EXPORT RESTRICTIONS.  You acknowledge and agree that the Software is subject to restrictions and controls imposed by the United States Export Administration Act and the regulations thereunder.  You agree that you will not export or re-export the Product or any copy thereof, including manuals, in any form without the appropriate United States and foreign government license or permit, as necessary. You also agree that your obligations under this Section will survive and continue after any termination or revocation of rights under this Agreement.

MAINTENANCE SERVICES

11. MAINTENANCE SERVICES.  Cadence will provide remedial and preventive maintenance services ("Maintenance Services") to keep the most current release of the Software licensed by you under this Agreement in good operating condition.  Please note that certain features within the Software are provided for the convenience of customers but are not supported by Cadence.  Cadence has no obligation to provide Maintenance Services for such features.  These unsupported features are designated within the Software.

   (a) Cadence will provide appropriate assistance to you within a reasonable period after you adequately describe a Product problem to Cadence's Customer Support Organization.  Such assistance will be at Cadence's expense where it determines that the reported problem is due to defects in an unaltered most current version of the Product.  If it determines that the reported problem is not due to the Product, if you request and Cadence agrees to provide the requested service, you agree to pay Cadence's then current prices for services Cadence provides to correct such problem.

   (b) If you make modifications, interfaces, and/or other changes to the Product, if permitted by Cadence in writing, you shall promptly inform Cadence in writing and provide such information as Cadence determines necessary to properly maintain the Product.

   (c) Cadence's obligation to provide Maintenance Services pursuant to this Agreement is dependent upon your compliance at all times with the terms of the this Agreement.

   (d) Cadence shall not be obligated to provide Maintenance Services pursuant to this Agreement that are required by any of the following:

   (1) abuse, misuse, accident or neglect; or

   (2) repairs, alterations, and/or modifications which are not permitted under this Agreement and which are performed by other than Cadence or its agents; or

   (3) use of materials not meeting Cadence's requirements; or

   (4) use of the Product for other than the intended purpose for which licensed and designated; or

   (5) malfunction, modification or relocation of the Designated Equipment (as defined below); or

   (6) where inadequate backups are supplied.

   (e) Cadence may refuse to provide Maintenance Services where, in Cadence's opinion, a condition exists that represents a hazard to the safety of its employees or agents.

   (f) Products are licensed for use on a specific hardware unit ("Designated Equipment"), and as indicated in this Agreement, a Product may only be transferred to another hardware unit upon prior approval of Cadence and after payment of the appropriate transfer fees.

12. INITIAL TERM; COMMENCEMENT; RENEWAL.  This Agreement is intended to commence at the time of shipment or download, as applicable, of the Product(s). Maintenance Services shall commence on the business day following software installation subject to the approval of Cadence and payment in advance of the applicable fee(s).  Unless otherwise specified in a product quotation from Cadence or an authorized Cadence reseller, this Agreement shall have an initial term of one (1) year.  Upon issuance of your purchase order prior to the expiration of the initial term or any renewal term, acceptance by Cadence of such purchase order and payment by you of the applicable fees, this Agreement shall renew for successive periods (for the term specified in a product quotation) unless terminated by Cadence per Section 21 below.  If there has been any lapse of Maintenance Services, such Maintenance Services will commence only after an evaluation by Cadence of your current status, payment of applicable fees, and, if necessary, updating of the Software to a serviceable revision.  You shall pay Cadence's software update charges where applicable.  Maintenance Services renewal is contingent on current payment of maintenance fees, you not being in default hereunder, and a valid order from you.

13. NO WARRANTY.  IN CONNECTION WITH THE MAINTENANCE SERVICES RENDERED UNDER

THIS AGREEMENT, CADENCE MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR OF MERCHANTABILITY OR OF NON-INFRINGEMENT.

14. PRICES AND TERMS OF PAYMENT.  The price for Maintenance Services set forth on the product quotation applies to the initial term.  Cadence will advise you at least thirty (30) days prior to the expiration of a term of the prices applicable to the subsequent term.  Each annual installment is due and payable in advance, net thirty (30) days from invoice date. Delivery is to be made F.O.B. point of shipment.  Shipping charges, including insurance, shall be paid by you.  Risk of loss shall pass to you upon delivery to carrier.

15. ADDITIONAL SERVICES.  If Cadence agrees to perform services requested by you, which are not included as part of this Agreement, such services shall be billed to you at prices and terms determined by Cadence.

16. UPDATES AND NEW PRODUCTS.  Updates, consisting of one copy of modifications and improvements to each Product which Cadence determines are required to achieve the specifications established by Cadence for the Product will be provided at no additional cost.  You acknowledge that Cadence will maintain only the most current version of the Software.  Cadence shall maintain prior versions until the earlier of six (6) months from the release of each new version release, or termination of this Agreement.  Upon receipt and installment of an update to a Product, you may keep one copy of the previous version of the Product for archival purposes only and shall destroy all other copies of the previous version of the Product.  New products are determined and defined solely by Cadence and are not covered by the fees already paid by you.

17. EXCLUDED SERVICES.  Cadence does not itself provide hardware maintenance unless the same is pre-arranged for a fee.  In addition, services connected with relocation of the Software from your hardware or reconfiguration of same or problems induced by you associated with the hardware are excluded.  The cost of tools, supplies, accessories, media, and other expendables required by Cadence to perform the Maintenance Services are excluded.

18. YOUR RESPONSIBILITIES.  You shall:
   (a) Notify Cadence promptly by Cadence designated electronic problem reporting software or telephone of Product problems and provide follow-up reports in writing.  Cadence will confirm receipt of any electronic problem report within twenty-four (24) hours of receipt and, in the absence of such a confirmation, you shall promptly re-transmit such report;
   (b) Allow Cadence full and unrestricted access to all Designated Equipment at your premises and other communication facilities and provide Cadence reasonable workspace and storage and other normal and customary facilities;
   (c) Provide Cadence with reasonable assistance as requested and insure that one of your employees, if applicable, is present during a service visit;
   (d) Provide sufficient support and test time on your computer system to duplicate the problem, certify that the problem is due to the Product and, when repairs are complete, certify that the problem has been repaired;
   (e) Provide the same standard of care for Product that you apply to your own products or data of like nature and value and return any defective Product or attest in writing to the destruction of same as directed by Cadence;
   (f) Provide sufficient data to Cadence to reproduce the problem on another computer at Cadence's Customer Support Center.  Cadence will retain a copy of the data to use for validation of future releases of Cadence Products unless specifically directed not to do so in writing by you.

19. RELOCATION OF DESIGNATED EQUIPMENT.  You shall notify Cadence in writing not less than thirty (30) days prior to moving the Designated Equipment as to its intended new location.  Cadence shall be under no obligation to provide any Maintenance Services under this Agreement during or as a result of such relocation.

20. LIMITATION OF LIABILITY.  CADENCE'S CUMULATIVE LIABILITY UNDER THIS PORTION OF

THE AGREEMENT FOR ALL CAUSES OF ACTION SHALL BE LIMITED TO AND NOT EXCEED THE MAINTENANCE SERVICES FEE PAID BY YOU, REGARDLESS OF WHETHER CADENCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR THAT ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE OR OTHERWISE.  CADENCE SHALL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSTITUTE SERVICES, LOSS OF PROFITS, INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE.  YOU ACKNOWLEDGE THAT THE MAINTENANCE FEE REFLECTS THIS ALLOCATION OF RISK.

21. TERMINATION.  Cadence reserves the right to terminate your rights under this Agreement and to seek any other legal remedies upon default by you of any provisions of this Agreement and, in the event of such termination, you agree to return the Product to Cadence or to delete all copies of the Product in your possession or under your control. Additionally, where a new version of Product has been offered to you, Cadence may terminate Maintenance Services for the old version of such Product under this Agreement six (6) months after first commercial shipment or delivery to you of such new version if you have not installed such version.

22. DEFAULT.  Your failure to perform your obligations hereunder, including, without limitation, timely payment in full of all fees or the insolvency, bankruptcy, reorganization, assignment for the benefit of creditors, or dissolution, liquidation, or winding up of the business shall constitute a default under this Agreement.

23. TAXES.  You will pay or reimburse all federal, state and local taxes (exclusive of taxes on Cadence's net income), duties and assessments arising on or measured by amounts payable to Cadence under this Agreement.

24. FORCE MAJEURE.  Cadence shall not be liable for any loss, damage, or penalty resulting from delay due to causes beyond its control, including, without limitation, delays by its suppliers.

25. NO ASSIGNMENT.  You shall not assign, delegate, or subcontract any portion of your rights, duties, or obligations under this Agreement and any attempt to do so shall be void.  Without limitation of the foregoing, an assignment, delegation or transfer shall include, but not be limited to a sale of substantially all your assets, a merger, a re-organization, or change in control of fifty percent (50%) or more of your equity (a "Change in Control").  No assignment, delegation or transfer (including, without limitation, by operation of law) of this Agreement may be made without the prior written consent of Cadence. Such prior written consent by Cadence may be withheld at Cadence's sole discretion.

26. NOTICES.  Notices to you shall be sent to the address specified by you on the product quotation, and notice to Cadence shall be sent to: 2655 Seely Avenue, Building 5, San Jose, CA 95134, U.S.A., Attn: Legal Department, or such new address as a party specifies to the other in writing.

27. GOVERNING LAW.  You agree to submit to exclusive jurisdiction in the federal and state courts of California, U.S.A. in the event of a dispute. This Agreement will be governed by the procedural and substantive laws of the State of California, U.S.A., without regards to its conflicts of laws principles.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. This Agreement is prepared and executed and shall be interpreted in the English language only, and no translation of the Agreement into another language shall have any effect. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from and shall not apply to this Agreement.

28. ATTORNEYS' FEES. In the event a party brings legal action against the other party to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses for any proceeding, at or before trial and upon appeal, in addition to any other relief deemed appropriate by the court.

29. ENTIRE AGREEMENT.  This Agreement constitutes the entire agreement between the parties with respect to the use of the Product, and supersedes all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter.  Any terms and conditions contained or incorporated by reference in purchase orders, acknowledgments, invoices, confirmations or other business forms of either party which add to or differ from the terms and conditions of this Agreement shall be of no force or effect whatsoever concerning the subject matter of this Agreement, and either party's failure to object thereto shall not be deemed a waiver of such party's rights hereunder.  This Agreement may not be modified unless a written amendment is signed by a corporate officer of Cadence.

If you have any questions concerning this Agreement, or if you desire to contact Cadence Design Systems, Inc. for any reason, please do so in writing at the address listed below.  Cadence is a registered trademark and the Cadence logo is a trademark of Cadence Design Systems, Inc. All others are properties of their holders.

Copyright (c) 2019 by Cadence Design Systems, Inc.  All rights reserved.
Cadence Design Systems, Inc., 2655 Seely Avenue, San Jose, CA 95134, U.S.A.

v2016-1 (146406_3)

# Exhibit 10

**AWR CORPORATION**

**END USER LICENSE AGREEMENT**

AWR Corporation ("AWR") licenses the Software (defined below) under the terms and conditions of this End User License Agreement ("Agreement"). This Agreement is a legal contract between you (if accepting in your capacity as an individual) or the legal entity you represent (such as your employer), if you are using the software on its behalf ("Customer") and AWR.

**BEFORE COMPLETING THE INSTALLATION PROCESS, CAREFULLY READ THIS AGREEMENT. BY SELECTING "I AGREE" TO COMPLETE THE INSTALLATION PROCESS, CUSTOMER CONSENTS TO THE TERMS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THIS AGREEMENT. IF CUSTOMER DOES NOT WISH TO BECOME A PARTY TO THIS AGREEMENT AND BE BOUND BY ALL OF ITS TERMS AND CONDITIONS, SELECT "I DO NOT AGREE" TO CANCEL THE INSTALLATION PROCESS, DO NOT INSTALL OR USE THE SOFTWARE, AND DELETE AND DESTROY ALL COPIES OF THE SOFTWARE.**

If both Customer and AWR have signed a software license agreement to obtain a license to use the Software, then that agreement supersedes this Agreement and will apply and govern Customer's use of the Software.

**1. Definitions**.

**Academic Institution** means a degree-granting educational institution.

**Designated Equipment** means the specific computer on which the Software may be installed and used.

**Designated Site** means the specific Customer location or facility specified as the "designated site" on the Proof of License or, if the Proof of License does not specify a designated site, any facility owned or leased by Customer that is within a one-mile radius of the "Ship To" address specified on the Proof of License. Alternatively, in the case of a downloaded evaluation or personal license, the Designated Site is the address provided by Customer when registering for the license on AWR's website.

**Documentation** means the user manual, reference manuals and other end user materials, in printed and electronic form, supplied by AWR for use with the Software.

**Effective Date** means the date on which Licensee accepts this Agreement by clicking on the "I Agree" button.

**Instructor** means an individual teaching at an Academic Institution.

**Designated Number of Users** means (i) for a floating license, the number of simultaneous users specified in the Proof of License, and (ii) for a locked license, only a single user.

**Proof of License** means the collective set of applicable documents authorized by AWR specifying the type of license granted to Customer under this Agreement and the other applicable terms, including the duration of the license. The Proof of License may be in the form of AWR's invoice and other AWR documents that describe or specify the type of license granted to Customer, including a license activation file containing key codes.

**Software** means the AWR software provided with this Agreement, consisting of one or more of the following AWR software products: Microwave Office, Analog Office, Visual System Simulator, APLAC, Analyst and/or AXIEM, and any third party software products included in any of the foregoing (other than those which are provided subject to separate license terms as described below), in each case in machine-readable object code form, and including updates, upgrades, new versions and new releases provided by AWR, if any. AWR provides certain third party software subject to separate license terms either presented at the time of installation or otherwise provided with the Software ("Third Party Software"). Such Third Party Software is not included in the definition of the term "Software".

**Student** means an individual enrolled or taking continuing education classes at an Academic Institution.

**License Term** means the period of time commencing on the date set forth in the Proof of License; provided, however, the license may not be activated until Customer accepts the terms of this Agreement and completes the installation process and continuing for the period of time specified in the Proof of License. If this Agreement is terminated earlier by AWR or Customer as provided herein, such period is deemed to have ended on the effective date of such termination.

**2. Licenses and Restrictions**.

    **a. License Type**. The Proof of License specifies the type of license granted to Customer under this Agreement. If the Proof of License fails to specify the type of license granted to Customer, then the license type is evaluation.

        **1. Commercial License**. For a commercial license, Customer receives either a "floating" license or a "locked" license, and that license is of either perpetual or fixed term. The Proof of License specifies whether the license is "floating" or "locked" and the term.

**i. Floating License**. If the license is a "floating" license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) serve licenses from the network server identified on the Proof of License, reproduce and install the Software on computers at the Designated Site only for use by the Designated Number of Users and (ii) make an archival copy of the Software solely for emergency back-up purposes and for Customer's internal business purposes, solely at the Designated Site or via a secure virtual private network or application sharing utility at the personal residences of Customer's personnel whose normal permanent work location is the Designated Site. The number of simultaneous users of the Software may not exceed the Designated Number of Users and virtualization may not be used to increase the number of simultaneous users.

**ii. Locked License**. If the license is a "locked" license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) reproduce and install the Software on the Designated Equipment solely at the Designated Site only for use and access by a single user at a time, (ii) make an archival copy of the Software solely for emergency back-up purposes and (iii) permit the single user to use the Software, only for Customer's internal business purposes and solely on the Designated Equipment at the Designated Site. For avoidance of any doubt, a locked license does not permit access or use of the Software through any virtual private network application sharing utility, including, without limitation, VPN Client, VNC, Windows Remote Desktop or Webex. Customer shall not run the software on other than the Designated Equipment and Customer shall not run the software in a virtual machine environment.

## 2. Academic License.

**i. Educational License**. If the license is an educational license, then Customer's license is either a floating license as set forth in Section 2.a(1)(i) above, or a locked license as set forth in Section 2.a(1)(ii) above, as specified in the Proof of License, for the License Term. Software may be used only for Customer's own educational use, only by Students and Instructors at Customer's Academic Institution, and use by contractors is not permitted. There is no right to access or use the Software for any commercial or industrial purposes, or any purpose that is not solely and strictly educational in nature, whatsoever. For avoidance of any doubt, academic licenses, including Student Install Option licenses, may not be transferred (including to other Students or to another Academic Institution).

**ii. Academic Teaching License**. If the license is an academic teaching license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to use the Software solely for instructional purposes in Customer's department, college, or on a specific university campus, in each case, of an Academic Institution, depending on the option selected in the Proof of License applicable purchase order. A use will be considered as one for "instructional purposes" only if such use meets either of the following criteria: (i) a common exam is given to Students at the end of a semester or other academic period and the exam relates (in whole or part) to the Students' use of the Software or (ii) homework or similar projects requiring the use of the Software are used for grading in lieu of an exam. Customer may install the Software on no more than the number of Customer's Academic Institution's Designated Equipment items (located within the applicable department, college, or specific university campus) specified by AWR in writing in the Proof of License. If any of the Designated Equipment items on which the Software may be installed is a laptop, notebook or similar portable computer, Customer may use the Software on the portable computer while temporarily away from Customer's Academic Institution's classroom, lab, or other facilities for the same purpose permitted by this Agreement as Customer normally would use the Software on the portable computer while in such facilities. Without limiting the generality of the foregoing, any use of the Software by any person who is not an Instructor at Customer's Academic Institution or any use for research, commercial, or industrial purposes under this Agreement is prohibited.

**iii. Student Install Option**. If the license is an academic teaching license with a student install option, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to make the Software available (i) to no more than the total number of Students specified by AWR in writing in the Proof of License, each of which Students must be then currently enrolled at the applicable department, college, or specific university campus of Customer's Academic Institution specified by AWR in writing in the Proof of License applicable quote or other offer documents, (ii) for use by each such Student only for his or her own personal education purposes and not for any other purpose, including research, professional, commercial, or industrial purposes, on up to three items of Designated Equipment. The applicable student install option license will automatically expire upon the conclusion or termination of the applicable Student's enrollment at Customer's Academic Institution; upon any such expiration, the Student must promptly uninstall all copies of the Software.

**iv. Academic Research Option.** If the license is an academic research license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to use the Software solely for academic research purposes in Customer's department, college, or on a specific university campus, in each case, of an Academic Institution, as specified in the Proof of License. Customer may install the Software on no more than the number of Customer's Designated Equipment items specified by AWR in writing in the Proof of License. If any of the Designated Equipment items on which the Software may be installed is a laptop, notebook or similar portable computer, Customer may use the Software on the portable computer while temporarily away from

Customer's institution's classroom, lab, or other facilities for the same purpose permitted by this Agreement as Customer normally would use the Software on the portable computer while in such facilities. Customer must purchase separate maintenance for the Software to maintain the license.

**3. Evaluation License**. If the license is an evaluation license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) reproduce and install the Software on the Designated Equipment solely at the Designated Site only for use and access by a single user at a time, (ii) make an archival copy of the Software solely for emergency back-up purposes and (iii) permit the single user to use the Software, only internally and solely to evaluate the Software for determining whether to license it from AWR on a non-evaluation basis. Customer has no right to use the Software for any commercial purpose, including in commercial or industrial production or, in the case of beta software, for the purpose of testing the functionality of the Software. **SOFTWARE LICENSED UNDER AN EVALUATION LICENSE MAY NOT BE FULLY FUNCTIONAL, AND CUSTOMER ASSUMES THE ENTIRE RISK AS TO THE RESULTS AND PERFORMANCE OF THE SOFTWARE. AWR HAS NO OBLIGATION TO UPDATE OR SUPPORT THE SOFTWARE.**

**4. Personal License**. If the license is a personal license, Customer must be an individual (i.e., a natural person), and subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) reproduce and install the Software on the Designated Equipment for use and access only by Customer, (ii) make an archival copy of the Software solely for emergency back-up purposes and (iii) use the Software for Customer's own purposes. There is no right for anyone other than Customer to access or use the Software for any purposes whatsoever.

**b. Documentation License**. Subject to the terms and conditions of this Agreement, AWR hereby grants Customer, during the term of this Agreement, a non-exclusive, non-sublicensable, non-transferable, license to use and reproduce a limited number of copies of the Documentation solely in conjunction with Customer's licensed use of the Software. Customer shall not modify or create any derivative works of the Documentation without written permission of AWR. Customer shall not distribute the Documentation.

**c. Additional Restrictions**. In addition to any restrictions stated elsewhere in this Agreement, the following restrictions apply.

**1. Use and Users**. The Software may not be used for any purpose other than its ordinary intended purpose as a software tool for use in Customer's design and verification of its circuits, components, products, subsystems and systems as appropriate for the particular Software item.

**2. Third Parties' Use**. Customer may permit (i) Customer's parents, subsidiaries, or affiliates located at the Designated Site and (ii) contractors to use Software (such (i) and (ii) collectively the "Permitted Third Parties"). Customer hereby agrees and acknowledges that Customer will be liable for any and all actions or omissions of Permitted Third Parties with respect to the use of the Software, as if such actions or omissions were Customer's own. In addition, Customer's contractor (i) must agree in writing that the Software shall be used solely in accordance with this Agreement and solely for Customer's benefit and that the contractor is liable to AWR for any breach by contractor of this Agreement and (ii) must not be a competitor of AWR.

**3. Locked and Floating Licenses**. For a locked license, the Software may only reside on the Designated Equipment that is physically located at the Designated Site. For a floating license, Customer may serve licenses from a different network server computer from the one identified on the Proof of License only with AWR's prior written approval. If approval is given, Customer must remove the license server software from the prior network server computer on which it was installed, and the new network server computer will become the permitted network server computer for purposes of this Agreement (including the Proof of License).

**4. Other Restrictions**. Unless explicitly permitted in this Agreement, Customer shall not (i) permit any third party to use the Software; (ii) copy, sublicense, disclose, distribute, lend, rent or lease the Software or Documentation; (iii) use the Software or Documentation for third-party training without prior written permission from AWR or on any time-sharing basis (whether commercial or non-commercial); (iv) use, separately from the Software, any components, models or libraries included in the Software or otherwise provided by AWR; (v) take any action that results in any of the Software being subject to a license that requires, or purports to require, as a condition of use, modification, or distribution, that (a) the code that is or could become subject to the license, be disclosed or distributed in source code form or (b) others have the right to modify or create derivative works of the code that is or could become subject to the license; or (vi) directly or indirectly, export, re-export, download, transmit, or ship the Software or Documentation in violation of Section 12.c or otherwise in violation of any applicable laws or regulations, including those of the U.S. or the jurisdiction in which Customer uses or downloads the Software. All uses of the Software shall be in accordance with the applicable Documentation and not in any manner intended to or that circumvents such Documentation or the intent of this Agreement. Except as expressly permitted in this Section 2, under no circumstance is "floating", shared, or concurrent use of the Software, or remote accessing of the Software, permitted under this Agreement. The use of the Software is intended only for use with content that has been properly licensed by the Customer or any content owned by the Customer. Customer may require a patent, copyright or other license from a third party to create, copy, download, record or save content files for use with this Software or to serve or distribute such files to be used with the Software. Customer shall

only use the Software and Documentation in a manner that complies with all applicable laws in the jurisdictions in which it uses the Software and Documentation, including applicable restrictions concerning copyright and other intellectual property rights. Customer shall not use the Software in an attempt to, or in conjunction with any device, program or service designed to, circumvent technological measures employed to control access to, or the rights in, a content file or other work protected by the copyright laws of any jurisdiction.

**d. Proprietary Rights Notices**. Customer shall not remove, deface or obscure any copyright or other proprietary notices appearing on or within the Software or Documentation. Customer shall include reproductions of the copyright and other proprietary notices on all copies of the Software and Documentation made by or for Customer. For patents covering AWR products, refer to http://www.awrcorp.com/patents. AWR, Microwave Office, Analog Office, Visual System Simulator and AXIEM are trademarks of AWR. Refer to http://www.awrcorp.com/trademarks for more information about AWR trademarks.

**e. Reverse Engineering; Modifications**. Customer shall not cause or permit (i) the disassembly, decompilation or reverse engineering of the Software or any other attempt to gain access to or discover the source code for the Software (or the underlying ideas, algorithms, structure or organization of the Software) except to the extent that such restriction is expressly prohibited by applicable law or (ii) the modification, adaptation, translation or creation of derivative works based on the Software.

**f. Key Codes; Deactivation.** Customer shall only access the Software using a key code created by AWR that is provided directly to Customer by AWR. Customer shall not use the Software in any manner without that key code. AWR reserves the right to update or replace the key code periodically or implement an alternative licensing protection mechanism. Customer shall comply with any alternative licensing protection mechanism that may be subsequently implemented by AWR. Customer shall not distribute, make accessible, transmit or provide any key code to any third party or make it available to the public, use or attempt to use the key code other than for the Software for which it is provided by AWR to Customer, or take any action to circumvent any key code system or alternative licensing protection mechanism. Any action by Customer (including any employee of Customer) in contravention of this paragraph is a material breach of this Agreement. **THE SOFTWARE MAY CONTAIN CODE THAT WILL, AFTER TERMINATION OR EXPIRATION OF THE LICENSE TERM, DEACTIVATE THE SOFTWARE AND RENDER THE SOFTWARE UNUSABLE. ALTHOUGH THE SOFTWARE MAY WARN YOU OF THE TIME-FRAME IN WHICH IT WILL BE DISABLED, YOU ACKNOWLEDGE AND AGREE THAT THE SOFTWARE MAY BE DEACTIVATED OR RENDERED UNUSABLE WITH OR WITHOUT WARNING AND THAT YOU MAY NOT BE ABLE TO ACCESS ANY CONTENT (INCLUDING YOUR DEVELOPMENTS) THAT ARE SAVED WITHIN THE SOFTWARE.**

**3. Support.** Any software maintenance services and other software support services provided by AWR for the Software are subject to AWR's then current applicable standard software support policies.

**4. Payment**.

**a. License Fees and Taxes**. Customer shall pay the license fees set forth in the Proof of License, if any, and all associated taxes.

**b. Payments**. Except as otherwise set forth herein, all amounts due must be paid within the payment period specified on the Proof of License in the currency specified by AWR. If no period is specified, then the due amounts must be paid within thirty (30) days of (i) invoice or (ii) the Effective Date, if there is no invoice. Customer agrees to be responsible for payment of this debt to creditor or its assigns. In the event of default, Customer is responsible for reasonable attorney's fees and court costs incurred to recover amounts due. If the account is placed with a collection agency, the undersigned is responsible for all collection costs incurred, including, but not limited to, all collection fees or contingency fees of up to 33.3% added by a third party to the original or referral balance, service charges, and/or interested as allowed by the law. AWR may report information about your account to the proper credit bureaus. Late payments, missed payments, or other defaults on Customer's account may also be reflected in its credit report.

**5. Protection of Licensed Materials; Feedback; Compliance**.

**a.** The Software and Documentation, and all copies of the Software and Documentation, are owned by AWR or its suppliers or licensors and are protected by applicable copyright laws and international treaty provisions. Customer hereby acknowledges and agrees that the Software and Documentation (and all copies thereof) are the copyrighted and proprietary property of AWR or AWR's licensors. AWR and its licensors retain all right, title and interest, including intellectual property rights, in and to the Software and Documentation and any corrections, enhancements, or other modifications to the Software. AWR's licensors are third party beneficiaries of Customer's compliance with this Agreement to the extent of their respective interests. Customer acknowledges that the Software is licensed, not sold, and that the license granted under this Agreement provides Customer only with a limited right to use the Software under the terms and conditions of this Agreement. There are no implied rights. All rights not expressly granted by AWR to Customer are hereby reserved by AWR. Further, and without limiting the foregoing, no license or any right of any kind (whether by express license, implied license, the doctrine of exhaustion, or otherwise) is granted under any AWR patents (whether identified herein or not) or other intellectual property right of AWR with respect to any other products of AWR or of any third party, including the right to use any of these other products.

**b.** Customer agrees that any feedback regarding Customer's use of the Software that Customer discloses to AWR, including

errors or bugs that Customer might find and any changes or suggested changes to AWR's current or future products and services (collectively "Feedback"), shall be received and treated by AWR on a non-confidential and unrestricted basis, notwithstanding any restrictive or proprietary legends to the contrary accompanying or otherwise associated with the Feedback. Customer hereby grants to AWR a worldwide, royalty-free, non-exclusive, perpetual, and irrevocable license to use, copy, and modify Feedback for any purpose, including incorporation or implementation of such Feedback into AWR products or services, and to display, market, sublicense and distribute Feedback as incorporated or embedded in any product or service distributed or offered by AWR.

   **c.** Customer agrees to make all applicable records available for review by AWR during Customer's normal business hours so as to permit AWR (upon reasonable notice to Customer) to verify Customer's compliance with the terms and conditions of this Agreement. Further, if Customer is a business or other entity, Customer agrees that upon the request of AWR or AWR's authorized representative, Customer will promptly document and certify in writing to AWR that Customer and Customer's employees' use of the Software complies with the terms and conditions of this Agreement.

**6. <u>Customer Experience Improvement Program</u>**. The software may collect statistics on the capabilities used and report those to AWR, which uses them to improve the performance and capabilities of the software. Commercial and Personal license Customers can decline participation in this program when using production software; beta software, academic license and evaluation license users cannot. This process does not collect or communicate any proprietary application data.

**7. <u>Software Updates, Error Reporting, and License Compliance</u>**. Customer agrees that the Software may collect and communicate certain software, hardware, and use information to AWR or its service providers' servers for the purposes of (i) checking for and performing any updates, (ii) documenting application errors (such as crashes), (iii) ensuring that Customer has complied and is complying with the terms and license conditions in this Agreement, including Customer's use of valid software key codes, and (iv) AWR's internal product development. This process does not collect or communicate any proprietary application data. AWR will not provide any information gathered in connection with this process to any third party except (i) as may be required by law or legal process or (ii) to enforce compliance with this Agreement and the key code requirement described above.

**8. <u>Limited Warranty</u>**.

   **a. <u>Limited Warranty.</u>** Software provided under an evaluation or academic license is provided without warranty. For all other Software, AWR warrants, for Customer's benefit alone, that for a period of thirty (30) days from the date the Software is shipped to Customer (or, if downloaded, from the date the Software is first downloaded by Customer) (i) the Software will perform substantially in accordance with the applicable Documentation and (ii) the medium on which the Software is recorded will be free from defects in materials and workmanship under normal use and service ("Limited Warranty"). Any replacement Software will be warranted for the same period. Some states/jurisdictions do not allow limitations on duration of an express or implied warranty, so the above or any other limitation provided herein may not apply to Customer. In such event, such warranties are limited to the minimum warranty period allowed by applicable law. The Limited Warranty is void if failure of the Software has resulted from accident, abuse, misapplication, third party products (i.e., hardware or software) used by Customer that are not intended by AWR for use with the Software, utilization of an improper hardware or software key (if applicable), any use of the Software other than as permitted by this Agreement or unauthorized maintenance of the Software.

   **b. <u>Customer Remedies</u>**. AWR's sole obligation (and Customer's sole remedy) with respect to the foregoing Limited Warranty shall be to, at AWR's option, return the fees paid by Customer to AWR, in which event Customer must return or destroy all copies of the Software in accordance with AWR's reasonable instructions and the license granted to Customer shall terminate without liability on the part of AWR by reason of such termination, or repair or replace the Software, provided that AWR receives written notice of applicable defects during the warranty period. Customer hereby agrees not to bring an action to enforce Customer's remedies under the foregoing Limited Warranty, or for breach of warranty, more than one (1) year after the accrual of such cause of action.

   **c. <u>No Other Warranties.</u> EXCEPT AS EXPRESSLY SET FORTH IN SECTION 8.A, NO WARRANTIES, EITHER EXPRESS OR IMPLIED ARE MADE WITH RESPECT TO THE SOFTWARE, THIRD PARTY SOFTWARE OR SOFTWARE SERVICES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. THERE ARE NO OTHER WARRANTIES THAT MAY ARISE FROM USAGE OF TRADE OR COURSE OF DEALING. AWR DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT RELATING TO THE SOFTWARE, THIRD PARTY SOFTWARE, AND THE SOFTWARE SERVICES. AWR DOES NOT WARRANT, GUARANTEE, OR MAKE ANY REPRESENTATIONS REGARDING THE USE OF OR THE RESULTS OF THE USE OF THE SOFTWARE OR SOFTWARE SERVICES IN TERMS OF CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE AND DOES NOT WARRANT THAT THE OPERATION OF THE SOFTWARE OR SOFTWARE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE. AWR'S LICENSORS MAKE NO WARRANTIES OR REPRESENTATIONS TO CUSTOMER AND SHALL HAVE NO LIABILITY TO CUSTOMER IN CONNECTION WITH THIS AGREEMENT.**

**9. No Obligation for Third Party Claims**. AWR has no obligation, responsibility or liability whatsoever to defend, indemnify or hold Customer harmless from or against any third party claims, suits or actions related to, arising out of or connected with the use of the Software or Customer's exercise of the licenses granted in this Agreement (including, without limitation, any patent, copyright or other intellectual property infringement claims) or for any damages, losses, liabilities, settlement amounts, costs or expenses related to those third party claims, suits or actions.

**10. Limitation of Liability**.

    **a. Limitation of Damages**. NEITHER AWR NOR ITS LICENSORS, SUPPLIERS OR DISTRIBUTORS ARE LIABLE FOR ANY LOST PROFITS, LOSS OF DATA, COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, OR EXEMPLARY DAMAGES, OR ANY DIRECT DAMAGES IN EXCESS OF THE LICENSE FEES PAID BY CUSTOMER HEREUNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE USE OR INABILITY TO USE THE SOFTWARE OR THIRD PARTY SOFTWARE, OR ANY SUPPORT SERVICES RELATING TO THE SOFTWARE OR THE THIRD PARTY SOFTWARE, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE OF AWR OR OTHERS), AND EVEN IF AWR OR ITS LICENSORS, SUPPLIERS OR DISTRIBUTORS HAVE BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. Because some jurisdictions do not allow the exclusion or limitation of liability for consequential or incidental damages, some of the preceding limitation may not apply to Customer.

    **b. Allocation of Risk**. The sections on limitation on liability, warranties and disclaimer of warranties allocate the risks in this Agreement between the parties. This allocation is an essential element of the basis of the bargain between the parties. Moreover, Customer acknowledges that the amounts payable hereunder are based in part on the limitations of this Section 10, and hereby agrees that these limitations will apply notwithstanding any failure of the essential purpose of this Agreement or any limited remedy hereunder. The foregoing limitations will apply to the maximum extent permitted by law.

    **c. WARNING**. THE SOFTWARE AND SERVICES ARE NOT DESIGNED, MANUFACTURED, OR TESTED FOR USE INHAZARDOUS ENVIRONMENTS OR ANY OTHER ENVIRONMENTS REQUIRING FAIL-SAFE PERFORMANCE, INCLUDING IN THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION, AIR TRAFFIC CONTROL SYSTEMS; LIFE SAVING OR LIFE SUSTAINING SYSTEMS OR SUCH OTHER MEDICAL DEVICES; OR ANY OTHER APPLICATION IN WHICH THE FAILURE OF THE SOFTWARE COULD LEAD TO DEATH, PERSONAL INJURY, SEVERE PROPERTY DAMAGE, OR ENVIRONMENTAL HARM. CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD AWR AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS HARMLESS FROM ANY AND ALL CLAIMS, LOSSES, LIABILITIES, DAMAGES, ACTIONS (INCLUDING LAWSUITS, ARBITRATIONS, AND/OR ADMINISTRATIVE ACTIONS) AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING OUT OF CUSTOMER'S USE OF THE SOFTWARE OR SERVICES FOR HIGH-RISK USES, INCLUDING CLAIMS FOR PRODUCT LIABILITY, PERSONAL INJURY OR DEATH, OR DAMAGE TO PROPERTY, REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO BY THE NEGLIGENCE OF AWR OR OTHERS. CUSTOMER ACKNOWLEDGES AND AGREES THAT IT IS ULTIMATELY RESPONSIBLE FOR VERIFYING AND VALIDATING THE SUITABILITY OF THE SOFTWARE AND SERVICES FOR USE IN OR IN CONNECTION WITH A PARTICULAR APPLICATION OR SYSTEM, INCLUDING THE APPROPRIATE DESIGN, PROCESS, AND SAFETY LEVEL OF SUCH APPLICATION OR SYSTEM. CUSTOMER WILL DEFEND, INDEMNIFY, AND HOLD HARMLESS AWR AND ITS DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY AND ALL CLAIMS, LOSSES, DAMAGES, ACTIONS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING OUT OF ITS USE OF THE SOFTWARE IN CONNECTION WITH A PARTICULAR APPLICATION; PROVIDED, HOWEVER, THAT CUSOMTER'S CONTRACTUAL OBLIGATION OF INDEMNIFICATION SHALL NOT EXTEND TO THE PERCENTAGE OF THE CLAIMANT'S DAMAGES OR INJURIES OR THE SETTLEMENT AMOUNT ATTRIBUTABLE TO AWR'S NEGLIGENCE OR OTHER FAULT OR TO STRICT LIABILITY IMPOSED UPON AWR AS A MATTER OF LAW.

**11. Term and Termination**.

    **a. Term**. This Agreement begins on the Effective Date and continues until terminated. This Agreement will automatically terminate at the end of the License Term if not previously terminated as provided in this Agreement.

    **b. Termination**. Customer may terminate this Agreement at any time upon written notice to AWR. This Agreement may be terminated by AWR if Customer materially breaches or defaults in the performance of this Agreement and fails to cure that breach or default within thirty (30) days, regardless of whether notice is given by AWR or AWR has knowledge of the breach or default; provided, however, AWR may immediately terminate this Agreement upon written notice to Customer if Customer fails to make any payment within ten (10) days after its due date or Customer becomes the subject of a voluntary or involuntary petition in bankruptcy or any voluntary or involuntary proceeding relating to insolvency, receivership, liquidation, or composition or assignment for the benefit of creditors. Either party may terminate an evaluation license at any time.

    **c. Effect of Termination**. Upon termination or expiration of this Agreement, all licenses will immediately end and Customer will return or permanently erase/destroy, at AWR's election and Customer's expense, the Software, Documentation,

license key codes and all copies thereof, and, if requested by AWR, deliver to AWR a written certification signed by an officer of Customer stating that it has complied with its obligations under this section. Nothing contained in this Agreement will limit any other remedies that either party may have under this Agreement, at law or in equity, nor relieve a party of any liability incurred prior to or after termination. Any unpaid amounts due by Customer to AWR shall survive termination or expiration of the Agreement. The provisions set forth in Sections 2.d, 2.e, 4, 5, and 8-12 shall survive termination or expiration of the Agreement.

**12. Miscellaneous**.

   **a. Assignment**. Customer may not assign any of its rights under this Agreement except with AWR's prior written consent. AWR shall not unreasonably withhold its consent to proposed assignment in connection with a merger or acquisition of Customer or a sale of all or substantially all of Customer's assets or business to which this Agreement and the Software relates if both (i) maintenance and support obligations with respect to the Software are then in effect, and (ii) the assignee agrees in writing to be bound by, and comply with, this Agreement. All other assignments of rights are prohibited under this section, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner. For purposes of this section, a change of control is deemed an assignment of rights; and "merger" refers to any merger in which Customer participates, regardless of whether it is the surviving or disappearing corporation. Customer may not delegate any performance of this Agreement. Any purported assignment of rights or delegation of performance in violation of this section is void. Subject to the foregoing, this Agreement is binding on the parties and will inure to the benefit of their respective successors and permitted assigns.

   **b. Severability; Waiver**. If any of the provisions of this Agreement is held by a court to be invalid, the remaining provisions of this Agreement remain in full force and the invalid provision will be replaced with an enforceable provision that carries out the parties' intentions to the greatest lawful extent. No failure or delay (i) in exercising any right or remedy or (ii) in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, operates as a waiver or estoppel of any right, remedy or condition. A waiver made in writing on one occasion is effective only in that instance and only for the purpose stated. A waiver, once given, is not to be construed as a waiver on any future occasion or against any other person or entity.

   **c. Export Control**. The Software and Documentation are, and Third Party Software provided by AWR with the Software may be, subject to control under the U.S. Export Administration Regulations (15 CFR Part 730 et. seq.), other applicable U.S. export control laws and regulations, and applicable global export control laws and regulations, including, for products exported from the European Union, the Council Regulation (EC) No. 428/2009. Customer represents and warrants that Customer is not ineligible or otherwise restricted by US or applicable law to receive any copies of the Software or Third Party Software. AWR reserves the right not to ship or permit downloading of the Software ordered if, at any time, AWR believes that such shipment or downloading of such Software or Third Party Software may violate U.S. or other applicable export control laws. Customer agrees that Customer will not export, re-export or transfer any Software or Third Party Software in violation of any U.S. and applicable global export control laws and that Customer will not export, re-export, or transfer the Software or Third Party Software by any means to (i) any person or entity on OFAC's List of Specially Designated Nationals or on BIS's Denied Persons List, Entity List, or Unverified List, or any other applicable restricted party list or (ii) any prohibited destination, entity, or individual without the required export licenses or authorizations from the U.S. Government or other applicable export licensing authority. For text of the relevant legal materials, see http://www.awrcorp.com/export.

   **d. Entire Agreement; Modification**. This Agreement and the Proof of License represent the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings with respect to the subject matter hereof, whether written or oral. The parties may amend this Agreement only by a written agreement of the parties that identifies itself as an amendment to this Agreement.

   **e. Conflicting Documents**. Any terms or conditions of any Customer purchase order, Customer invoice or other Customer business form that are in addition to or inconsistent with the terms of this Agreement will be deemed stricken from the purchase order, invoice or other business form, notwithstanding any acknowledgement or acceptance of it.

   **f. Governing Law**. The laws of the State of California (without giving effect to its conflicts of law principles) govern all matters arising out of or relating to this Agreement. All claims of Customer arising out of this Agreement are subject to the exclusive jurisdiction of, and venue in, the federal and state courts in Los Angeles, California, USA. Each party hereby irrevocably consents to the personal and exclusive jurisdiction and venue of these courts. The United Nations Convention on Contracts for the International Sale of Goods is hereby excluded and shall not be applicable this Agreement.

   **g. U.S. Government Rights**. The Software is a "commercial item" developed exclusively at private expense, consisting of "commercial computer software" and "commercial computer software documentation" as such terms are defined or used in the applicable U.S. acquisition regulations. If Customer is an agency, department, or other entity of the United States Government, the Software is licensed hereunder (i) only as a commercial item and (ii) with only those rights as are granted to all other licensees pursuant to the terms and conditions of this Agreement. Customer agrees not to use, duplicate, or disclose the Software in any way not expressly permitted by this Agreement. Nothing in this Agreement requires AWR to produce or furnish technical data for or to Customer.

**h. <u>Force Majeure</u>**. Except for Customer's payment obligations, neither party is responsible for any delays or inability to perform this Agreement due to any act of God, fire, casualty, flood, earthquake, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, or any other cause beyond the reasonable control of that party.

**i. <u>Attorneys' Fees</u>**. In any litigation or action concerning this Agreement, the prevailing party is entitled to be awarded all court costs and reasonable attorneys fees incurred, including all costs and fees incurred in enforcing and collecting any judgment.

**j. <u>Equitable Relief</u>**. Customer hereby acknowledges and agrees that AWR will suffer substantial and irreparable harm, for which there is no adequate remedy at law, if Customer breaches this Agreement, and that, in the event of a breach, or threatened breach, of this Agreement by Customer, AWR shall be entitled, without waiving any additional rights or remedies available to AWR at law, in equity, or by statute, to such injunctive or other equitable relief as may be deemed proper by a court of competent jurisdiction. Customer hereby waives any requirement that a bond be posted in order for AWR to obtain any such relief.

Version 2016.11

Exhibit 11

**AWR CORPORATION**

**END USER LICENSE AGREEMENT**

AWR Corporation ("AWR") licenses the Software (defined below) under the terms and conditions of this End User License Agreement ("Agreement"). This Agreement is a legal contract between you (if accepting in your capacity as an individual) or the legal entity you represent (such as your employer), if you are using the software on its behalf ("Customer") and AWR.

**BEFORE COMPLETING THE INSTALLATION PROCESS, CAREFULLY READ THIS AGREEMENT. BY SELECTING "I AGREE" TO COMPLETE THE INSTALLATION PROCESS OR BY EXECUTING A QUOTE REFERENCING THIS AGREEMENT, CUSTOMER CONSENTS TO THE TERMS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THIS AGREEMENT.**

**1. Definitions**.

**Academic Institution** means a degree-granting educational institution.

**Designated Equipment** means the specific computer on which the Software may be installed and used.

**Designated Site** means the specific Customer location or facility specified as the "designated site" on the Proof of License or, if the Proof of License does not specify a designated site, any facility owned or leased by Customer that is within a one-mile radius of the "Ship To" address specified on the Proof of License. Alternatively, in the case of a downloaded evaluation or personal license, the Designated Site is the address provided by Customer when registering for the license on AWR's website.

**Documentation** means the user manual, reference manuals and other end user materials, in printed and electronic form, supplied by AWR for use with the Software.

**Effective Date** means the date on which Licensee accepts this Agreement by clicking on the "I Agree" button.

**Instructor** means an individual teaching at an Academic Institution.

**Designated Number of Users** means (i) for a floating license, the number of simultaneous users specified in the Proof of License, and (ii) for a locked license, only a single user.

**Proof of License** means the collective set of applicable documents authorized by AWR specifying the type of license granted to Customer under this Agreement and the other applicable terms, including the duration of the license. The Proof of License may be in the form of AWR's invoice and other AWR documents that describe or specify the type of license granted to Customer, including a license activation file containing key codes.

**Software** means the AWR software provided with this Agreement, consisting of one or more of the following AWR software products: Microwave Office, Analog Office, Visual System Simulator, APLAC, Analyst and/or AXIEM, and any third party software products included in any of the foregoing (other than those which are provided subject to separate license terms as described below), in each case in machine-readable object code form, and including updates, upgrades, new versions and new releases provided by AWR, if any. AWR provides certain third party software subject to separate license terms either presented at the time of installation or otherwise provided with the Software ("Third Party Software"). Such Third Party Software is not included in the definition of the term "Software".

**Student** means an individual enrolled or taking continuing education classes at an Academic Institution.

**License Term** means the period of time commencing on the date set forth in the Proof of License; provided, however, the license may not be activated until Customer accepts the terms of this Agreement and completes the installation process and continuing for the period of time specified in the Proof of License. If this Agreement is terminated earlier by AWR or Customer as provided herein, such period is deemed to have ended on the effective date of such termination.

**2. Licenses and Restrictions**.

    **a. License Type**. The Proof of License specifies the type of license granted to Customer under this Agreement. If the Proof of License fails to specify the type of license granted to Customer, then the license type is evaluation.

        **1. Commercial License**. For a commercial license, Customer receives either a "floating" license or a "locked" license, and that license is of either perpetual or fixed term. The Proof of License specifies whether the license is "floating" or "locked" and the term.

            **i. Floating License**. If the license is a "floating" license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) serve licenses from the network server identified on the Proof of License, reproduce and install the Software on computers at the Designated Site only for use by the Designated Number of Users and (ii) make an archival copy of the Software

solely for emergency back-up purposes and for Customer's internal business purposes, solely at the Designated Site or via a secure virtual private network or application sharing utility at the personal residences of Customer's personnel whose normal permanent work location is the Designated Site. The number of simultaneous users of the Software may not exceed the Designated Number of Users and virtualization may not be used to increase the number of simultaneous users.

**ii. Locked License**. If the license is a "locked" license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) reproduce and install the Software on the Designated Equipment solely at the Designated Site only for use and access by a single user at a time, (ii) make an archival copy of the Software solely for emergency back-up purposes and (iii) permit the single user to use the Software, only for Customer's internal business purposes and solely on the Designated Equipment at the Designated Site. For avoidance of any doubt, a locked license does not permit access or use of the Software through any virtual private network application sharing utility, including, without limitation, VPN Client, VNC, Windows Remote Desktop or Webex. Customer shall not run the software on other than the Designated Equipment and Customer shall not run the software in a virtual machine environment.

**2. Academic License**.

**i. Educational License**. If the license is an educational license, then Customer's license is either a floating license as set forth in Section 2.a(1)(i) above, or a locked license as set forth in Section 2.a(1)(ii) above, as specified in the Proof of License, for the License Term. Software may be used only for Customer's own educational use, only by Students and Instructors at Customer's Academic Institution, and use by contractors is not permitted. There is no right to access or use the Software for any commercial or industrial purposes, or any purpose that is not solely and strictly educational in nature, whatsoever. For avoidance of any doubt, academic licenses, including Student Install Option licenses, may not be transferred (including to other Students or to another Academic Institution).

**ii. Academic Teaching License**. If the license is an academic teaching license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to use the Software solely for instructional purposes in Customer's department, college, or on a specific university campus, in each case, of an Academic Institution, depending on the option selected in the Proof of License applicable purchase order. A use will be considered as one for "instructional purposes" only if such use meets either of the following criteria: (i) a common exam is given to Students at the end of a semester or other academic period and the exam relates (in whole or part) to the Students′ use of the Software or (ii) homework or similar projects requiring the use of the Software are used for grading in lieu of an exam. Customer may install the Software on no more than the number of Customer's Academic Institution′s Designated Equipment items (located within the applicable department, college, or specific university campus) specified by AWR in writing in the Proof of License. If any of the Designated Equipment items on which the Software may be installed is a laptop, notebook or similar portable computer, Customer may use the Software on the portable computer while temporarily away from Customer's Academic Institution's classroom, lab, or other facilities for the same purpose permitted by this Agreement as Customer normally would use the Software on the portable computer while in such facilities. Without limiting the generality of the foregoing, any use of the Software by any person who is not an Instructor at Customer's Academic Institution or any use for research, commercial, or industrial purposes under this Agreement is prohibited.

**iii. Student Install Option**. If the license is an academic teaching license with a student install option, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to make the Software available (i) to no more than the total number of Students specified by AWR in writing in the Proof of License, each of which Students must be then currently enrolled at the applicable department, college, or specific university campus of Customer's Academic Institution specified by AWR in writing in the Proof of License applicable quote or other offer documents, (ii) for use by each such Student only for his or her own personal education purposes and not for any other purpose, including research, professional, commercial, or industrial purposes, on up to three items of Designated Equipment. The applicable student install option license will automatically expire upon the conclusion or termination of the applicable Student′s enrollment at Customer's Academic Institution; upon any such expiration, the Student must promptly uninstall all copies of the Software.

**iv. Academic Research Option.** If the license is an academic research license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to use the Software solely for academic research purposes in Customer's department, college, or on a specific university campus, in each case, of an Academic Institution, as specified in the Proof of License. Customer may install the Software on no more than the number of Customer's Designated Equipment items specified by AWR in writing in the Proof of License. If any of the Designated Equipment items on which the Software may be installed is a laptop, notebook or similar portable computer, Customer may use the Software on the portable computer while temporarily away from Customer's institution's classroom, lab, or other facilities for the same purpose permitted by this Agreement as Customer normally would use the Software on the portable computer while in such facilities. Customer must purchase separate maintenance for the Software to maintain the license.

**3.** **Evaluation License**. If the license is an evaluation license, then subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) reproduce and install the Software on the Designated Equipment solely at the Designated Site only for use and access by a single user at a time, (ii) make an archival copy of the Software solely for emergency back-up purposes and (iii) permit the single user to use the Software, only internally and solely to evaluate the Software for determining whether to license it from AWR on a non-evaluation basis. Customer has no right to use the Software for any commercial purpose, including in commercial or industrial production or, in the case of beta software, for the purpose of testing the functionality of the Software. **SOFTWARE LICENSED UNDER AN EVALUATION LICENSE MAY NOT BE FULLY FUNCTIONAL, AND CUSTOMER ASSUMES THE ENTIRE RISK AS TO THE RESULTS AND PERFORMANCE OF THE SOFTWARE. AWR HAS NO OBLIGATION TO UPDATE OR SUPPORT THE SOFTWARE.**

**4.** **Personal License**. If the license is a personal license, Customer must be an individual (i.e., a natural person), and subject to the terms and conditions of this Agreement, AWR hereby grants Customer, solely during the License Term, a non-exclusive, non-sublicensable, non-transferable license to (i) reproduce and install the Software on the Designated Equipment for use and access only by Customer, (ii) make an archival copy of the Software solely for emergency back-up purposes and (iii) use the Software for Customer's own purposes. There is no right for anyone other than Customer to access or use the Software for any purposes whatsoever.

**b.** **Documentation License**. Subject to the terms and conditions of this Agreement, AWR hereby grants Customer, during the term of this Agreement, a non-exclusive, non-sublicensable, non-transferable, license to use and reproduce a limited number of copies of the Documentation solely in conjunction with Customer's licensed use of the Software. Customer shall not modify or create any derivative works of the Documentation without written permission of AWR. Customer shall not distribute the Documentation.

**c.** **Additional Restrictions**. In addition to any restrictions stated elsewhere in this Agreement, the following restrictions apply.

**1.** **Use and Users**. The Software may not be used for any purpose other than its ordinary intended purpose as a software tool for use in Customer's design and verification of its circuits, components, products, subsystems and systems as appropriate for the particular Software item.

**2.** **Third Parties' Use**. Customer may permit (i) Customer's parents, subsidiaries, or affiliates located at the Designated Site and (ii) contractors to use Software (such (i) and (ii) collectively the "Permitted Third Parties"). Customer hereby agrees and acknowledges that Customer will be liable for any and all actions or omissions of Permitted Third Parties with respect to the use of the Software, as if such actions or omissions were Customer's own. In addition, Customer's contractor (i) must agree in writing that the Software shall be used solely in accordance with this Agreement and solely for Customer's benefit and that the contractor is liable to AWR for any breach by contractor of this Agreement and (ii) must not be a competitor of AWR.

**3.** **Locked and Floating Licenses**. For a locked license, the Software may only reside on the Designated Equipment that is physically located at the Designated Site. For a floating license, Customer may serve licenses from a different network server computer from the one identified on the Proof of License only with AWR's prior written approval. If approval is given, Customer must remove the license server software from the prior network server computer on which it was installed, and the new network server computer will become the permitted network server computer for purposes of this Agreement (including the Proof of License).

**4.** **Other Restrictions**. Unless explicitly permitted in this Agreement, Customer shall not (i) permit any third party to use the Software; (ii) copy, sublicense, disclose, distribute, lend, rent or lease the Software or Documentation; (iii) use the Software or Documentation for third-party training without prior written permission from AWR or on any time-sharing basis (whether commercial or non-commercial); (iv) use, separately from the Software, any components, models or libraries included in the Software or otherwise provided by AWR; (v) take any action that results in any of the Software being subject to a license that requires, or purports to require, as a condition of use, modification, or distribution, that (a) the code that is or could become subject to the license, be disclosed or distributed in source code form or (b) others have the right to modify or create derivative works of the code that is or could become subject to the license; or (vi) directly or indirectly, export, re-export, download, transmit, or ship the Software or Documentation in violation of Section 12.c or otherwise in violation of any applicable laws or regulations, including those of the U.S. or the jurisdiction in which Customer uses or downloads the Software. All uses of the Software shall be in accordance with the applicable Documentation and not in any manner intended to or that circumvents such Documentation or the intent of this Agreement. Except as expressly permitted in this Section 2, under no circumstance is "floating", shared, or concurrent use of the Software, or remote accessing of the Software, permitted under this Agreement. The use of the Software is intended only for use with content that has been properly licensed by the Customer or any content owned by the Customer. Customer may require a patent, copyright or other license from a third party to create, copy, download, record or save content files for use with this Software or to serve or distribute such files to be used with the Software. Customer shall only use the Software and Documentation in a manner that complies with all applicable laws in the jurisdictions in which it uses the Software and Documentation, including applicable restrictions concerning copyright and other intellectual property rights. Customer shall not use the Software in an attempt to, or in conjunction with any device, program or service designed to, circumvent technological measures employed to control access to, or the rights in, a content file or other work protected by the

copyright laws of any jurisdiction.

**d. Proprietary Rights Notices**. Customer shall not remove, deface or obscure any copyright or other proprietary notices appearing on or within the Software or Documentation. Customer shall include reproductions of the copyright and other proprietary notices on all copies of the Software and Documentation made by or for Customer. For patents covering AWR products, refer to http://www.awrcorp.com/patents. AWR, Microwave Office, Analog Office, Visual System Simulator and AXIEM are trademarks of AWR. Refer to http://www.awrcorp.com/trademarks for more information about AWR trademarks.

**e. Reverse Engineering; Modifications**. Customer shall not cause or permit (i) the disassembly, decompilation or reverse engineering of the Software or any other attempt to gain access to or discover the source code for the Software (or the underlying ideas, algorithms, structure or organization of the Software) except to the extent that such restriction is expressly prohibited by applicable law or (ii) the modification, adaptation, translation or creation of derivative works based on the Software.

**f. Key Codes; Deactivation.** Customer shall only access the Software using a key code created by AWR that is provided directly to Customer by AWR. Customer shall not use the Software in any manner without that key code. AWR reserves the right to update or replace the key code periodically or implement an alternative licensing protection mechanism. Customer shall comply with any alternative licensing protection mechanism that may be subsequently implemented by AWR. Customer shall not distribute, make accessible, transmit or provide any key code to any third party or make it available to the public, use or attempt to use the key code other than for the Software for which it is provided by AWR to Customer, or take any action to circumvent any key code system or alternative licensing protection mechanism. Any action by Customer (including any employee of Customer) in contravention of this paragraph is a material breach of this Agreement. **THE SOFTWARE MAY CONTAIN CODE THAT WILL, AFTER TERMINATION OR EXPIRATION OF THE LICENSE TERM, DEACTIVATE THE SOFTWARE AND RENDER THE SOFTWARE UNUSABLE. ALTHOUGH THE SOFTWARE MAY WARN YOU OF THE TIME-FRAME IN WHICH IT WILL BE DISABLED, YOU ACKNOWLEDGE AND AGREE THAT THE SOFTWARE MAY BE DEACTIVATED OR RENDERED UNUSABLE WITH OR WITHOUT WARNING AND THAT YOU MAY NOT BE ABLE TO ACCESS ANY CONTENT (INCLUDING YOUR DEVELOPMENTS) THAT ARE SAVED WITHIN THE SOFTWARE.**

**3. Support.** Any software maintenance services and other software support services provided by AWR for the Software are subject to AWR's then current applicable standard software support policies.

**4. Payment.**

**a. License Fees and Taxes**. Customer shall pay the license fees set forth in the Proof of License, if any, and all associated taxes.

**b. Payments**. Except as otherwise set forth herein, all amounts due must be paid within the payment period specified on the Proof of License in the currency specified by AWR. If no period is specified, then the due amounts must be paid within thirty (30) days of (i) invoice or (ii) the Effective Date, if there is no invoice. Customer agrees to be responsible for payment of this debt to creditor or its assigns. In the event of default, Customer is responsible for reasonable attorney's fees and court costs incurred to recover amounts due. If the account is placed with a collection agency, the undersigned is responsible for all collection costs incurred, including, but not limited to, all collection fees or contingency fees of up to 33.3% added by a third party to the original or referral balance, service charges, and/or interested as allowed by the law. AWR may report information about your account to the proper credit bureaus. Late payments, missed payments, or other defaults on Customer's account may also be reflected in its credit report.

**5. Protection of Licensed Materials; Feedback; Compliance.**

**a.** The Software and Documentation, and all copies of the Software and Documentation, are owned by AWR or its suppliers or licensors and are protected by applicable copyright laws and international treaty provisions. Customer hereby acknowledges and agrees that the Software and Documentation (and all copies thereof) are the copyrighted and proprietary property of AWR or AWR's licensors. AWR and its licensors retain all right, title and interest, including intellectual property rights, in and to the Software and Documentation and any corrections, enhancements, or other modifications to the Software. AWR's licensors are third party beneficiaries of Customer's compliance with this Agreement to the extent of their respective interests. Customer acknowledges that the Software is licensed, not sold, and that the license granted under this Agreement provides Customer only with a limited right to use the Software under the terms and conditions of this Agreement. There are no implied rights. All rights not expressly granted by AWR to Customer are hereby reserved by AWR. Further, and without limiting the foregoing, no license or any right of any kind (whether by express license, implied license, the doctrine of exhaustion, or otherwise) is granted under any AWR patents (whether identified herein or not) or other intellectual property right of AWR with respect to any other products of AWR or of any third party, including the right to use any of these other products.

**b.** Customer agrees that any feedback regarding Customer's use of the Software that Customer discloses to AWR, including errors or bugs that Customer might find and any changes or suggested changes to AWR's current or future products and services (collectively "Feedback"), shall be received and treated by AWR on a non-confidential and unrestricted basis, notwithstanding any restrictive or proprietary legends to the contrary accompanying or otherwise associated with the Feedback. Customer hereby grants to AWR a worldwide, royalty-free, non-exclusive, perpetual, and irrevocable license to use, copy, and modify Feedback

for any purpose, including incorporation or implementation of such Feedback into AWR products or services, and to display, market, sublicense and distribute Feedback as incorporated or embedded in any product or service distributed or offered by AWR.

**c.** Customer agrees to make all applicable records available for review by AWR during Customer's normal business hours so as to permit AWR (upon reasonable notice to Customer) to verify Customer's compliance with the terms and conditions of this Agreement. Further, if Customer is a business or other entity, Customer agrees that upon the request of AWR or AWR's authorized representative, Customer will promptly document and certify in writing to AWR that Customer and Customer's employees′ use of the Software complies with the terms and conditions of this Agreement.

**6. <u>Customer Experience Improvement Program</u>**. The Software may collect statistics on the capabilities used and report those to AWR, which uses them to improve the performance and capabilities of the software. Commercial and Personal license Customers can decline participation in this program when using production software; beta software, academic license and evaluation license users cannot. This process does not collect or communicate any proprietary application data.

**7. <u>Software Updates, Error Reporting, and License Compliance</u>**. Customer agrees that the Software may collect and communicate certain software, hardware, and use information to AWR or its service providers' servers for the purposes of (i) checking for and performing any updates, (ii) documenting application errors (such as crashes), (iii) ensuring that Customer has complied and is complying with the terms and license conditions in this Agreement, including Customer's use of valid software key codes, and (iv) AWR's internal product development. This process does not collect or communicate any proprietary application data. AWR will not provide any information gathered in connection with this process to any third party except (i) as may be required by law or legal process or (ii) to enforce compliance with this Agreement and the key code requirement described above.

**8. <u>Limited Warranty</u>**.

**a. <u>Limited Warranty.</u>** Software provided under an evaluation or academic license is provided without warranty. For all other Software, AWR warrants, for Customer's benefit alone, that for a period of thirty (30) days from the date the Software is shipped to Customer (or, if downloaded, from the date the Software is first downloaded by Customer) (i) the medium on which the Software is recorded will be free from defects in materials and workmanship under normal use and service ("Limited Warranty"). Any replacement Software will be warranted for the same period. Some states/jurisdictions do not allow limitations on duration of an express or implied warranty, so the above or any other limitation provided herein may not apply to Customer. In such event, such warranties are limited to the minimum warranty period allowed by applicable law. The Limited Warranty is void if failure of the Software has resulted from accident, abuse, misapplication, third party products (i.e., hardware or software) used by Customer that are not intended by AWR for use with the Software, utilization of an improper hardware or software key (if applicable), any use of the Software other than as permitted by this Agreement or unauthorized maintenance of the Software.

**b. <u>Customer Remedies</u>**. AWR's sole obligation (and Customer's sole remedy) with respect to the foregoing Limited Warranty shall be to, at AWR′s option, return the fees paid by Customer to AWR, in which event Customer must return or destroy all copies of the Software in accordance with AWR′s reasonable instructions and the license granted to Customer shall terminate without liability on the part of AWR by reason of such termination, or repair or replace the Software, provided that AWR receives written notice of applicable defects during the warranty period. Customer hereby agrees not to bring an action to enforce Customer's remedies under the foregoing Limited Warranty, or for breach of warranty, more than one (1) year after the accrual of such cause of action.

**c. <u>No Other Warranties</u>. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 8.A, NO WARRANTIES, EITHER EXPRESS OR IMPLIED ARE MADE WITH RESPECT TO THE SOFTWARE, THIRD PARTY SOFTWARE OR SOFTWARE SERVICES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. THERE ARE NO OTHER WARRANTIES THAT MAY ARISE FROM USAGE OF TRADE OR COURSE OF DEALING. AWR DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT RELATING TO THE SOFTWARE, THIRD PARTY SOFTWARE, AND THE SOFTWARE SERVICES. AWR DOES NOT WARRANT, GUARANTEE, OR MAKE ANY REPRESENTATIONS REGARDING THE USE OF OR THE RESULTS OF THE USE OF THE SOFTWARE OR SOFTWARE SERVICES IN TERMS OF CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE AND DOES NOT WARRANT THAT THE OPERATION OF THE SOFTWARE OR SOFTWARE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE. AWR'S LICENSORS MAKE NO WARRANTIES OR REPRESENTATIONS TO CUSTOMER AND SHALL HAVE NO LIABILITY TO CUSTOMER IN CONNECTION WITH THIS AGREEMENT.**

**9. <u>No Obligation for Third Party Claims</u>**. AWR has no obligation, responsibility or liability whatsoever to defend, indemnify or hold Customer harmless from or against any third party claims, suits or actions related to, arising out of or connected with the use of the Software or Customer's exercise of the licenses granted in this Agreement (including, without limitation, any patent, copyright or other intellectual property infringement claims) or for any damages, losses, liabilities, settlement amounts, costs or expenses related to those third party claims, suits or actions.

10. **Limitation of Liability**.

   a. **Limitation of Damages**. NEITHER AWR NOR ITS LICENSORS, SUPPLIERS OR DISTRIBUTORS ARE LIABLE FOR ANY LOST PROFITS, LOSS OF DATA, COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, OR EXEMPLARY DAMAGES, OR ANY DIRECT DAMAGES IN EXCESS OF THE LICENSE FEES PAID BY CUSTOMER HEREUNDER, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE USE OR INABILITY TO USE THE SOFTWARE OR THIRD PARTY SOFTWARE, OR ANY SUPPORT SERVICES RELATING TO THE SOFTWARE OR THE THIRD PARTY SOFTWARE, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE OF AWR OR OTHERS), AND EVEN IF AWR OR ITS LICENSORS, SUPPLIERS OR DISTRIBUTORS HAVE BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. Because some jurisdictions do not allow the exclusion or limitation of liability for consequential or incidental damages, some of the preceding limitation may not apply to Customer.

   b. **Allocation of Risk**. The sections on limitation on liability, warranties and disclaimer of warranties allocate the risks in this Agreement between the parties. This allocation is an essential element of the basis of the bargain between the parties. Moreover, Customer acknowledges that the amounts payable hereunder are based in part on the limitations of this Section 10, and hereby agrees that these limitations will apply notwithstanding any failure of the essential purpose of this Agreement or any limited remedy hereunder. The foregoing limitations will apply to the maximum extent permitted by law.

   c. **WARNING**. THE SOFTWARE AND SERVICES ARE NOT DESIGNED, MANUFACTURED, OR TESTED FOR USE INHAZARDOUS ENVIRONMENTS OR ANY OTHER ENVIRONMENTS REQUIRING FAIL-SAFE PERFORMANCE, INCLUDING IN THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION, AIR TRAFFIC CONTROL SYSTEMS; LIFE SAVING OR LIFE SUSTAINING SYSTEMS OR SUCH OTHER MEDICAL DEVICES; OR ANY OTHER APPLICATION IN WHICH THE FAILURE OF THE SOFTWARE COULD LEAD TO DEATH, PERSONAL INJURY, SEVERE PROPERTY DAMAGE, OR ENVIRONMENTAL HARM. CUSTOMER SHALL DEFEND, INDEMNIFY, AND HOLD AWR AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS HARMLESS FROM ANY AND ALL CLAIMS, LOSSES, LIABILITIES, DAMAGES, ACTIONS (INCLUDING LAWSUITS, ARBITRATIONS, AND/OR ADMINISTRATIVE ACTIONS) AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING OUT OF CUSTOMER'S USE OF THE SOFTWARE OR SERVICES FOR HIGH-RISK USES, INCLUDING CLAIMS FOR PRODUCT LIABILITY, PERSONAL INJURY OR DEATH, OR DAMAGE TO PROPERTY, REGARDLESS OF WHETHER CAUSED OR CONTRIBUTED TO BY THE NEGLIGENCE OF AWR OR OTHERS. CUSTOMER ACKNOWLEDGES AND AGREES THAT IT IS ULTIMATELY RESPONSIBLE FOR VERIFYING AND VALIDATING THE SUITABILITY OF THE SOFTWARE AND SERVICES FOR USE IN OR IN CONNECTION WITH A PARTICULAR APPLICATION OR SYSTEM, INCLUDING THE APPROPRIATE DESIGN, PROCESS, AND SAFETY LEVEL OF SUCH APPLICATION OR SYSTEM. CUSTOMER WILL DEFEND, INDEMNIFY, AND HOLD HARMLESS AWR AND ITS DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS FROM ANY AND ALL CLAIMS, LOSSES, DAMAGES, ACTIONS, AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING OUT OF ITS USE OF THE SOFTWARE IN CONNECTION WITH A PARTICULAR APPLICATION; PROVIDED, HOWEVER, THAT CUSOMTER'S CONTRACTUAL OBLIGATION OF INDEMNIFICATION SHALL NOT EXTEND TO THE PERCENTAGE OF THE CLAIMANT'S DAMAGES OR INJURIES OR THE SETTLEMENT AMOUNT ATTRIBUTABLE TO AWR'S NEGLIGENCE OR OTHER FAULT OR TO STRICT LIABILITY IMPOSED UPON AWR AS A MATTER OF LAW.

11. **Term and Termination**.

   a. **Term**. This Agreement begins on the Effective Date and continues until terminated as set forth in this Section 11. This Agreement will automatically terminate at the end of the License Term if not previously terminated as provided in this Agreement.

   b. **Termination**. Neither party may terminate this Agreement for convenience. This Agreement may be terminated by AWR if Customer materially breaches or defaults in the performance of this Agreement and fails to cure that breach or default within thirty (30) days, regardless of whether notice is given by AWR or AWR has knowledge of the breach or default; provided, however, AWR may immediately terminate this Agreement upon written notice to Customer if Customer fails to make any payment within ten (10) days after its due date or Customer becomes the subject of a voluntary or involuntary petition in bankruptcy or any voluntary or involuntary proceeding relating to insolvency, receivership, liquidation, or composition or assignment for the benefit of creditors. Either party may terminate an evaluation license at any time.

   c. **Effect of Termination**. Upon termination or expiration of this Agreement, all licenses will immediately end and Customer will return or permanently erase/destroy, at AWR's election and Customer's expense, the Software, Documentation, license key codes and all copies thereof, and, if requested by AWR, deliver to AWR a written certification signed by an officer of Customer stating that it has complied with its obligations under this section. Nothing contained in this Agreement will limit any other remedies that either party may have under this Agreement, at law or in equity, nor relieve a party of any liability incurred prior to or after termination. Any unpaid amounts due by Customer to AWR shall survive termination or expiration of the Agreement. The provisions set forth in Sections 2.d, 2.e, 4, 5, and 8-12 shall survive termination or expiration of the Agreement.

**12. Miscellaneous**.

    **a. Assignment**. Customer may not assign any of its rights under this Agreement except with AWR's prior written consent. All other assignments of rights are prohibited under this section, whether they are voluntary or involuntary, by merger, consolidation, dissolution, operation of law, or any other manner. For purposes of this section, a change of control is deemed an assignment of rights; and "merger" refers to any merger in which Customer participates, regardless of whether it is the surviving or disappearing corporation. Customer may not delegate any performance of this Agreement. Any purported assignment of rights or delegation of performance in violation of this section is void. Subject to the foregoing, this Agreement is binding on the parties and will inure to the benefit of their respective successors and permitted assigns.

    **b. Severability; Waiver**. If any of the provisions of this Agreement is held by a court to be invalid, the remaining provisions of this Agreement remain in full force and the invalid provision will be replaced with an enforceable provision that carries out the parties' intentions to the greatest lawful extent. No failure or delay (i) in exercising any right or remedy or (ii) in requiring the satisfaction of any condition, under this Agreement, and no act, omission or course of dealing between the parties, operates as a waiver or estoppel of any right, remedy or condition. A waiver made in writing on one occasion is effective only in that instance and only for the purpose stated. A waiver, once given, is not to be construed as a waiver on any future occasion or against any other person or entity.

    **c. Export Control**. The Software and Documentation are, and Third Party Software provided by AWR with the Software may be, subject to control under the U.S. Export Administration Regulations (15 CFR Part 730 et. seq.), other applicable U.S. export control laws and regulations, and applicable global export control laws and regulations, including, for products exported from the European Union, the Council Regulation (EC) No. 428/2009. Customer represents and warrants that Customer is not ineligible or otherwise restricted by US or applicable law to receive any copies of the Software or Third Party Software. AWR reserves the right not to ship or permit downloading of the Software ordered if, at any time, AWR believes that such shipment or downloading of such Software or Third Party Software may violate U.S. or other applicable export control laws. Customer agrees that Customer will not export, re-export or transfer any Software or Third Party Software in violation of any U.S. and applicable global export control laws and that Customer will not export, re-export, or transfer the Software or Third Party Software by any means to (i) any person or entity on OFAC's List of Specially Designated Nationals or on BIS's Denied Persons List, Entity List, or Unverified List, or any other applicable restricted party list or (ii) any prohibited destination, entity, or individual without the required export licenses or authorizations from the U.S. Government or other applicable export licensing authority. For text of the relevant legal materials, see http://www.awrcorp.com/export.

    **d. Entire Agreement; Modification**. This Agreement and the Proof of License represent the entire agreement between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings with respect to the subject matter hereof, whether written or oral. The parties may amend this Agreement only by a written agreement of the parties that identifies itself as an amendment to this Agreement.

    **e. Conflicting Documents**. Any terms or conditions of any Customer purchase order, Customer invoice or other Customer business form that are in addition to or inconsistent with the terms of this Agreement will be deemed stricken from the purchase order, invoice or other business form, notwithstanding any acknowledgement or acceptance of it.

    **f. Governing Law**. The laws of the State of California (without giving effect to its conflicts of law principles) govern all matters arising out of or relating to this Agreement. All claims of Customer arising out of this Agreement are subject to the exclusive jurisdiction of, and venue in, the federal and state courts in Santa Clara County, California, USA. Each party hereby irrevocably consents to the personal and exclusive jurisdiction and venue of these courts. The United Nations Convention on Contracts for the International Sale of Goods is hereby excluded and shall not be applicable this Agreement.

    **g. U.S. Government Rights**. The Software is a "commercial item" developed exclusively at private expense, consisting of "commercial computer software" and "commercial computer software documentation" as such terms are defined or used in the applicable U.S. acquisition regulations. If Customer is an agency, department, or other entity of the United States Government, the Software is licensed hereunder (i) only as a commercial item and (ii) with only those rights as are granted to all other licensees pursuant to the terms and conditions of this Agreement. Customer agrees not to use, duplicate, or disclose the Software in any way not expressly permitted by this Agreement. Nothing in this Agreement requires AWR to produce or furnish technical data for or to Customer.

    **h. Force Majeure**. Except for Customer's payment obligations, neither party is responsible for any delays or inability to perform this Agreement due to any act of God, fire, casualty, flood, earthquake, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, or any other cause beyond the reasonable control of that party.

    **i. Attorneys' Fees**. In any litigation or action concerning this Agreement, the prevailing party is entitled to be awarded all court costs and reasonable attorneys' fees incurred, including all costs and fees incurred in enforcing and collecting any judgment.

    **j. Equitable Relief**. Customer hereby acknowledges and agrees that AWR will suffer substantial and irreparable harm, for which there is no adequate remedy at law, if Customer breaches this Agreement, and that, in the event of a breach, or threatened breach, of this Agreement by Customer, AWR shall be entitled, without waiving any additional rights or remedies available to

AWR at law, in equity, or by statute, to such injunctive or other equitable relief as may be deemed proper by a court of competent jurisdiction. Customer hereby waives any requirement that a bond be posted in order for AWR to obtain any such relief.

Version 2020.02

Exhibit 12

Case 3:21-cv-03610-SI    Document 209    Filed 10/07/22    Page 125 of 177



## Complex product design and large-scale systems

### Experience

We believe in new technology's ability to empower businesses, organizations, and people. Our global engineering teams in the Americas, Europe, and Asia drive product innovation in all our business areas: telecom, automotive, medtech, and industrial. After nearly 40 years of innovation, R&D forms part of our backbone.

### Expertise

Our approach to each customer's unique vision and R&D needs is holistic. Decades of experience, achievements, and innovation has enabled us to see the entire picture. We are recognized as business leaders in the design of systems related to electronics, software, and mechanics. Advanced wireless applications, automation, and measurement technology are among our areas of expertise. Globally as well as locally, Syntronic is renowned as a progressive and innovative research & development partner.

### One-stop-shop

When you choose us as your partner, we become your one-stop-shop: Conceptualization, system and product design, prototyping, verification, regulatory compliance, production test, volume production, and product maintenance form part of our offer. Choose to have us by your side the entire product development journey or for specific passages.

### State-of-the-art labs

Your outsourcing journey with us will be smooth, easy, and efficient. Our local presence, in combination with our global reach, allows us to give you personalized attention while at the same time giving you access to our full international offer. The cutting-edge designs, state-of-the-art design labs, and excellent verification environment that we offer will empower you to leverage your strengths and take your business to the next level.



What we do ⌄     About us     Career ⌄     Contact us     News          ⊕ EN ⌄



**Our competences**

- System design (HW / SW / mechanics)
- HW design (digital, analogue, radio / microwave, PCB layout)
- Software design
- Firmware design
- FPGA / ASIC design
- Mechanical design
- Verification
- Project and quality management



## Business models

Our business models cover time and material, fixed price, and box solutions. We welcome the opportunity to use incentive-based models and are happy to discuss new or alternative business models.

Our global service portfolio covers outsourced assignments at our premises, specialist consultants at our partners' sites, and platform-based solutions for increased efficiency and cost-effectiveness.

## Our Design Partners

In the design process, we collaborate with global players who are world-leading in their areas of expertise.



National Instruments ⌄



Mentor ⌄



Silicon Labs ⌄



Qualcomm ⌄



BlackBerry QNX ⌄



Keysight technologies ⌄



Cadence ⌄



Altium ⌄

SYNTRONIC

What we do ⌄   About us   Career ⌄   Contact us   News    ⊕ EN ⌄

# Related news

[See all news ›]



**News, R&D, Telecom**  /  2022-07-11

### RF Integration Competition for growth and development

Läs mer ›



**Automotive, Industrial, Medtech, News, R&D, Telecom**  /  2022-06-21

### Syntronic Opens Greater Toronto Area Design Center located in Markham, Ontario

Läs mer ›



**Aftermarket, News, NPI, Production, R&D, Telecom**  /  2022-06-16

### A forum for innovators: Stockholm's Electronics Fair 2022

Läs mer ›



## Our offer

| Research and development | New production introduction | Production | Aftermarket |
|---|---|---|---|
| We support you by designing systems related | Take the leap from concept | Flexibility and in-depth expertise at our own world- | Our state-of-the-art repair centre has the capacity to |



automation, and
measurement technology
are among our areas of
expertise.

**Our R&D services >**

focus with expertise, quality,
and confidentiality.

**Our NPI services >**

made solutions of the
highest standards.

**Our production services >**

thanks to our global
presence.

**Our aftermarket services >**

**Contact us**

Region Office AMERICAS
info.americas@syntronic.com

Region Office APAC
info.apac@syntronic.com

Region Office EMEA
info.emea@syntronic.com

**Read more**

Policies

News

Career EMEA

Career AMERICAS

Career APAC

Students

Cookie settings

One step ahead.

Privacy - Terms



What we do ⌄    About us    Career ⌄    Contact us    News



Exhibit 13

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Acting Register of Copyrights, United States of America

**Registration Number**

**TX 7-264-496**

**Effective date of
registration:**

June 7, 2010

---

## Title

**Title of Work:** Cadence PCB Systems Division Version 15.0

## Completion/Publication

**Year of Completion:** 2003

**Date of 1st Publication:** July 14, 2003     **Nation of 1st Publication:** United States

## Author

■     **Author:** Cadence Design Systems, Inc.

**Author Created:** computer program

**Work made for hire:** Yes

**Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Cadence Design Systems, Inc.

2655 Seely Avenue, Building 5, San Jose, CA  95134, CA, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program, previously published material and licensed material

**New material included in claim:** computer program, additional and revised code and computer program

## Certification

**Name:** Lisa Greenwald-Swire

**Date:** June 7, 2010

**Applicant's Tracking Number:** 24901-0363001

---

**Registration #:**   TX0007264496

**Service Request #:**   1-414371621



Fish & Richardson P.C.
Lisa Greenwald-Swire
P.O. Box 1022
Minneapolis, MN 55440-1022  United States

Exhibit 14

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

TX 7-751-386

**Effective date of registration:**

January 11, 2012

## Title

**Title of Work:** Allegro 16.5

## Completion/Publication

**Year of Completion:** 2011

**Date of 1st Publication:** May 17, 2011          **Nation of 1st Publication:** United States

## Author

■          **Author:** Cadence Design Systems, Inc.

**Author Created:** computer program

**Work made for hire:** Yes

**Citizen of:** United States          **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Cadence Design Systems, Inc.

2655 Seely Avenue, Bldg. 5, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program, previously published material; licensed material

**Previous registration and year:** TX0007264496   2010

**New material included in claim:** computer program, additional and revised code and computer program

## Certification

**Name:** Kristen McCallion

**Date:** January 11, 2012

**Registration #:**  TX0007751386
**Service Request #:**  1-709644681



Fish & Richardson P.C.
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022  United States

Exhibit 15

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*[signature]*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-323-840

**Effective Date of Registration:**
April 13, 2017

## Title _____

**Title of Work:** Allegro PCB 16.6

## Completion/Publication _____

**Year of Completion:** 2011
**Date of 1st Publication:** October 23, 2012
**Nation of 1st Publication:** United States

## Author _____

- **Author:** Cadence Design Systems, Inc.
  **Author Created:** computer program
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant _____

**Copyright Claimant:** Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim _____

**Material excluded from this claim:** computer program
**Previous registration and year:** TX 7-751-386, 2012

**New material included in claim:** computer program

## Rights and Permissions _____

**Organization Name:** Cadence Design Systems, Inc.
**Address:** 2655 Seely Avenue
San Jose, CA 95134 United States

## Certification _____

**Name:** Kristen McCallion
**Date:** April 13, 2017
**Applicant's Tracking Number:** 24901-0608001

**Registration #:**   TX0008323840
**Service Request #:**   1-4754272646

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 16

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-322-031

**Effective Date of Registration:**
April 10, 2017

## Title

| | |
|---|---|
| **Title of Work:** | Allegro PCB 17.2 |

## Completion/Publication

| | |
|---|---|
| **Year of Completion:** | 2016 |
| **Date of 1st Publication:** | April 08, 2016 |
| **Nation of 1st Publication:** | United States |

## Author

| | |
|---|---|
| • **Author:** | Cadence Design Systems, Inc. |
| **Author Created:** | computer program |
| **Work made for hire:** | Yes |
| **Citizen of:** | United States |

## Copyright Claimant

| | |
|---|---|
| **Copyright Claimant:** | Cadence Design Systems, Inc.<br>2655 Seely Avenue, San Jose, CA, 95134, United States |

## Limitation of copyright claim

| | |
|---|---|
| **Material excluded from this claim:** | computer program |
| **Previous registration and year:** | TX 7-751-386, 2012 |
| **New material included in claim:** | computer program |

## Rights and Permissions

| | |
|---|---|
| **Organization Name:** | Cadence Design Systems, Inc. |
| **Address:** | 2655 Seely Avenue<br>San Jose, CA 95134 United States |

## Certification

| | |
|---|---|
| **Name:** | Kristen McCallion |
| **Date:** | April 10, 2017 |
| **Applicant's Tracking Number:** | 24901-0611001 |

**Registration #:**   TX0008322031
**Service Request #:**   1-4754272811

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 17

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-322-028

**Effective Date of Registration:**
April 10, 2017

---

## Title

**Title of Work:** Sigrity 2015

## Completion/Publication

**Year of Completion:** 2015
**Date of 1st Publication:** February 13, 2015
**Nation of 1st Publication:** United States

## Author

- **Author:** Cadence Design Systems, Inc.
  **Author Created:** computer program
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program

**New material included in claim:** computer program

## Rights and Permissions

**Organization Name:** Cadence Design Systems, Inc.
**Address:** 2655 Seely Avenue
San Jose, CA 95134 United States

## Certification

**Name:** Kristen McCallion
**Date:** April 10, 2017
**Applicant's Tracking Number:** 24901-0614001



**Registration #:**  TX0008322028
**Service Request #:**  1-4824393842

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 18

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kagn Tegle Clayott*

Acting United States Register of Copyrights and Director

**Registration Number**
## TX 8-264-236
**Effective Date of Registration:**
March 28, 2016

---

## Title

**Title of Work:**  Sigrity 2016

## Completion/Publication

**Year of Completion:**  2016
**Date of 1st Publication:**  February 19, 2016
**Nation of 1st Publication:**  United States

## Author

- **Author:**  Cadence Design Systems, Inc.
**Author Created:**  computer program
**Work made for hire:**  Yes
**Citizen of:**  United States

## Copyright Claimant

**Copyright Claimant:**  Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:**  prior published material

**New material included in claim:**  computer program

## Rights and Permissions

**Organization Name:**  Cadence Design Systems, Inc.
**Address:**  2655 Seely Avenue
San Jose, CA 95134 United States

## Certification

**Name:**  Kristen McCallion
**Date:**  March 28, 2016
**Applicant's Tracking Number:**  24901.0578001

**Correspondence:**   Yes

**Registration #:** TX0008264236
**Service Request #:** 1-3195197588

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 19

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayın Leigh Clayptt*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-320-010

**Effective Date of Registration:**
April 06, 2017

---

## Title _____

**Title of Work:**  Sigrity 2017

## Completion/Publication _____

**Year of Completion:**  2016
**Date of 1st Publication:**  December 15, 2016
**Nation of 1st Publication:**  United States

## Author _____

- **Author:**  Cadence Design Systems, Inc.
  **Author Created:**  computer program
  **Work made for hire:**  Yes
  **Citizen of:**  United States

## Copyright Claimant _____

**Copyright Claimant:**  Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim _____

**Material excluded from this claim:**  computer program
**Previous registration and year:**  TX 8-264-236, 2016

**New material included in claim:**  computer program

## Rights and Permissions _____

**Organization Name:**  Cadence Design Systems, Inc.
**Address:**  2655 Seely Avenue
San Jose, CA 95134 United States

## Certification _____

**Name:**  Kristen McCallion
**Date:**  April 06, 2017
**Applicant's Tracking Number:**  24901-0614001



**Registration #:** TX0008320010
**Service Request #:** 1-4752759832

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 20

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*[signature]*

Acting United States Register of Copyrights and Director

**Registration Number**
## TX 8-320-016
**Effective Date of Registration:**
April 06, 2017

## Title ────────────────────────────

**Title of Work:**  OrCAD 16.5

## Completion/Publication ────────────

**Year of Completion:**  2011
**Date of 1st Publication:**  May 17, 2011
**Nation of 1st Publication:**  United States

## Author ──────────────────────────

- **Author:**  Cadence Design Systems, Inc.
  **Author Created:**  computer program
  **Work made for hire:**  Yes
  **Citizen of:**  United States

## Copyright Claimant ──────────────

**Copyright Claimant:**  Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim ──────

**Material excluded from this claim:**  computer program
**Previous registration and year:**  TX 7-751-386, 2012

**New material included in claim:**  computer program

## Rights and Permissions ───────────

**Organization Name:**  Cadence Design Systems, Inc.
**Address:**  2655 Seely Avenue
San Jose, CA 95134 United States

## Certification ───────────────────

**Name:**  Kristen McCallion
**Date:**  April 06, 2017
**Applicant's Tracking Number:**  24901-0607001

**Registration #:**   TX0008320016
**Service Request #:**   1-4753417714

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 21

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-320-041

**Effective Date of Registration:**
April 06, 2017

---

## Title

**Title of Work:**  OrCAD 16.6

## Completion/Publication

**Year of Completion:**  2012
**Date of 1st Publication:**  October 23, 2012
**Nation of 1st Publication:**  United States

## Author

- **Author:**  Cadence Design Systems, Inc.
  **Author Created:**  computer program
  **Work made for hire:**  Yes
  **Citizen of:**  United States

## Copyright Claimant

**Copyright Claimant:**  Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:**  computer program
**Previous registration and year:**  TX 7-751-386, 2012

**New material included in claim:**  computer program

## Rights and Permissions

**Organization Name:**  Cadence Design Systems, Inc.
**Address:**  2655 Seely Avenue
San Jose, CA 95134 United States

## Certification

**Name:**  Kristen McCallion
**Date:**  April 06, 2017
**Applicant's Tracking Number:**  24901-0609001

Page 1 of 2

**Registration #:** TX0008320041
**Service Request #:** 1-4754272241

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 22

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teyl Clayoth*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-320-040**

**Effective Date of Registration:**
April 06, 2017

## Title

**Title of Work:** OrCAD 17.2

## Completion/Publication

**Year of Completion:** 2016
**Date of 1st Publication:** April 08, 2016
**Nation of 1st Publication:** United States

## Author

- **Author:** Cadence Design Systems, Inc.
  **Author Created:** computer program
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program
**Previous registration and year:** TX 7-751-386, 2012

**New material included in claim:** computer program

## Rights and Permissions

**Organization Name:** Cadence Design Systems, Inc.
**Address:** 2655 Seely Avenue
San Jose, CA 95134 United States

## Certification

**Name:** Kristen McCallion
**Date:** April 06, 2017
**Applicant's Tracking Number:** 24901-0613001

**Registration #:**  TX0008320040
**Service Request #:**  1-4754272316

Fish & Richardson PC
Kristen McCallion
P.O. Box 1022
Minneapolis, MN 55440-1022 United States

Exhibit 23

# Certificate of Registration





This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-905-154**

**Effective Date of Registration:**
October 08, 2020

**Registration Decision Date:**
October 23, 2020

## Title

**Title of Work:** Allegro PCB 17.4

## Completion/Publication

**Year of Completion:** 2019
**Date of 1st Publication:** October 18, 2019
**Nation of 1ˢᵗ Publication:** United States

## Author

- **Author:** Cadence Design Systems, Inc.
**Author Created:** computer program
**Work made for hire:** Yes
**Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program
**Previous registration and year:** TX 8-322-031, 2017
TX 8-323-840, 2017

**New material included in claim:** computer program

## Rights and Permissions

**Organization Name:** Cadence Design Systems, Inc.
**Address:** 2655 Seely Avenue
San Jose, CA 95134 United States

## Certification _____

|  |  |
|---|---|
| **Name:** | Kristen McCallion |
| **Date**: | October 08, 2020 |
| **Applicant's Tracking Number**: | 24901-0713001 |

Exhibit 24

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marie Strong*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-905-132**

**Effective Date of Registration:**
October 08, 2020
**Registration Decision Date:**
October 23, 2020

## Title

**Title of Work:** Clarity 3D Solver 2019

## Completion/Publication

**Year of Completion:** 2019
**Date of 1st Publication:** April 02, 2019
**Nation of 1st Publication:** United States

## Author

- **Author:** Cadence Design Systems, Inc.
  **Author Created:** computer program
  **Work made for hire:** Yes
  **Citizen of:** United States

## Copyright Claimant

**Copyright Claimant:** Cadence Design Systems, Inc.
2655 Seely Avenue, San Jose, CA, 95134, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program

**New material included in claim:** computer program

## Rights and Permissions

**Organization Name:** Cadence Design Systems, Inc.
**Address:** 2655 Seely Avenue
San Jose, CA 95134 United States

## Certification

**Name:**  Kristen McCallion
**Date**:  October 08, 2020
**Applicant's Tracking Number**:  24901-0712001

Exhibit 25

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code,* attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn Temple Claggett*

Acting United States Register of Copyrights and Director

**Registration Number**

**TX 8-377-602**

**Effective Date of Registration:**
March 08, 2017

---

## Title

**Title of Work:** Microwave Office 2017 Release 13.00

## Completion/Publication

**Year of Completion:** 2017
**Date of 1st Publication:** January 16, 2017
**Nation of 1st Publication:** United States

## Author

• **Author:** National Instruments Corporation
**Author Created:** computer program
**Work made for hire:** Yes
**Citizen of:** United States
**Anonymous:** Yes

## Copyright Claimant

**Copyright Claimant:** National Instruments Corporation
11500 N MoPac Expway, Building B, Austin, TX, 78759-3504, United States

## Limitation of copyright claim

**Material excluded from this claim:** computer program
**Previous registration and year:** TX 5-593-123, 2001

**New material included in claim:** computer program

## Rights and Permissions

**Organization Name:** National Instruments Corporation
**Address:** 11500 N MoPac Expway
Building B
Austin, TX,, TX 78759-3504 United States

## Certification

**Name:** Peter Ansis Smits, Esq.

Page 1 of 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Kayn Teyle Clazett*

Acting United States Register of Copyrights and Director

**Registration Number**

## TX 8-510-281

**Effective Date of Registration:**
September 25, 2017

---

## Supplementary Registration

        **Supplement To:**   TX0008377602, 2017

## Title _____

        **Title of Work:**   Microwave Office 2017 Release 13.00

## Completion/Publication _____

        **Year of Completion:**   2017
        **Date of 1st Publication:**   January 16, 2017
        **Nation of 1st Publication:**   United States

## Author _____

    •        **Author:**   AWR Corporation
        **Author Created:**   computer program
        **Work made for hire:**   Yes
        **Citizen of:**   United States
        **Anonymous:**   No

## Copyright Claimant _____

        **Copyright Claimant:**   AWR Corporation
        1960 E. Grand Avenue, Suite 430, El Segundo, CA, 90245, United States

## Limitation of copyright claim _____

        **Material excluded from this claim:**   previously published version of computer program
        **Previous registration and year:**   TX0008379767, 2015
        TX0007916237, 2014
        TX0005593123, 2001

        **New material included in claim:**   new and revised version of computer program

## Rights and Permissions _____

| | |
|---|---|
| **Organization Name:** | National Instruments Corporation |
| **Name:** | Rod Djukich |
| **Email:** | rod.djukich@ni.com |
| **Telephone:** | (512)683-9471 |
| **Alt. Telephone:** | (512)683-9471 |
| **Address:** | 11500 N MoPac Expway, Building B (5K110) |
| | Building B (5K110) |
| | Austin, TX 78759 United States |

## Certification
_____

| | |
|---|---|
| **Name:** | Rod Djukich, Authorized agent of National Instruments Corp. |
| **Date:** | September 25, 2017 |
| **Applicant's Tracking Number:** | Austin |

| | |
|---|---|
| **Correspondence:** | Yes |
| **Explanation of Corrections:** | Regarding U.S. Copyright Basic Registration TX 8-377-602, pursuant to U.S. Copyright Compendium Sec. 1802.8(B), information set forth in the basic registration was incorrect when the basic registration was made. Correction is requested, as follows:  1) SUBJECT MATTER -- Author: a) Incorrect Organization Name: National Instruments Corporation; b) Correct Organization Name: AWR Corporation;  2) SUBJECT MATTER -- Copyright Claimant: a) Incorrect Organization Name: National Instruments Corporation; b) Correct Organization Name: AWR Corporation;  Incorrect Address: 11500 N MoPac Expway, Building B, Austin, TX, 78759-3504, United States;   Correct Address: 1960 East Grand Ave., Suite 430, El Segundo, CA, 90245, United States. |
| **Explanation of Amplifications:** | AWR Corporation ("AWR") is a subsidiary of National Instruments Corporation ("NIC").  NIC acquired AWR in 2011. As a wholly owned NI subsidiary, AWR has operated as a separate legal entity following the merger and acquisition. Subsequent to the acquisition, prior U.S. Copyright Registrations TX 7-916-237 and TX 7-918-802 each named AWR as both Author and Copyright Claimant. Only after issuance of Basic Registrations TX 8-379-767 and TX 8-377-602, certain information was brought to our attention that, for business reasons (including but not limited to AWR software license enforcement procedures), AWR should have been named both Author and Claimant for these registrations, as with the two prior registrations. |

